No. 2014-1483

# United States Court of Appeals for the Federal Circuit

—————

DEPUY SYNTHES PRODUCTS, LLC,
PLAINTIFF-APPELLEE

*v.*

GLOBUS MEDICAL, INC.,
DEFENDANT-APPELLANT

—————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CASE NO. 1:11-CV-00652-LPS, JUDGE LEONARD P. STARK*

—————

**NON-CONFIDENTIAL BRIEF FOR DEFENDANT-APPELLANT**

—————

LUKE A. CULPEPPER
*Winston & Strawn LLP*
*1111 Louisiana St., 25th Floor*
*Houston, TX  77002*
*(713) 651-2600*
*lculpepper@winston.com*

STEFFEN N. JOHNSON
VIVIAN S. KUO
ANDREW R. SOMMER
*Winston & Strawn LLP*
*1700 K Street N.W.*
*Washington, DC  20006*
*(202) 282-5000*
*sjohnson@winston.com*
*vkuo@winston.com*
*asommer@winston.com*

*Counsel for Defendant-Appellant*

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Globus Medical, Inc. certifies the following:

**1.**   **The full name of every party or amicus represented by me is:**

Globus Medical, Inc.

**2.**   **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Globus Medical, Inc.

**3.**   **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Not applicable.

**4.**   **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

*Winston & Strawn LLP*: Steffen N. Johnson; Vivian S. Kuo; Robert F. Ruyak; Andrew R. Sommer; Luke A. Culpepper; Kevin A. Keeling; Shane A. Nelson; Matthew B. Weinstein

*Potter Anderson & Corroon LLP:* Richard L. Horwitz; David E. Moore

Dated: DECEMBER 17, 2014

                                 */s/ Steffen N. Johnson*
                                 STEFFEN N. JOHNSON
                                 *Winston & Strawn LLP*
                                 *1700 K St., NW*
                                 *Washington, DC 20006*
                                 *(202) 282-5000*
                                 *sjohnson@winston.com*
                                 *Counsel for Defendant-Appellant*
                                 *Globus Medical, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ................................................ vii

GLOSSARY OF ABBREVIATIONS ................................................ viii

INTRODUCTION ..............................................................................1

JURISDICTION..................................................................................2

ISSUE STATEMENT..........................................................................2

STATEMENT OF FACTS AND OF THE CASE ................................4

    A.    The human spine ....................................................4

    B.    Spinal fusion surgery..............................................4

    C.    Intervertebral fusion implants ................................5

    D.    Plate-spacer implants..............................................8

    E.    Synthes' asserted patents......................................10

    F.    Globus' accused products......................................16

    G.    Proceedings below.................................................18

SUMMARY OF ARGUMENT .........................................................20

STANDARD OF REVIEW ..............................................................24

ARGUMENT ...................................................................................25

I.    The district court erroneously construed several critical claim terms, and judgment of non-infringement is required under the correct constructions. ..........................................................................25

    A.    The "sized and configured … to anchor" limitation of the '076 patent was erroneously construed at the end of trial based on the specification of the '207 patent—an unrelated patent. .......................25

i

# TABLE OF CONTENTS
## (continued)

Page

    1.    The district court's conclusion that claim 1 does not require the bone screws to anchor the implant to the bone screw heads was largely based on its apparent confusion between the '207 and '076 patents. .........................................26

    2.    Under the proper construction of claim 1, no reasonable jury could have concluded that any Globus product infringes. ................................................................32

    3.    At a minimum, the court's eleventh-hour claim construction warrants a new trial. .............................34

  B.    The district court wrongly construed the "anchorable within" limitation of the '207 patent to include non-rigid connections. ..........35

  C.    The district court erred in construing the Height Limitations of the '076 and '616 patents. ..................................................40

    1.    The district court improperly construed the Height Limitations to cover any implant whose body and plate fit even "partly"—to any degree—between the adjacent vertebrae. ...............................................................40

    2.    As construed by the district court, the Height Limitations are invalid as indefinite. ..........................................42

  D.    The district court erroneously construed the "positioned between" limitation of the '076 patent by ignoring Synthes' clear disclaimers regarding the prior art Fraser reference during prosecution. .......................................................46

II.  Even under the district court's erroneous constructions, it erred in denying JMOL to Globus on non-infringement. .........................................50

  A.    No reasonable jury could have found that Globus' accused products have bone screws that are "capable of being constrained" by the boreholes, as required by the "anchorable within" limitation. .............................................51

# TABLE OF CONTENTS
## (continued)

Page

B.   No reasonable jury could have found infringement of the '076 and '616 patents because Dr. Hayes' testimony on the Height Limitations, as construed, was flawed as a matter of law..................53

C.   The district court erred in denying JMOL, or a new trial, to Globus on non-infringement of the "securing plate" limitation of the '207 patent...............................................................................59

1.   Infringement of the '207 patent is not supported by substantial evidence. ................................................................61

2.   Improper jury instructions render the jury verdict against the clear weight of the evidence, warranting a new trial. .........64

III.   If the judgment below is reversed, or a new trial is granted, as to Globus' liability for infringement of any one of Synthes' three asserted patents, a new trial on damages is necessary...................................66

CONCLUSION .......................................................................................................67

## STATEMENT OF GENERAL NATURE OF REDACTED MATERIAL

Pursuant to Federal Circuit Rule 28(d)(1)(B), confidential information that is the subject of a protective order entered by the district court has been redacted in this brief.  This information generally relates to the parties' research and development, regulatory approval, and internal business practices.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
   567 F.3d 1366 (Fed. Cir. 2009) ...........................................................29

*Astrazeneca AB v. Mutual Pharm. Co., Inc.*,
   384 F.3d 1333 (Fed. Cir. 2004) .............................................28, 29, 30

*Atl. Research Marketing Sys., Inc. v. Troy*,
   659 F.3d 1345 (Fed. Cir. 2011) ...........................................................34

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
   922 F.2d 792 (Fed. Cir. 1990) ......................................................65, 66

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) ...........................................................49

*Cat Tech LLC v. TubeMaster, Inc.*,
   528 F.3d 871 (Fed. Cir. 2008) .............................................................38

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010) ....................................................49, 50

*Eshelman v. Agere Sys., Inc.*,
   554 F.3d 426 (3d Cir. 2009) .............................................24, 50, 56

*Exxon Research & Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001) ...........................................................54

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
   607 F.3d 776 (Fed. Cir. 2010) .............................................................52

*In re Cyclobenzaprine*,
   676 F.3d 1063 (Fed. Cir. 2012) ....................................................54, 55

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001) ...........................................................67

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Laitram Corp. v. Morehouse Indus. Inc.*,
  143 F.3d 1456 (Fed. Cir. 1998) ..........................................................50

*Litton Sys., Inc. v. Honeywell, Inc.*,
  140 F.3d 1449 (Fed. Cir. 1998) ..........................................................65

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ..........................................................54

*Markman v. Westview Instruments*,
  517 U.S. 370 (1996)...........................................................25, 55, 56

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014).......................................................22, 40, 42, 43

*Pall Corp. v. Micro Separations, Inc.*,
  66 F.3d 1211 (Fed. Cir. 1995) ..........................................................54

*Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*,
  599 F.3d 1308 (Fed. Cir. 2010) ..........................................................34

*Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*,
  517 F.3d 1364 (Fed. Cir. 2008) ..........................................................50

*Robert Bosch, LLC v. Snap-On Inc.*,
  769 F.3d 1094 (Fed. Cir. 2014) ..........................................................24

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ....................................................29, 64

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
  731 F.2d 818 (Fed. Cir. 1984) ..........................................................54

*Tech. Patents LLC v. T-Mobile (UK) Ltd.*,
  700 F.3d 482 (Fed. Cir. 2012) ....................................................29, 31

*United States v. Adams*,
  383 U.S. 39 (1966)..........................................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Petersen*,
  622 F.3d 196 (3d Cir. 2010) ................................................................64

*Verve, LLC v. Crane Cams, Inc.*,
  311 F.3d 1116 (Fed. Cir. 2002) .........................................................59

*Warren v. Reading School Dist.*,
  278 F.3d 163 (3d Cir. 2002) ..........................................................24, 25

*Western Union Co. v. MoneyGram Payment Sys., Inc.*,
  626 F.3d 1361 (Fed. Cir. 2010) ........................................................24

## STATUTES

28 U.S.C. § 1295(a)(1) ............................................................................2

28 U.S.C. § 1331 .....................................................................................2

28 U.S.C. § 1338 .....................................................................................2

35 U.S.C. § 112(b) .............................................................................42, 43

35 U.S.C. § 112, ¶1 ...............................................................................34

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Globus Medical, Inc. is not aware of (a) any other appeal in or from the same civil action or proceeding in the lower court that was previously before this or any other appellate court, or (b) any case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

The parties are involved in a pending *inter partes* reexamination regarding one of the three asserted patents at issue in this appeal, U.S. Patent No. 7,875,076 ("the '076 patent"). *See Inter Partes* Reexamination No. 95/002,066. All claims of the '076 patent currently stand rejected in the reexamination as obvious based on, *inter alia*, the prior art Fraser and Kozak references.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| JMOL | Judgment as a Matter of Law |
| Globus | Defendant-Appellant Globus Medical, Inc. |
| Synthes | Plaintiff-Appellee DePuy Synthes Products, LLC |
| PTO | Patent and Trademark Office |
| POSA | Person having Ordinary Skill in the Art |
| '076 patent | U.S. Patent No. 7,875,076 |
| '616 patent | U.S. Patent No. 7,862,616 |
| '207 patent | U.S. Patent No. 7,846,207 |
| Asserted Patents | The '076, '616, and '207 patents |
| Height Limitations | The "generally equal" limitation of the '076 patent and the "substantially equal" limitation of the '616 patent |
| A___ | Joint Appendix pages |

## INTRODUCTION

This case involves patents directed to devices that are surgically inserted between the spine's vertebrae, replacing damaged discs and enabling the vertebrae to "fuse" together. Synthes asserted three such patents against Globus. Two of them (the '207 and '616 patents) are related and are directed to an implant having a spacer body with an attached front plate, bone screws that pass through the implant into the vertebrae, and a securing plate that covers part of the bone screws. The third patent (the '076 patent) is similar, but does not require a securing plate. The idea behind all three patents was to prevent the bone screws that attach spinal implants to the patient's vertebrae from backing out—threatening nearby blood vessels—by ensuring a rigid connection between the screws and the implant *itself*.

After a trial, the jury found that Globus infringed all three patents, awarding $16.3 million in damages. As explained below, however, the district court misconstrued key aspects of the patents' claims in ways that infect the judgment for all three patents. Further, even under the court's erroneous constructions, there is insufficient evidence to support the verdict. And because the damages award did not distinguish among Synthes' patents, if the judgment is disturbed as to *any* patent, at least a new trial on damages is warranted.

# JURISDICTION

Final judgment was entered on April 9, 2014. A1-3. Globus timely noticed this appeal on May 9, 2014. A19874-875. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

# ISSUE STATEMENT

### Claim Construction Issues:

I.A. ***'076 Patent***. Whether the district court erred in construing the "sized and configured" limitation—which requires the implant's "first and second bone screws" to be "sized and configured … to anchor the intervertebral implant to … the heads of the first and second bone screws"—to mean that the patent "does not require that the bone screws be … rigidly connected to the [implant's] front plate," where the bone screw heads rest.

I.B. ***'207 Patent***. Whether the district court erred in construing the "anchorable within" limitation—which requires the implant's bone screws to be "anchorable within the [implant's] boreholes"—to mean that the screws need only be "capable of being constrained" by the boreholes in a manner that does not require the capability of a rigid connection.

I.C. ***'076 and '616 Patents***. Whether the district court erred in construing the patents' Height Limitations—which require the heights of the implant's plate and spacer to be "generally" or "substantially equal"—by expanding the claims' scope to cover embodiments with widely varying heights, as long as the plate and spacer "fit partly"—*i.e.*, to *any extent*—between the adjacent vertebrae.

I.D. ***'076 Patent***. Whether the district court erred in construing the patent's requirement that the implant's boreholes be "positioned between the upper and lower planes" of the spacer's body as covering boreholes that are "positioned *partly* or entirely" within those planes, where Synthes overcame the prior art Fraser reference during prosecution by amending its claim and arguing that Fraser's boreholes—which were clearly shown to be partly within the planes—"still are *not positioned between*" the planes.

2

***Infringement Issues:***

II.A    Whether the district court erred in denying JMOL or a new trial regarding non-infringement of the "anchorable within" limitation of the '207 patent, where Synthes admitted that, even under the court's construction, the implant's boreholes must be capable of preventing the implant's screw heads from backing out.

II.B    Whether the district court erred in denying JMOL or a new trial regarding non-infringement of the Height Limitations of the '076 and '616 patents, where Synthes' expert's infringement theory was based not on the perspective of an ordinary skilled artisan but rather on "anyone's estimation" of the height differences.

II.C.    Whether the district court erred in denying JMOL or a new trial regarding non-infringement of the "securing plate" limitation of the '207 patent, where the court construed "plate" as "a structure with a planar dimension greater than its thickness" and it is undisputed that the planar dimension of Globus' blocking set screw is not greater than its thickness.

***New Trial on Damages Issue:***

III.    Whether, if this Court reverses or remands on any issue, a new trial on damages is required, where the jury's damages award did not distinguish among the three asserted patents, Synthes' expert acknowledged that the royalty rate awarded below could be lower if less than all three patents were infringed, and the parties agreed that the royalty base would be substantially decreased if the '207 patent was not infringed.

## STATEMENT OF FACTS AND OF THE CASE

### A.    The human spine

The human spine consists of bones called ***vertebrae*** and soft tissue called ***intervertebral discs***.  A24486 (reproduced at right).  A column of 33 or 34 vertebrae support the body and protect the spinal cord.

Vertebrae are separated from one another by intervertebral discs, which act as shock absorbers, distribute stress, keep the vertebral bodies from grinding against each other, and allow the spine to flex. A24485.

Even minor problems with one's vertebrae or intervertebral discs can cause pain.  Such problems include degenerated disc disease, bulging discs, herniated discs, thinning discs, and bone spurs.  As a last resort, these conditions may be treated by spine surgery.  A24486-487.

### B.    Spinal fusion surgery

One longstanding type of spine surgery is "spinal fusion," a technique that joins vertebrae to prevent movement between them.  A24487.  The surgeon typically replaces the disc with an intervertebral fusion implant packed with biomaterials that promote bone growth.  Over time, the vertebrae "fuse" together, forming a single immovable unit.  A24487; A17338 (346:1-7).  Typically, "fusion"

is augmented by "fixation"—which stabilizes the vertebrae with screws, rods, plates, or cages to facilitate proper bone fusion.  A17339 (350:18-24).

Spinal fusion surgery requires both precise technique and precisely sized implants.  Globus and Synthes provide implants sized in "millimeter increment[s] [that] are very important" (A17648 (1562:9-1563:13)) and having tiny manufacturing "tolerance[s]"—"around .1 millimeter or just a fraction of a millimeter" (A17649 (1567:1-16)).  One millimeter can make the difference between a successful and unsuccessful operation, or even between life and death.  *Id.*

### C.    Intervertebral fusion implants

Earlier implants used a plastic spacer inserted between the vertebrae, and a metal plate inserted outside the vertebral column.  Bone screws were drilled into the front surface of the vertebra.  The following are examples:

*Confidential Information Redacted*

| A27951 | A24678 |
|--------|--------|
|  | |

These implants, however, require separate installation steps for the spacer and plate, and increase the risk that the protruding plate will damage nearby blood vessels.  A92 (1:65-2:3).

In later "standalone" implants, the bone screws are inserted directly into the spacer itself, as shown in the prior art Dove and Michelson references:

*Confidential Information Redacted*

| Dove  (and "STALIF")<br>[A23401; A24774] | Michelson<br>[A28115] |
|---|---|
| <br>*Fig. 4*<br>(front view of Dove)<br><br><br>(STALIF, commercialized from Dove)<br>[A17620 at 1455:8-12] | <br>FIG. 1 |

Standalone implants require only one installation step, and often have a "zero profile"—*i.e.*, their front surface does not protrude from the vertebral column, minimizing the risk of injuring nearby blood vessels.  Prior art also showed standalone implants with an integrated metal front plate connected to the plastic spacer.  A28105-106 ("Fraser") (reproduced here, where 16 is the spacer and 20 is the metal plate).  The integrated plate allowed



FIG. 3

one-step installation, kept the plate from materially protruding, and improved the

implant's stability by allowing the bone screws to connect to the stronger metal plate rather than the plastic spacer.

### D. Plate-spacer implants

Like Fraser's implant, the implants claimed here are "plate-spacer" implants having a spacer with an integrated front plate. The front plate has boreholes that allow bone screws to pass through and anchor the implant to the vertebrae.

One critical aspect of the design of plate-spacer implants is whether the implant uses "locking" or "non-locking" bone screws. Both types of screws have threads on the screw's ***shaft***, which enables the screws to drill through and anchor to the vertebrae. But unlike non-locking screws, "locking" screws have a ***second*** set of threads found on the screw's ***head***. This second set of threads corresponds to mating threads in the plate's boreholes, and the two lock together. These pictures illustrate the distinction:

| Synthes Locking Screw (A24748) | Globus Non-locking Screw (A29293) |
| --- | --- |



The differences between locking and non-locking screws affect how implants function in several ways. First, implants must be able to accommodate post-

operative "settling"—*i.e.*, slight movements between the implant and vertebrae that occur when patients move following surgery. A17568 (1246:8-12). Although the connection between the implant and the vertebrae should be secure, an unyielding connection creates undue stress on the vertebrae. An implant with non-locking screws can absorb minor movements because the screws can "toggle" within the boreholes. A17568 (1245:16-1246:22); A17367 (460:5-18). Conversely, the heads on locking screws "are fully engaged in the plate" and cannot toggle. A17569 (1251:17-1252:2). Such implants must accommodate settling movement in another way—*e.g.*, by allowing a sliding ("dovetail") connection between the front plate and spacer. A17373 (486:6-21) (discussing A23138).

Second, locking screws keep screws from "back[ing] out" and "damag[ing]" nearby "[blood] vessels." A17386 (532:25-533:5). Ideally, the connection between the bone screws and the vertebrae serves that purpose. But sometimes the "screws become loose" and "go back into the body," which "can really be a catastrophe." A17719 (1840:14-1841:9). Locking screws prevent backout because, even if the vertebra weakens, the screw head "locks the screw into the plate." A17386 (533:14-17). Non-locking screws, by contrast, use other features to prevent backout. A17569 (1251:12-16); *see infra* at 17.

Third, non-locking screws provide the advantage of "lagging." During installation, a non-locking screw can keep rotating—due to its smooth head—even

9

after it has been fully inserted through the boreholes.  A17569 (1249:1-11).  This allows the screw to continue drawing the implant and vertebrae tighter together—or "lag"—creating a better connection.  *Id.* (1250:25-1251:6).  Locking screws cannot lag.  *Id.* (1250:19-24).

Finally, "with the locking bone screw, you can't have a variable [angle] screw"—rather, the screw must be inserted at a fixed angle, so the threads on the screw head and borehole can mate.  A17569 (1250:17-18).  Conversely, non-locking screws can be inserted at variable angles.  And variable-angle screws are among "the most significant [features] in driving the sales," as many surgeons prefer being able to choose an insertion angle tailored to the patient's anatomy.  A17574-575 (1272:25-1273:8).

### E.    Synthes' asserted patents

Synthes asserts three patents against Globus:  the '076 patent (A88-94); the '616 patent (A75-87); and the '207 patent (A61-74).  These patents are all entitled "Intervertebral Implant," and, with a few notable exceptions, are similar.

The parent application that resulted in the '076 patent was filed in 2002.  A88.  In 2003, that patent's two inventors joined with two others and filed another parent application that resulted in both the '207 and '616 patents (A61; A75), which have identical specifications.

10

***The '076 patent***.  The '076 patent describes a plate-spacer implant that helps

prevent backout.  According to the patent, the problem with prior art implants was

that their "[bore]holes" had "inner, smooth surfaces."  A92 (1:24) (citing Dove ref-

erence).  This design had "the drawback that the inserted affixation screws may be

***anchored*** into the bone ***only by their shanks***, a rigid connection with the … inter-

vertebral implant being lacking.  As soon as the anchoring of the bone screw in the

bone is weakened," "the bone screws may then migrate."  A92 (1:26-33).[1]

The inventors sought to solve this problem by "creat[ing] an intervertebral

implant which is able to ***rigidly connect*** to bone affixation means in a manner that

even in the event of bone structure weakening, loosening between the interverte-

bral implant and the bone affixation means shall be precluded."  A92 (1:43-48).

"The above problem is solved," the patent continues, "by an intervertebral implant

exhibiting the features of claim 1.  The advantages offered by the present invention

substantially are attained by the ***rigid, that is by the firm connection*** between the

intervertebral implant and the longitudinal affixation elements [the bone screws]."

*Id*. (1:49-54).  This "rigid connection" is preferably achieved by "fit[ting] [the

screw heads] with an external thread that matches the inner thread of the interver-

tebral implant's borehole."  A92 (2:62-65).  But other connections—such as a con-

---

[1]  In this brief, all emphasis is added unless otherwise noted.

ically tapered head that is received into a matching borehole or a "thread[ed] head" that "cut[s] or tap[s] into" a smooth borehole—are also disclosed as providing a "rigid connection."  A92-3 (2:22-28; 2:65-3:2; 3:50-53).

Consistent with this disclosure, claim 1 of the '076 patent recites an implant comprising a body (*i.e.*, a spacer), a plate, and bone screws that are "sized and configured … to anchor the intervertebral implant to **[1]** the upper and lower vertebrae and **[2]** the heads of the first and second bone screws positioned between the upper and lower planes."  A93-94 (4:54-5:16).  Under claim 1, therefore, the implant must be "anchor[ed]" to both the vertebrae and "*the heads* of the … bone screws."

The '076 patent also requires that the heights of the plate and spacer be "generally equal"—based on their respective upper and lower surfaces—and that the plate's boreholes be "positioned between the upper and lower planes" of the spacer's body.  *Id.*  The "positioned between" limitation, however, was not in the original claims.

Rather, the examiner rejected the original claims based on Fraser (*supra* at 7), finding that it anticipated claim 1, including its requirement of a plate with "top and bottom surfaces located generally on upper and lower planes of the body [and] [s]aid body having a height H1 which is generally equal to the height H2 of the plate."  A27825.  In response, Synthes amended claim 1 to require that the boreholes be "positioned between the upper and lower planes [of the body]" (A27861),

12

arguing that "the bone screw holes 36, 38, 40 and 42 [in Fraser's plate] *are not positioned between* the upper and lower planes of the body 10." A27855-56. Synthes annotated Figure 8 of Fraser to illustrate its argument (A27857)[2]:



Synthes further argued that "[Fraser's] tabs 36', 38', 40', and 42' *must define* the plate top surface and the plate lower surface [and thus] the height of the plate in Fraser must include the tabs." A27859. Because the plate's height must include these tabs, Synthes continued, Fraser's plate height is "substantially greater than the height of the body," preventing it from teaching the "generally equal"

---

[2] Synthes provided an identical annotation of Fraser during prosecution of the '207 patent. A27519.

heights limitation. *Id.* Finding Synthes' "amendments and arguments [to be] persuasive" (A28023), the examiner issued a notice of allowance.

*The '207 and '616 patents.* The '207 and '616 patents are likewise directed to a plate-spacer implant that improves backout prevention, but with additional structure. The shared specifications for these patents repeat the '076 patent's discussion of the problem with the prior art: "The [bore]holes [in Dove] are smooth on the inside [which] does not result in a rigid connection with the … implant," so "the bone screws tend to migrate" if their connection with "the bone is weakened." A70 (1:18-30) ('207 patent).

The '207 and '616 patents further discuss the prior art Michelson reference, which discloses "two boreholes with an internal thread, into which bone screws with a threaded head can be introduced" (A70 (1:31-34))—but the inventors contend that these screws are nevertheless "not secured against … falling out." *Id*. (1:31-36). Michelson was undesirable because its bone screws "are fastened completely to the implant body itself," without the use of a separate front plate, which places "a relatively large stress" on the implant. *Id*. (1:37-39).

The '207 and '616 patents explain an alleged improvement—"an intervertebral implant which can enter into a *permanent, rigid connection* with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means." A70 (1:51-55).

14

This concept is embodied in each figure from these patents, which show locking screws adapted to mate with threaded boreholes in the plate:



| A65 (items 21, 25) | A68 (item 11) |
|---|---|

Further, "a securing plate enables all bone fixation elements to be secured simultaneously." A70 (1:59-60); *see also* A64 (Item 18, reproduced below).



As one inventor testified, Synthes developed the securing plate because it "still had in mind that the risk of backing out of screws" existed even with locking

screws.  A17719 (1842:11-18).  The '207 and '616 patents thus disclose a belt-and-suspenders approach of using both locking screws and a securing plate to prevent backout.  "In the course of the project," however, Synthes "learned … that there is no risk of backing out or loosening of screws with [a] locking head mechanism." *Id*. (1843:12-18).  Thus, when Synthes launched its commercial products, it had "reached a confidence level in using [] locking head screws [such] that we escaped [the need for a securing plate]."  *Id*. (1843:18-25).

Consistent with these disclosures, claim 1 of both the '207 and '616 patents recites a plate and body (*i.e.*, spacer) with bone screws.  Claims 1 and 42 of the '207 patent further require that the bone screws be "anchorable within" the bore-holes, and that a "securing plate" be fastened to the front plate, such that the bore-holes and screw heads "are covered at least partly by the securing plate."  A72 (6:44-58).  Claim 1 of the '616 patent does not require these additional limitations, and instead requires that the plate and spacer heights be "substantially equal" to each other.  A86.

**F.    Globus' accused products**

Synthes accused three Globus products of infringement: the Coalition® implant, the Independence® implant, and the InterContinental® implant.

16



| Coalition® | Independence® | InterContinental® |
|:---:|:---:|:---:|
| A29254 | A29290 | A29206 |

All three products are plate-spacer implants, and each uses "non-locking" bone screws where "the screw head is smooth, and there's no threads inside the borehole." A17642-643 (1536:3-1537:25; 1540:9-17; 1542:20-21); *see also* A17644 (1547:5-15); A17645 (1549:23-1551:12). Instead of using locking screws, each Globus product prevents backout by using "blocking set screws" that cam in-to the sides of the bone screws.



A29292; *see also* A17567 (1242:22-1243:18).

In addition, the plates in the accused products all have "eyebrows," shown in the annotated version of A29257 below, which allow the boreholes to be placed

closer to the top or bottom surface of the plate, thereby increasing the plate's height.  A17566 (1239:17-1240:14).



And, in the case of the Coalition and InterContinental products, the plate's top and bottom surfaces have extensions—"torsional stabilizers"—that engage the vertebra.  A17576 (1277:25-1278:10).  Each of these products has at least six height options, successively sized in 1-2 millimeter increments.  A29211; A29263; A29293.

### G.    Proceedings below

In 2011, Synthes sued Globus (A128-134), contending that Globus' three products infringed Synthes' patents.  A129-132.  Globus denied Synthes' allegations and counterclaimed on non-infringement and invalidity.  A174-183.

In 2012, the parties briefed and argued claim construction.  In 2013, the court construed the disputed terms.  As relevant here, the court rejected Globus' proposed constructions of the following terms:

- the "anchorable within" limitation of the '207 patent;

18

- the Height Limitations of the '076 and '616 patents (plate and spacer heights that are "generally equal" and "substantially equal," respectively); and

- the "positioned between" term of the '076 patent.

The court did not then construe the "sized and configured … to anchor" limitation of the '076 patent.

Later in 2013, the court conducted a 14-day jury trial. Synthes asserted claims 1 and 11 of the '076 patent, claims 1 and 13 of the '616 patent, and claims 1, 2, 16, and 42 of the '207 patent. A16438. Synthes sought a 15% reasonable royalty if all three patents were infringed, and "no less than ten percent" if one or two patents were infringed. A17556 (1200:7-16).

Globus denied infringement and asserted invalidity (A16438), alternatively arguing for a 3%-5% royalty if found liable for infringement. A17700 (1766:16-22). Further, the parties agreed that if the '207 patent is not infringed, the royalty base should decrease from $106 million to $73 million. A17549 (1174:1-16).

On the last day of trial, just hours before closing arguments, the district court construed—for the first time—the '076 patent's requirement that the bone screws be "sized and configured … to anchor" the implant to the heads of the bone screws. A17741 (1925:8-19); A16791. The court construed the claim to "not require that the bone screws be locked, threaded or otherwise rigidly connected to the front plate." A17741 (1925:8-13). The court similarly expanded, for the first

19

time, on its construction of the "anchorable within" limitation of the '207 patent. *Id.* (1924:24-1925:5). These constructions were contrary to Globus' argument and evidence regarding these terms' ordinary meaning, and were announced ***after*** Globus had rested its case-in-chief.

The court then instructed the jury that "[n]othing in this claim 1 [of the '076 patent] or any other claim of the asserted patents requires that an accused device have bone screws that are locked, threaded, or otherwise rigidly connected to the front plate in order to infringe." A17799 (2153:2-9). The jury found infringement and validity of all asserted claims, awarding a 15% royalty on Globus' sales of accused products. A16878-97.

Globus renewed its motion for JMOL or a new trial, which the court denied in March 2014. A20. On April 9, 2014, it entered final judgment. A1-3.

## SUMMARY OF ARGUMENT

**I. *Claim construction errors*.** The judgment below rests on several errors in claim construction. The district court misunderstood two critical aspects of the claims—the terms directed to the rigid connection between the bone screws and the implant (Parts I.A-B), and the terms directed to the heights of the implant's spacer and plate (Parts I.C-E).

**I.A.** The '076 patent requires the implant's bone screws to be "sized and configured … to anchor the intervertebral implant to the upper and lower vertebrae

*and* the heads of the … bone screws." But according to the court below, this limitation "does ***not*** require that the bone screws be locked, threaded or otherwise rigidly connected" to the implant. A17741 (1925:8-13). The court thus eliminated the requirement that the implant be "anchor[ed]" not only to the *vertebrae*, but also to "the heads of the … bone screws." Worse, this construction was announced at the end of trial—depriving Globus of any opportunity to adjust its defense. *Infra* at 34.

**I.B.** Similarly, the district court misconstrued the '207 patent's "anchorable within" limitation—which requires the bone screws to "be[] anchorable within the [implant's] boreholes." According to the court, this limitation requires only that the screws be "capable of being constrained" by the boreholes—even laterally. But the term "anchorable" demands more. Preventing *lateral* movement is an inherent capability of *all* boreholes, and the specification repeatedly confirms that the '207 patent requires a "rigid connection" preventing *axial* movement. Indeed, the whole point of Synthes' invention was to overcome the problem that plagued prior art implants—the risk of screw backout caused by the lack of a rigid connection between the implant itself and the bone screws. *Infra* at 36-39.

**I.C.** The district court also misconstrued the '076 and '616 patents' "Height Limitations"—which respectively require plate and spacer heights that are "generally" or "substantially equal." The court expanded the claims' scope to cover em-

bodiments with widely varying heights, provided the plate and spacer "fit partly" —to *any degree*—between the adjacent vertebrae.  But that vague construction eviscerates the claim requirement that ***both*** "the three dimensional body ***and*** the plate" of the implant be "***contained between*** the adjacent vertebral bodies."  Moreover, by treating as "substantially equal" plates and spacers having widely varying heights, the court's construction renders the claims indefinite under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

**I.D.**  Similarly, the court misconstrued the "positioned between" term of the '076 patent—which requires the plate's boreholes to be "positioned between the [spacer's] upper and lower planes"—to cover boreholes that were only *partly* between the planes.  Synthes expressly disclaimed such an interpretation during prosecution, arguing just the opposite to secure allowance of the claims.

**II.  *Infringement errors*.**  Even under the district court's constructions, the evidence cannot support the verdict.

**II.A.**  Even if the '207 patent's "anchorable within" limitation required only that the bone screws be "capable of being constrained" within the boreholes, Synthes' own inventor and documents showed that this "constraint" means the boreholes' walls must be capable of preventing the implant's screw heads from backing out.  Yet it is undisputed that Globus' boreholes and screw heads are *smooth*. Nothing in their design prevents backout.

**II.B.**  The parties agreed that, under the court's construction of the Height Limitations, the limitations were terms of degree—which must be evaluated from the perspective of an ordinary skilled artisan.  Yet Synthes provided no such testimony.  Synthes' expert's infringement opinions were supposedly "common sense" based on "anyone's estimation."  In the context of spine surgery, however, that is insufficient.  As Globus' expert explained without contradiction, differences of *a fraction of a millimeter* are clinically significant.  "Anyone's estimation" whether the heights of an implant's components are "substantially equal" is irrelevant.

**II.C.**  The '207 patent requires that the bone screws be covered at least partly by a "securing plate."  The district court declined to construe "securing plate," construing "plate" alone as "a structure with a planar dimension greater than its thickness."  Globus' products, however, do not have a "plate"; they have a blocking set screw.  Recognizing this, Synthes' expert disregarded the *shaft* of Globus' blocking set screw, arguing that the *head* of that screw is a "plate."  Synthes' expert offered no engineering or scientific support for his position—only a statement that Synthes' counsel told him to adopt it.  Under the court's construction, a "plate" must be "*a structure*," not ***part of*** a structure such as a screw.  Even Synthes' own patent distinguishes between "plates" and "screws."  Indeed, there are ***dozens*** of instances throughout the '207 patent, including in the claims, where the

inventors distinguished screws from plates. Now, however, Synthes says a screw and a plate are one and the same thing.

**III.** For the foregoing reasons, the decision below should be reversed in its entirety. But even if the Court reverses only in part, a new trial on damages is necessary. The jury's damages award did not distinguish among Synthes' patents and, as Synthes acknowledged, if less than three patents were infringed, the parties would have been "negotiating for less," warranting a lower royalty. *Infra* at 66-67.

## STANDARD OF REVIEW

Claim construction issues, including indefiniteness, are reviewed de novo. *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1098 (Fed. Cir. 2014). The denial of judgment as a matter of law is reviewed de novo under regional circuit law (*Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1367 (Fed. Cir. 2010)), which here asks "whether viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which the jury reasonably could find liability." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (quotation omitted).

The denial of a new trial is reviewed for an abuse of discretion. *Warren v. Reading School Dist.*, 278 F.3d 163, 168 (3d Cir. 2002). But where the district

court's decision is "based upon the application of a legal precept[,] [appellate] review is plenary." *Id*.

## ARGUMENT

I.   **The district court erroneously construed several critical claim terms, and judgment of non-infringement is required under the correct constructions.**

Infringement analysis entails determining the meaning of the asserted claims and comparing them to the accused device. *Markman v. Westview Instruments*, 517 U.S. 370, 374 (1996). Here, the court below misunderstood two critical aspects of the claims and the prior art, which led the court to misconstrue several claim terms. And under the correct constructions, Globus is entitled to judgment of non-infringement.

A.   **The "sized and configured … to anchor" limitation of the '076 patent was erroneously construed at the end of trial based on the specification of the '207 patent—an unrelated patent.**

Consistent with the patent's central purpose, claim 1 of the '076 patent requires that the "first and second bone screws" be "sized and configured … *to anchor the intervertebral implant to* [1] the upper and lower vertebrae and [2] *the heads of the first and second bone screws* positioned between the upper and lower planes." A94 (5:8-16). To infringe, therefore, an accused implant must be "anchor[ed]" to *both* the "vertebrae" *and* "the heads" of the implant's "bone screws." Indeed, having an implant "which is able to rigidly connect to bone [screws]" (A92 [1:43-55]) was the whole point of Synthes' invention, as the prior art screws were

25

threaded only on their shafts—allowing them to back out and harm the patient. *Supra* at 11-12.

Because this limitation was not construed before trial, Globus' central non-infringement position at trial was that the plain meaning of this language required the implant to be anchored, or rigidly connected, to the bone screw heads and the vertebrae. But after Globus rested—the day before jury deliberations—the district court adopted Synthes' eleventh-hour argument that this limitation "does ***not*** require that the bone screws be … rigidly connected to the front plate" of the implant. A16671-72; A17740-41 (1923:17-1295:13). The court thus instructed the jury to that effect. A17756 (1984:21-25); A17799 (2153:2-9). As it was then too late for Globus to adjust its positions, the court's decision precluded Globus from presenting an effective trial strategy on the '076 patent. That was reversible error.

> **1.    The district court's conclusion that claim 1 does not require the bone screws to anchor the implant to the bone screw heads was largely based on its apparent confusion between the '207 and '076 patents.**

1. The district court apparently believed it had *already* resolved the "rigid connection" point "as a matter of law." A17740-741 (1923:17-1924:23). In support of its construction, the court stated only that it viewed the '076 and '207 patents as using basically the same language, warranting "the very same language" in the court's instructions, and that it believed it had "decided in its claim construc-

26

tion opinion that Globus was incorrect … as a matter of claim construction"—that "[r]igid connections are not required."  A17740-741 (1923:23-1925:13).

In reality, however, the court was not previously asked to construe the "sized and configured … to anchor" limitation, and never did.  Further, the '076 patent has a different specification—requiring an independent analysis.  The differences between the two specifications are particularly pronounced as to the '207 patent's disclosure that the bone screws "may have either a smooth head, so that there will not be a rigid connection with the implant or a threaded, conical or expendable end, so that there will be a rigid connection."  A71-72 (4:67-5:4).  During claim construction, this disclosure was the district court's principal justification for determining that the '207 patent does not require rigid connections.  A41.  The court repeated this justification at trial when mistakenly linking the '207 and '076 patents.[3]  A17740-41 (1923:23-1924:3) ("rigid connections are not required for reasons including that the specification expressly discloses nonrigid connections").  Yet the '076 patent contains no such disclosure.  Thus, the district court erred by importing its (flawed) interpretation of "anchorable within" into the '076 patent's "sized and configured" term.

---

[3] As explained below (at 38), the disclosure of nonrigid connections in the '207 patent is not relevant to the proper construction of the "anchorable within" term of that patent.

2.  The goal of claim construction is to determine what the claimed invention is by interpreting the claims in light of the patent's disclosure.  *Astrazeneca AB v. Mut. Pharm. Co., Inc.*, 384 F.3d 1333, 1337 (Fed. Cir. 2004).  But the court here appears to have considered the wrong patent, thwarting this goal.

Claim 1 of the '076 patent is directed to an intervertebral implant comprising a body, a plate and:

> ***first and second bone screws*** each having a head and a shank, the first bone screw ***being sized and configured*** to extend through the first borehole and into the upper endplate, the second bone screw being sized and configured to extend through the second borehole and into the lower endplate ***to anchor the intervertebral implant to* [1]** the upper and lower vertebrae and **[2]** ***the heads of the first and second bone screws positioned between the upper and lower planes***.

A93-94 (4:55-5:16).  The plain language of this limitation requires the implant to be "anchor[ed]" to ***both*** "the upper and lower vertebrae" ***and*** "the heads of the first and second bone screws positioned between the upper and lower planes."

As noted above, however, the district court incorrectly construed claim 1 and twice instructed the jury that the "sized and configured" limitation "does *not* require that the bone screws be … rigidly connected to the front plate," where the heads of the bone screws are located.  A17756 (1984:21-25); A17799 (2153:2-9).  The court thus eliminated claim 1's requirement that the bone screws be sized and configured "to anchor the implant to … the heads of the [bone screws]."  To be "anchored," after all, entails being connected *in a way that prevents movement*.

And by adopting a construction "contrary to the [claim's] plain language," the court both undermined the patent's public notice function and committed legal error in instructing the jury. *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009).

3. Even if claim 1 were ambiguous as to whether the implant must be anchored to the screw heads, the balance of the specification would confirm that the screws must be "sized and configured" to allow anchoring their heads to the plate. "[C]laims are to be construed in light of the specifications" (*United States v. Adams*, 383 U.S. 39, 49 (1966)), and courts must avoid claim constructions that "ignore[] … the very purpose of the invention," or "would arguably cover the very … system that the patent criticized." *Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482, 493 (Fed. Cir. 2012).

In *Astrazeneca*, for example, this Court limited the term "solubilizer" to solubilizers that were not surfactants. 384 F.3d at 1340. The subject patent's specification had limited the term "solubilizers" both by defining the term by implication and by "criticizing" prior art solubilizers that "lack[ed] that same feature," which "operate[d] as a clear disavowal of these other products." *Id*. Likewise, in *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, this Court held that where the subject patent disclosed that a coaxial lumen configuration was the "basic sleeve structure for all embodiments of the present invention," the inventors

had limited their claims—which did not use the phrase "coaxial lumen"—to a co-axial configuration.  242 F.3d 1337, 1339-1343 (Fed. Cir. 2001).

The statements regarding the invention in the '076 patent are like the statements that drove *Astrazeneca* and *SciMed*.  As the '076 patent explains, the "drawback" of an earlier British patent ("Dove") disclosing an intervertebral implant was that its "screws may be anchored into the bone only," such that it lacked "a rigid connection with the … implant."  A92 (1:21-29).  Thus, if the connection to the bone weakened, "***the bone screws may… migrate***," potentially harming the patient.  *Id.* (1:26-34).

The inventors explained that this "problem is solved in the present invention by an intervertebral implant ***exhibiting the features of claim 1***" (A92 (1:49-50)), specifically stating: "This invention creates an intervertebral implant which is able to ***rigidly connect*** to bone affixation means [*i.e.*, bone screws] in a manner that even in the event of bone structure weakening, loosening between the intervertebral implant and the bone affixation means shall be precluded" (*id*. (1:43-48)).  "The advantages offered by the present invention substantially are attained by the ***rigid … connection between the intervertebral implant and the … affixing elements***."  *Id.* (1:51-54).

In other words, even if the bone structure weakens, the bone screws remain rigidly connected to the implant by their heads.  And since the heads of the screws

are the only place where the screws are connected to the implant—the shank connects only to the vertebrae (A91, Figs. 5-6)—it is indisputable that the heads of the bone screws must provide a "rigid connection."

The '076 patent equates the rigid connection with the word "anchor." For example, it states that the invention allows the screw head to "be rigidly anchored in said borehole," and it discusses another embodiment allowing "anchoring of the bone screw in the intervertebral implant." A92-93 (2:23-25, 3:44-50). The patent discloses only embodiments where the screw heads are anchored in the plate's boreholes, and discusses no other way to solve the stated problem.[4]

A construction that excludes a rigid connection between the screw heads and the implant therefore "ignores … the very purpose of the invention," "arguably cover[s] the very … system that the patent criticized," and eliminates "the heart of the invention's alleged improvement over the prior art." *Tech. Patents*, 700 F.3d at 493-94. Accordingly, the district court committed legal error in instructing the jury that the "sized and configured" limitation "does not require that the bone screws be … rigidly connected to the front plate." A17756 (1984:21-25); A17799 (2153:2-9); A16876-877.

---

[4] Even where the specification describes an embodiment with "smooth" borehole walls, that embodiment requires the "thread head" of the bone screw to "cut[] or tap[] into said smooth wall," forming a rigid connection. A93(3:50-53).

**2.    Under the proper construction of claim 1, no reasonable jury could have concluded that any Globus product infringes.**

Unable to suggest that the accused implants are "anchored … to the heads of the first and second bone screws," Synthes' expert, Dr. Wilson Hayes, simply "disagree[d]" that the "the bone screws have to be sized and configured so that they will … [k]eep the bone screws from falling out of the implant." A17509 (1012:18-1013:2). Even though claim 1 of the invention purports to solve the "problem" of "screws falling out, and the implant migrating," it was Dr. Hayes' view that the patent "would not tell [ordinary skilled artisans] that the bone screws have to be configured in such a way that they will stay in the borehole once they're implanted[.]" A17510 (1018:11-21).

Synthes thus made a tactical decision to ignore critical limitations of claim 1 of the '076 patent. Undisputed testimony confirms that, in the accused products, the heads of the bone screws are *not* secured or anchored to the plate's boreholes. For example, undisputed testimony confirmed that, "once the screw is actually inserted through [Globus'] borehole[s] it [can] still toggle" because there are no "threads on the heads of the bone screws" or the "internal walls of the boreholes." A17568 (1245:4-1248:11). Rather, "the screw head is smooth, and there's no

threads inside the borehole" of Globus' products[5]—meaning they are incapable, without additional structure beyond the screws, of being "anchor[ed]" to the "intervertebral implant." *See also* A29293 (reproduced below).



To be sure, the accused products can prevent screw backout—but by using a separate "blocking set screw" that presses against the sides of the screw heads to secure them. As William Rhoda, a Globus engineer, testified without contradiction, "once [the blocking set screws are] rotated, … about a quarter of a turn, [they] cam against the screw so it can't—they can't back out." A17567 (1243:14-20); *see also* A29292  (reproduced above at 17); A17569 (1251:12-16) (same); A17578 (1286:11-17) (same). Under the proper claim construction, no reasonable jury could find infringement of the '076 patent and the final judgment must be reversed in this regard.

---

[5]  A17642-643  (1536:3-1537:25;  1540:9-17;  1542:20-21) (Coalition); *see also* A17644 (1547:5-15) (Independence); A17645 (1549:23-1551:12) (InterContinental).

### 3.    At a minimum, the court's eleventh-hour claim construction warrants a new trial.

At a minimum, the court's eleventh-hour construction of claim 1 precluded Globus from presenting different noninfringement and invalidity defenses, in violation of due process.  *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010).

Had Globus known that the court would construe claim 1 as not requiring a rigid connection, it would have challenged claim 1 as invalid for lack of written description.  Apart from rigidly connecting the bone screw heads to the implant's plate, the '076 patent nowhere describes how to solve the problem of the bone screws backing out—the problem the patent purportedly solved.  *E.g.*, *Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1355 (Fed. Cir. 2011) (claims that exceed "in scope the subject matter that [the] inventor … chose to disclose to the public in the written description" are invalid under 35 U.S.C. § 112, ¶ 1).

This due process violation is not excused based on the district court's ability to engage in "rolling claim construction."  *Greatbatch*, 599 F.3d at 1316.  Such adjustments must be made "early enough in the trial to give [the parties] an opportunity to consider the new construction and adjust [their] arguments."  *Id*. at 1315-16.  Without that opportunity, late constructions "present a fundamental procedural flaw that jeopardizes the jury's verdict."  *Id*.  Such a fundamental flaw exists here, as the last-minute construction below kept Globus from adjusting its defense.

34

**B.    The district court wrongly construed the "anchorable within" limitation of the '207 patent to include non-rigid connections.**

1.  The district court likewise erred in construing the '207 patent's "anchorable within" limitation, which requires the implant's "fixation elements"—the two bone screws—to "be[] **anchorable within the** first and second **boreholes and** the first and second **partial boreholes**." A72 (6:44-46).  The court read this limitation to require only that the screws be "capable of being constrained"—in any fashion, even laterally—by the boreholes. A28; A41.  But the claim's language and the specification require more.  The screws must be "**anchorable** within the … boreholes"—*i.e.*, capable of being "rigidly connected to the [boreholes'] internal walls."  *Id.*  Indeed, insofar as boreholes *by definition* constrain lateral movement, the trial court's construction reads the "anchorable within" limitation out of the patent.

The language of the "anchorable within" limitation requires that the "anchoring" take place "within" the boreholes.  And under its ordinary meaning, this "anchorable" language cannot simply mean capable of being "constrained" in a manner that prevents lateral screw movement.  Rather, the screws must have mating threads or shapes or expandability that make them capable of being rigidly connected to the boreholes.  The absence of such features, and the rigid connection they create, would allow the screws to rotate, toggle, and back out of the boreholes.  Thus, by relaxing this requirement, the district court read "anchorable" to cover

screws that manifestly are *not* "anchorable." The capability to be "anchored," and the capability to be "constrained" in any way, are fundamentally different things. "Anchorable" means capable of being rigidly connected *in an axial direction*.

The specification powerfully confirms this reading. At its core, the '207 patent seeks to solve the same problems as the '076 patent—problems with bone screws that "can be anchored only with their shaft in the bone," which "does not result in a rigid connection" and, when "the bone is weakened," results in "bone screws [that] tend to migrate." A70 (1:18-46). The '207 patent provides two independent solutions. First, it explains that it "is directed to an intervertebral implant which can enter into a **permanent, rigid connection** with bone fixation means [*i.e.*, screws], so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the [screws]." A70 (1:51-55). Second, it explains that "a securing plate enables all bone fixation elements to be secured simultaneously." A70 (1:59-60).[6]

With respect to the first solution, the specification *repeatedly* states that a "rigid connection" is achieved by bone screws that prevent backout by being "anchored" to the boreholes. For example, the Abstract states that the screws "can be

---

[6] This second solution has no bearing on the "anchorable within" limitation. Rather, as explained above (at 15-16), it was intended to provide a redundant belt-and-suspenders approach to preventing screw backout.

*anchored*" to the boreholes, and that, "[b]y virtue of th[is] configuration … a *rigid, firm connection* between the intervertebral implant and the longitudinal fixation elements used to fasten it, is possible." A61. Elsewhere the patent states that "[t]he head 21 may preferably be provided with an external thread 25 … so that the heads 21 can be *anchored* in the boreholes in a *rigid* manner" (A70 (1:5:11-15)), and that the "boreholes … may taper conically … so that a bone screw … can be *anchored rigidly* therein" (A71 (4:36-42)).

Similarly, the "Background of the Invention" criticizes the prior art (Dove) because "bone screws" that pass through boreholes that "are smooth on the inside" have a "disadvantage"—they "can be *anchored only* with their shaft in the bone." A70 (1:22-25). As the patent then explains, a screw anchored to the implant only by its shaft "does *not result in a rigid connection* with the … implant." *Id*. As all this intrinsic evidence confirms, the patentee equated this "rigid connection" with screws that can be "anchored" to the boreholes to prevent backout.

2. Conversely, the district court's terminology—whereby "anchorable within" simply means "capable of being constrained"—is found *nowhere* in the intrinsic evidence. Synthes' own dictionary defines "anchor" as meaning "to secure firmly." A883; A942. But that definition supports *our* construction. Screws that are "secured firmly" within the boreholes means they are connected rigidly to those boreholes—preventing backout. Synthes' "strained … construction," by

contrast, "render[s] an important claim limitation … functionally meaningless." *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008).

In concluding that "[r]igid connections are not required" (A41), the district court cited a disclosure in the specification stating that some bone screws are connected to boreholes in a rigid manner (*i.e.*, with a threaded, conical, or expandable end), while others are connected in a non-rigid manner (*i.e.*, a smooth screw head). A41 (citing A72 (5:1-4)). But the fact that some screws can be anchored (*e.g.*, locking screws) while others need not be anchored (*e.g.*, non-locking screws) is of no consequence. The disclosure does not describe non-locking screws as being "anchorable within" the "borehole"—which is what the claim requires. At most, these disclosures relate to *other* claims (*e.g.*, claims 38 and 40) that omit the "anchorable within" limitation, and thus contemplate non-rigid screws.

Nor is it correct to say that claim 5's limitation requiring "internal threads" in the boreholes shows that the boreholes in claim 1 can be threaded *or* smooth. A943. This argument ignores that the specification discloses multiple structures—including internal threads, conical heads, or expandable ends—as providing a rigid connection. A71-72 (4:67-5:4). Thus, claim 5's "internal threads" requirement simply clarifies *which means* of achieving a rigid connection is covered. But there must be *some* means of achieving such a connection—claim 1 may not be rewritten to cover non-rigid connections.

Finally, Synthes says Globus' construction would exclude every embodiment of the patents, because the claims require the screws to be anchorable within the boreholes *and partial boreholes*, but no embodiment discloses screws having a rigid connection with the smooth walls of the partial boreholes. A946. Yet the specification addresses this point by noting that the boreholes "may have a smooth internal wall, *into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.*" A72 (4:59-62). Thus, rigid connections can be made with threaded screw heads that, when inserted, *create* corresponding threads in the borehole walls. Indeed, Synthes' own construction would exclude every embodiment of the patents. As Synthes admits, a partial borehole "is only a partial hole" (A946)—and partial holes are not "capable of constraining" bone screws.

Under the proper construction of "anchorable within," therefore, this Court must reverse. It is undisputed that Globus' products lack a "rigid connection" between the screw heads and the boreholes. Rather, Globus' screw heads and boreholes are smooth, non-conical, and non-expandable. A29293 (reproduced here); A17642-43 (1536:3-1537:25; 1540:9-17; 1542:20-21); A17644 (1547:5-15); A17645 (1549:23-1551:15).

### C.    The district court erred in construing the Height Limitations of the '076 and '616 patents.

The district court also erred in construing two of the patents' Height Limitations—which require the implants' plates and spacers to be "substantially equal" ('616 patent) or "generally equal" ('076 patent) to each other in height.  A86.

Noting that the dispute over these two terms was "substantively identical," the court adopted the same construction of each term—simply substituting "generally" for "substantially" when construing the '076 patent.  In both cases, however, the court violated settled law.  First, in interpreting the phrase "substantially equal" (or "generally equal") to cover any implant that "*fit[s] partly or entirely between* [the] adjacent vertebral bodies," the court eviscerated the '616 patent's requirement that *both* "the three dimensional body *and* the plate" of the implant be "*contained between* the adjacent vertebral bodies."  Second, the court's construction deprived the public of any "reasonable certainty" as to the claims' scope, making them indefinite under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

### 1.    The district court improperly construed the Height Limitations to cover any implant whose body and plate fit even "partly"—to any degree—between the adjacent vertebrae.

Both the '076 and '616 patents contain Height Limitations.  For example, after explaining how to measure the heights of the plate and the spacer (the implant's "body"), claim 1 of the '616 patent requires that "the first height being *substantially equal* to the second height *so that the three dimensional body and the plate are*

40

*contained between* the adjacent vertebral bodies when the implant is inserted." A86.  Thus, the plate and spacer must be both (1) "substantially equal" to each other in height, and (2) "contained between" the adjacent vertebra.  Similarly, the '076 patent requires "the [plate] height" to be "generally equal to the [spacer] height."

The district court concluded that these limitations should be construed as follows:  "the first and second heights are *substantially equal* to allow the body and the front plate to *fit partly or entirely between* adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."  A28; A50.[7]  But reading the claim to cover implants that fit only partly between the vertebrae—no matter how small a part—eviscerates the "contained between" limitation, and drastically broadens the claim's scope.  Indeed, the trial court's construction eviscerates entire aspects of the Height Limitations.  If "substantially" and "generally equal" mean only that the plate and spacer body must fit "partly" between the vertebrae, the claim scope covers many embodiments whose plate and spacer heights are drastically *different*, such as the following:

---

[7]  The "generally equal" Height Limitation in the '076 patent was construed similarly.  A52-53.

A10947

**Fig. 1** – Body height significantly greater than plate height, yet both are between vertebrae.

**Fig. 2** – Plate height significantly greater than body height, yet both are between vertebrae.

In short, if the "substantially equal" and "generally equal" Height Limitations were met regardless of their actual height, as long as they fit partly between the vertebrae, the Height Limitations would be rendered meaningless.

### 2. As construed by the district court, the Height Limitations are invalid as indefinite.

The district court's construction of the Height Limitations is thus untenable. Should this Court conclude otherwise, however, then the '616 and '076 patents must be invalidated for indefiniteness, as the construction adopted below utterly deprives the public of "reasonable certainty" as to the outer boundary of Synthes' claims. *See Nautilus*, 134 S. Ct. at 2129.

### (a) *Nautilus* adopted a strict standard for definiteness.

Under 35 U.S.C. § 112(b), patents must "*particularly* point[] out and *distinctly* claim[]" the applicant's invention. Before *Nautilus*, this Court read § 112(b) to invalidate only patent claims that were "insolubly ambiguous"—*i.e.*, "in-

42

capable of construction." A50. Thus, the court below construed the Height Limitations under that test, but "decline[d] to make a ***final*** determination as to indefiniteness." A51.[8]

*Nautilus*, however, adopted a much more rigorous indefiniteness test: Section 112(b) "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with *reasonable certainty*." 134 S. Ct. at 2129. The Court's touchstone for "reasonable certainty" was clear: "[A] patent must be precise enough to afford *clear notice* of what is claimed, thereby *apprising the public of what is still open to them*." *Id*. (quotations and citations omitted). And while the law permits a "modicum of uncertainty"—"absolute precision is unattainable"—it does *not* permit "'[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'" *Id*. at 2128, 2129 (citation omitted). Rather, the law "mandates clarity" as to a patent's outer limits. *Id*. at 2129.

> **(b)** **As construed below, the Height Limitations fail to provide clarity as to the scope of Synthes' claims.**

Under *Nautilus*, however, the district court's construction of the Height Limitations manifestly does *not* provide "clarity." Rather, the limitations create a

---

[8] The court declined to do so, notwithstanding its recognition that "[i]ndefiniteness is a matter of claim construction." A51 (citation omitted).

"zone of uncertainty" in an area that requires significant precision—spine surgery. Even without construction, the terms "substantially" and "generally" equal are ambiguous, leaving skilled artisans to guess how close in size the plate and spacer must be. But when the claims are construed to require only that *any* part of the implant fit between the vertebra, the terms lose all semblance of clarity.

The district court's construction of the Height Limitations cannot be saved by reference to the specification or prosecution history. ***Nowhere*** does the specification of either the '616 or '076 patent discuss these Limitations, and the prosecution history only creates ***more*** uncertainty as to their meaning.

For example, the "substantially equal" term in the '616 patent was added in a new claim by Synthes during prosecution, following its cancellation of all original claims. A27622-623. The Patent Examiner rejected the added claim based on Pub. No. US 2004/0078078 ("Shepard," *see* A11757), finding that Shepard disclosed an intervertebral implant ***meeting*** the "substantially equal" height requirement, in addition to other requirements. A27678-79. In response, Synthes did not dispute the Examiner's premise. Instead, it added other limitations directed to other unrelated aspects of the Examiner's rejection. A27705-27717.

Similarly, during prosecution of the '076 patent, claim 1—which contained the "generally equal" height limitation—was rejected as being "clearly anticipated

by Fraser (2002/0082597)."  A27824-825; *see also* A11797-799.  Synthes disputed this rejection, maintaining that "the height of the plate [in Fraser is] ***substantially greater*** than the height of the body."  A27859.

Moreover, in the PTO's pending reexamination of the '076 patent, the Examiner determined that U.S. Patent No. 5,397,364 ("Kozak") (A28073-74; A28079) does not show the "generally equal" limitation for the heights of the plate and body because, as exemplified in Figures 1 and 25, the plate is "offset" from the body, such that the height of the plate is "clearly less" than the height of the body. A11844.  Synthes did not object to the Examiner's determination.

In other words, the prosecution history shows that the Frazer and Kozak examples do not satisfy the Height Limitations:

| Heights of Plate And Body Are Substantially Equal | Height of Plate is Sub-stantially Greater Than Height of Body | Heights of Plate And Body Are Not Generally Equal | Heights of Plate And Body Are Not Generally Equal |
|---|---|---|---|
|  |  |  |  |
| A11757, Shepard | A11798, Fraser | A28074, Kozak | A28079, Kozak |

Yet this prosecution history only makes the scope of the Height Limitations, as construed, more uncertain.  For example, under the construction below, Fraser and Kozak would seem to fall within the scope of the Height Limitations.  While their plate and spacer heights are not identical (as with Shepard), they at least "fit

45

*partly* … between [the] adjacent vertebra[e]." Yet, Synthes expressly argued over these references and the PTO reached the opposite conclusion during prosecution, preventing a person of ordinary skill from having any "reasonable certainty" of the claims' scope.

Moreover, spinal implants are sized based on "millimeter increment[s] [that] are very important" (A17648 (1562:9-1563:13)) and involve "tolerance[s] … around .1 millimeter" (A17649 (1567:1-16))—and the district court's construction simply does not provide "reasonable certainty" regarding whether, for example, a height difference of 1 or 2 millimeters would fall inside or outside the claims. This leaves the public in a "zone of uncertainty," and further renders the claims indefinite because "[t]here is simply no discussion [in the '076 or '616 patents] that would allow one of ordinary skill to reasonably understand the relative terminology applied to the claims here by the use of the terms 'substantially' and 'generally' and the metes and bounds of those claims." A6117 (Coric).

**D.    The district court erroneously construed the "positioned between" limitation of the '076 patent by ignoring Synthes' clear disclaimers regarding the prior art Fraser reference during prosecution.**

The district court also erred in construing the '076 patent's "positioned between" limitation, ignoring an unambiguous disclaimer made to obtain the patent. To overcome the Fraser reference, Synthes (1) amended the '076 patent's claims to require the boreholes to be "positioned between the [spacer's] upper and lower

46

planes" (A94); and (2) told the PTO that this limitation *excluded* boreholes only *partly* between those planes (A27856-857). Yet the court below allowed Synthes to argue the opposite—that the "positioned between" term includes boreholes that *are* partly within those planes. By failing to hold Synthes to its definitive statements during prosecution—which included annotated drawings that show exactly what Synthes' arguments meant—Synthes recaptured precisely what it gave up to obtain the patent. And under the proper construction, Globus indisputably does not infringe, as the boreholes in Globus' products are not entirely within those planes.

1. During prosecution, the examiner rejected claim 1 of the '076 patent as anticipated by Fraser. A27824-25. In response, Synthes amended the claim to require "first and second boreholes positioned between the upper and lower planes." A27861. Along with the amendment, Synthes annotated Figure 8 of Fraser, explaining: "as schematically illustrated in Fig. 8," "the bone screw holes 36, 38, 40, and 42 formed in the plate 20, and hence the heads of the bone screws 46, 48 *are not positioned between* the upper and lower planes of the body 10." A27856-857.



| A27857 (as annotated and submitted to PTO by Synthes) | A27857 (cropped and zoomed in with red coloring added by Globus) |

Synthes' amendment, its argument, and its annotated Figure 8 could not have been clearer:  Because Fraser's boreholes and screw heads extended partially beyond the lines representing the "Upper Plane" and Lower Plane," they did not satisfy the newly added "positioned between" limitation.  As Synthes unambiguously told the PTO in hopes of securing allowance of its claims, boreholes and screw heads like Fraser's "still are ***not*** positioned between the upper and lower planes of the body."  A27857.

2.  Synthes' disclaimers clearly limit claim 1 to screw heads located *entirely* between the planes.  "[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history dis-

claimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). This doctrine, which "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution" (*id.*), compels reversal here.

The district court did not question the clarity of these disclaimers. Rather, noting that claim 5 of the '076 patent recites *a* "*plate*"—*not* a borehole—that "is entirely *contained* between the *endplates*," the court reasoned that "when this patentee intended for an element to be contained entirely between two other structures, the patentee expressly stated so." A45-46. This stretches the law of claim differentiation beyond the breaking point.

"Under this doctrine, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010). But where the independent claim is broader than the dependent claim under the proposed construction, it "simply does not implicate the doctrine of claim differentiation." *Id.* Here, claim 5 is directed to the position of the plate, not the position of the boreholes, and requires the plate to be *contained*, not *positioned*, between the *endplates*, not between the *planes*. By construing independent claim 1 to require boreholes that are positioned entirely between the

body's upper and lower planes, claim 1 is still broader than dependent claim 5, which narrows the scope of claim 1 by adding entirely different limitations. Thus, claim 5 "simply does not implicate the doctrine of claim differentiation." *Id.*

Moreover, even if claim differentiation were implicated, it merely creates a "[p]resumption[] [that is] rebuttable." *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008). "[C]laim differentiation is not a hard and fast rule," and the doctrine "will be overcome by a contrary construction dictated by the … prosecution history." *Id.* Accordingly, Synthes' disclaimers require that claim 1 "bear only one interpretation," and any "similarity with [claim 5] will have to be tolerated." *Laitram Corp. v. Morehouse Indus. Inc.*, 143 F.3d 1456, 1463 (Fed. Cir. 1998).

Under the proper construction of "positioned between," therefore, this Court should reverse the judgment of infringement as to the '076 patent. Synthes concedes that "the boreholes in the Accused Products … extend … above and below the body planes" (A9680), and thus are not "entirely" within those planes.

## II.     Even under the district court's erroneous constructions, it erred in denying JMOL to Globus on non-infringement.

Beyond the claim construction errors discussed above, Synthes failed to present sufficient evidence of infringement, requiring entry of JMOL in Globus' favor. *Eshelman*, 554 F.3d at 433.

**A.    No reasonable jury could have found that Globus' accused products have bone screws that are "capable of being constrained" by the boreholes, as required by the "anchorable within" limitation.**

Even under the district court's construction of the '207 patent's "anchorable within" limitation, the judgment must be reversed.  As the inventor himself testified, to be "capable of being constrained," bone screws must be prevented from "backing out" of the boreholes.  A17354 (409:14-410:1).  But it is undisputed that Globus' bone screw heads and boreholes are smooth, and no reasonable jury could find that the boreholes in Globus' products prevent their screw heads from backing out.

Claims 1 and 42 of the '207 patent require bone screws that are "anchorable within" the "boreholes and … partial boreholes."  A72; A74.  As discussed, the district court construed "anchorable within" to mean "capable of being constrained by" these boreholes. A41.  Yet the overwhelming evidence revealed that, in the context of this invention, "constrained" meant incapable of "backing out" or "coming out" of the boreholes axially.  As the inventor himself testified:

> Q: … [T]he constraint that you are specifically talking about in the patent was to constrain this way, axially, correct?  Coming this way (indicating).  That is the constraint you were talking about, backing out and hitting a blood vessel that may be down the front of this device; correct?
>
> A: Correct.
>
> Q: And there is nothing to hold it in the borehole, then it was not constrained from moving in this direction.  It can move all the way out.

The only thing going this direction—in it can be constrained, but not from coming out as described in your patent?

A: Correct.

A17354 (409:14-410:1).

The inventor's understanding of "constraint" is consistent with the surrounding claim language. *All* boreholes restrict *lateral* movement of bone screws, so boreholes that are "capable of constraining" bone screws must do more. To find otherwise would fail to "giv[e] effect to all of [the claims'] terms." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010).

Synthes' own documents confirm that the inventor's understanding tracks the ordinary meaning of "constrained by the boreholes." ████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████    Thus, Synthes itself recognizes that "constrained" screws must prevent backout by being securely fixed to the plate. *See also* A28122 (3:25-36) (Michelson reference) ("constrained" screws "fix[] the trajectory of each bone screw" and "unconstrained" screws "allow[] variable screw angles"). And based on the only legally sufficient meaning of "constraint," Globus' products do not infringe, as it is undisputed that their boreholes and bone screw heads "are smooth" and "the screw is freely moveable." A17653 (1540:9-17).

Dr. Hayes ignored the inventor's testimony regarding the ordinary meaning of "constrained." As he testified, "[t]he boreholes are in the front" and "[t]hey constrain the bone screw shank and head *by having solid walls*." A17487 (930:7-17). This theory was supposedly grounded in his experience. A17487 (930:14). But as he admitted on cross, his conclusions were based on his experience "as an engineer"—not the perspective of an ordinary skilled artisan. A17518-519 (1051:23-1052:22). Thus, the jury could not reasonably have credited his testimony, and the judgment of infringement of the '207 patent must be reversed.

**B.    No reasonable jury could have found infringement of the '076 and '616 patents because Dr. Hayes' testimony on the Height Limitations, as construed, was flawed as a matter of law.**

Nor could any reasonable jury have found infringement under the district court's constructions of "substantially" and "generally equal"—the Height Limitations. Those limitations are terms of degree, and they require evidence from the perspective of an ordinary skilled artisan. Yet Synthes' expert, Dr. Hayes, relied on "common sense" based on "anyone's estimation." He did not know, or recall being provided a definition of, the relevant level of skill. And in contrast to his irrelevant testimony, Globus' evidence established that, when it comes to spine surgery, differences as small as a fraction of a millimeter are clinically significant. That evidence requires reversal.

The phrases "substantially" and "generally" equal are relative terms of degree. *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). And even where such terms do not render a claim indefinite, "the patent's specification [must] provide[] [ordinary skilled artisans] with some standard for measuring that degree." *Id.*; *accord Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1381 (Fed. Cir. 2001). Moreover, while use of these terms "avoid[s] a strict numerical boundary to the specified parameter," the "range" of that parameter "must be interpreted in its technological and stylistic context." *Pall Corp. v. Micro Separations, Inc.,* 66 F.3d 1211, 1217 (Fed. Cir. 1995). These requirements reflect the maxim that a patent's claims and specification are "written for a person of skill in the art" and must be read from her perspective. *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

In *In re Cyclobenzaprine*, for example, the district court had concluded that a patent claiming a pharmaceutical compound that exhibited a "maximum blood plasma concentration ($C_{max}$) within the range of *about 80% to 125% of about 20 ng/ml*" was obvious over prior art that disclosed a $C_{max}$ value of 129.5%. 676 F.3d 1063, 1066, 1072 (Fed. Cir. 2012). But this Court reversed, citing the absence of "evidence specifically indicating that a cyclobenzaprine … with a $C_{max}$ profile of 129.5% of 20 ng/ml would be expected to yield the same therapeutic effect as" the claimed range. *Id.* at 1072. "While it might appear to a layperson that 129.5% is

'about' 125%," the court stated, "*expert testimony is necessary to establish how a person having ordinary skill in the art would perceive those figures*. We have no way of knowing the importance of even small differences in these percentages in the absence of [such] evidence." *Id.* at 1072 n.2.

The same is true of the question whether the heights of spinal implant components are "substantially" or "generally equal." While it "might appear to a layperson" that plates and spacers are "about" equal in size, a layperson cannot understand "the importance of even small differences" in the size of spinal implant components. *Id*. Thus, "expert testimony is necessary to establish how a person having ordinary skill in the art would perceive those figures." *Id.*

Indeed, during the *Markman* proceedings, Synthes stated: "*One of ordinary skill would understand* here that the purpose of the invention is to provide an implant that fits between the adjacent vertebral bodies. *The words of approximation in the claims are properly understood in view of this context*." A920. At trial, however, Synthes never offered a POSA's testimony. Rather, Dr. Hayes admitted he "just can't recall" seeing a definition of a POSA, and he repeatedly refused to provide such a definition. A17518-20 (1051:23-1052:5; 1055:25-1056:15).

In fact, to stop Globus' cross-examination on this point, Synthes insisted that such testimony was "irrelevant" to infringement. A17519 (1053:14-21). Dr. Hayes was therefore left to tell the jury that the height of Globus' plate (eyebrow to

eyebrow) and the height of the body—with differences ranging from 1.8–2.6 millimeters for sequentially sized families of implants for the accused products—were "substantially equal" based on "anyone's estimation" or a "kind of common-sense notion of being approximately equal or similar."  A17477-478 (890:13-18; 889:7-9; 895:7-15).

What is "substantially equal" for purposes of spine implants may not be determined by a by-guess-or-by-gosh approach.  Synthes' failure to offer testimony that the accused products meet the height limitations *from the perspective of a POSA* establishes that "the record is critically deficient of the minimum quantum of evidence in support of the verdict."  *Eshelman*, 554 F.3d at 433.

Here, it was undisputed that—based on the district court's claim construction, Synthes' position during the *Markman* proceedings,[9] and Dr. Hayes' trial testimony[10]—plate height is measured from "eyebrow" to "eyebrow," and the differences in height between the plate and the body are then compared.  The difference between the two numbers gives the difference in height.  The measurements from both parties' experts ranged from 1.8 to 2.6 millimeters across the various accused products, resulting in plate heights that are up to ***39% greater*** than the spacer body

---

[9]  *See, e.g.,* A1212-13 (45:24-47:6).

[10]  *E.g.*, A17476 (888:17-19) (Hayes) ("the second height on the plate … goes from above the eyebrows to below the eyebrows"); *accord* A17475 (884:10-19).

56

heights.  A17649-50 (1567:17-1568:22).  So, the question becomes:  Are these differences small enough to make the plates and spacers "substantially equal" in height to an ordinary skilled artisan?

Synthes presented no relevant testimony on this point.  Instead of testifying from the perspective of an ordinary skilled artisan, Dr. Hayes implored the jury to view the "substantially equal" requirement as a "kind of common-sense notion of being approximately equal or similar" (A17477 at 889:7-9), testifying that "in anyone's estimation," the heights are "approximately similar."  A17478 (895:11-15).  Rather than offer any clinical or technical analysis, Hayes drew comparisons to the thickness of "a dime."  A17478 (894:23-895:1).[11]  In short, despite the specific context of this case—implants surgically placed in people's spines—Synthes did not show how a POSA would perceive the relevant height differences.

Globus, by contrast, presented undisputed evidence that an ordinary skilled artisan *would* understand the height differences to be substantial for clinical purposes.  Globus' expert, Dr. Domagoj Coric—who testified from a POSA's per-

---

[11] Synthes also presented an email from Mark Adams, a Globus engineer, to support infringement.  But as Dr. Hayes admitted, this email was "in no way a scientific analysis," and does not speak to what would be considered "substantially equal" in the context of the patents-in-suit.  The email does not even mention the patents (indeed, it was drafted long before they issued), and it includes the teeth (contrary to Dr. Hayes' and Dr. Coric's methodology).  A23289-290; A17479 (897:7-15).

spective (A17617-618 (1443:19-1445:9))—explained that "the plate and the spacer are *not* generally or substantially equal." A17647 (1558:7-23). The heights are "different to a ***significant degree***" and these differences "are ***clinically significant*** because they're designed to serve specific functions." *Id*. (1559:8-13). "[O]ne of ordinary skill would, number one, understand the difference in the plate height and the spacer height but also understand that there are differences in how those things function." A17647-648 (1559:4-1560:2).

As Dr. Coric further explained, Globus' implants are sized to accommodate different patients, and "millimeter increment[s] are very important" because "[w]e want to size the spacer to fit properly in the disc space" to "give the patient the best chance to heal." A17648 (1562:9-1563:13); *see* A17648-649 (1563:14-1564:6). Since this is surgery on the spine, "you want to be exact," and spacing is critical because it changes how the bone grafts and the patient heals. A17649 (1564:7-14, 1564:24-1566:2).

As Dr. Coric explained, the plate's height in Globus' products is between 10 and 39% greater than the spacer's height. A17649-650 (1567:17-1568:22). More-over, the height difference is so critical that as little as *one millimeter—less* than the thickness of Hayes' chosen reference point of a "dime"—would cause the sur-geon to "go[] up to another size" in the same family of implants. A17650 (1569:4-19); *Supra* at 18. These substantial differences are clearly not encompassed by the

phrase "substantially equal," which only "accommodate[s] minor variations." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002).

In sum, the only evidence offered from the vantage point of a POSA shows that, in the context of spinal implants, height differences of 1.8 mm to 2.6 mm are substantial. The jury's contrary verdict is supported only by Dr. Hayes' so-called "common sense" assertion from "anyone's" vantage point. That is legally insufficient to show infringement.

**C.    The district court erred in denying JMOL, or a new trial, to Globus on non-infringement of the "securing plate" limitation of the '207 patent.**

Reversal is also warranted because no reasonable jury could find infringement of the '207 patent's "securing plate" limitation. That patent's asserted claims require that a "securing plate" be mounted on the "front plate" of the implant, to "cover[] at least partly" both the "boreholes" and "heads" of the implant's bone screws. A72. As construed below, a "plate" must be "a structure with a planar dimension greater than its thickness." A33. The term "securing plate" was not independently construed. A35.

Globus' implants, however, do not use anything like a "plate" to secure the implants' bone screws. They use a "blocking set screw," the head of which presses laterally against the head of Globus' bone screws, preventing backout. *Supra* at

17.  Synthes has never suggested that the "planar dimension" of Globus' blocking set screw is "greater than its thickness."  Nor could it.

| A29181 | A28999 | A28651 |
|---|---|---|
|  |  |  |
| Independence Blocking Set Screw | InterContinental Blocking Set Screw | Coalition Blocking Set Screw |

Because Synthes expressly "agree[s] that a screw is not a plate" (A16126 (28:4)), the only way Synthes could assert infringement of the "securing plate" limitation was to disregard the shaft and threads of Globus' blocking set screw and argue that a *portion* of a structure—the *head* of the blocking set screw—was a "securing plate."  The district court followed suit, erroneously instructing the jury that "a component … of the accused products can be part of a larger integral structure" and "the remainder of the integral structure is considered extra structure and is irrelevant."  A17757 (1988:6-12).

On the undisputed record, however, no reasonable jury could find the "securing plate" limitation to be met without eviscerating the claim requirement that a

"securing plate" be "a structure."  Thus, the ruling below must be reversed, or at least remanded for a new trial.

### 1.    Infringement of the '207 patent is not supported by substantial evidence.

Synthes' own testimony regarding the "securing plate" limitation highlights how Synthes improperly focused on only a portion of the structure—the head of the blocking set screw—and ignored other portions of that screw.  As Dr. Hayes testified:

> Q: If you could describe your opinion that the accused products meet [the securing plate] requirement, please?
>
> A: Yes. …  So we have a securing plate that is again embodied in the blocking set screw … .
>
> Q: Now, Dr. Hayes, it looks like you have *just measured the head* of the blocking screw in determining that the planar dimension is greater than its thickness.  Is that correct?
>
> A: I did measure the head of the blocking set screw.
>
> …
>
> Q: *What significance, if any, does the threaded shaft portion of the blocking set screw in the Globus products have on your opinion*?
>
> A: *It basically has no influence on my opinion* . … [I]t's extra structure. …

A17488 (935:5-936:16); *see also* A17517 (1047:2-9).  Dr. Hayes' likewise insisted that "whether we add structure to [the blocking set screw] to provide a screw shaft and thread *makes no difference to my opinion, period*."  A17517-518.  Finding a

portion of something that met the district court's interpretation of a "plate," was, in his view, "***the end of the analysis***."  A17522.

Synthes' view that the head of Globus' blocking set screw is a "plate" thus requires viewing the head alone—and not the screw as a whole—as "a structure." Synthes "agree[s] that a screw is not a plate" (A16126), and it has never suggested that the screw's planar dimension is greater than its thickness.[12]  Rather, Synthes' theory is "that *part of* a structure in an accused product can satisfy [the securing plate] element."  A19327 (Hayes).  ████████████████████

████████████████████████████████████████

████████████████████████████████████

Aware of this difficulty, Synthes' post-trial brief described the head, for the first time, as "fused to the shaft" (A19223), rather than an integral portion thereof. But the record forecloses this theory.  As Globus' engineering drawings show, the screw is manufactured as a single unit from a single piece of metal.  A28657; A28432; A29005 (reproduced to the right). And as Dr. Hayes's own report earlier acknowledged, the screw's head is *not* a distinct structure—it "is formed *integrally* with [the] threaded shaft [of the screw]."  A24524.  Moreover, in ***dozens*** of places the '207 patent itself distin-

---

[12] *Accord* A17651 (1574:13-25) (Coric) ("a plate is a plate, and a screw is a screw," and "a blocking set screw is not a plate").

guishes between "plates" and "screws," foreclosing Synthes' newfound view that those implant components are one and the same thing. *E.g.*, A70-71 (1:59-60; 2:6-16; 2:33-45; 4:4-13).

Synthes' post-trial brief also criticized Globus for distinguishing between a "structure" and a "freestanding structure." A19223. But the patent's claim uses an article to describe the structure—"a" structure—and this plainly refers to the unit as a whole. What Synthes thinks of as "structure" is really *substructure or a sub-part of the unit*. The record, however, does not support this. Indeed, Dr. Hayes did not interpret "structure" this way based on his understanding of that term; rather, he did so only because Synthes' counsel told him to. Moreover, every embodiment in the '207 patent discloses the plate as an integrally formed, freestanding structure. A64, A66, A69.

The undisputed evidence therefore shows that neither Globus' blocking set screw, nor the head of that screw, satisfies the "securing plate" limitation. The district court's judgment of infringement of the '207 patent should thus be reversed.

Finally, the final judgment should be independently reversed as to Globus' "Large Coalition" product, whose blocking set screw blocks only a ***single*** bone screw (A17491 (945:2-19); *see also* A28666; A29332 (reproduced below)), whereas the "securing plate" limitation requires that the securing plate cover both *two* "boreholes" and *two* "heads" of the implant's bone screws (plural).

*Confidential Information Redacted*



Recognizing this, Synthes did not even *allege* literal infringement by Large Coalition—it invoked the doctrine of equivalents. A17482-483 (911:25-913:3); A17491 (945:2-10). But applying that doctrine would "wholly vitiate[] [the] claim limitation" requiring that the "securing plate" cover two screws. *SciMed Life Sys., Inc.*, 242 F.3d at 1346-47. This requires reversal. Moreover, the district court's decision to omit separate questions for Large Coalition from the Verdict Form (A17739-740 at 1922:17-1923:4) requires a new trial since it resulted in an infringement finding that Synthes never alleged.

### 2. Improper jury instructions render the jury verdict against the clear weight of the evidence, warranting a new trial.

The district court's jury instructions, which bolstered Synthes' flawed infringement theory on the "securing plate" term, also warrant a new trial. Since this error pertained to the legal standard for infringement, it receives plenary review. *United States v. Petersen*, 622 F.3d 196, 207 (3d Cir. 2010).

"Literal infringement requires that the accused device contain each limitation *exactly*; any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) (abrogated on other grounds).  Here, over Globus' objection, the district court instructed the jury as follows:

> [A] component or feature of the Accused Products can be part of a larger integral structure (a single structure that has two or more connected parts) and still satisfy a claim requirement.  In such a case, the remainder of the integral structure is considered extra structure and is irrelevant to whether the claim requirement is satisfied by the Accused Products.

A17757.  In support of this instruction, Synthes cited *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed. Cir. 1990) (A15196, n.26), which states: "[W]here the claim language reads directly on the accused device, additional structure present in such device may, in appropriate circumstances, be disregarded in an infringement analysis."  But as *Becton* confirms, patentees cannot disregard "additional structure in the accused device" at the price of "disregarding … *specific* [*claim*] *limitations*." *Id*.  The instruction here invited the jury to do just that.

Specifically, the court invited the jury to find literal infringement even if just "a component or feature" of a structure, rather than the whole structure, reads on the claim.  But such an instruction eviscerates the "securing plate" claim limitation as construed below, which requires "a structure."  A21.  Thus, while the claims require "a structure," this instruction allows for infringement even by "a component

65

or feature" of a structure.  By allowing other "components or features" of a struc-

ture to be ignored—here, the shaft of Globus' blocking set screw—the instruction

unlawfully "disregard[s] … specific [claim] limitations."  *Becton*, 922 F.2d at 797.

Accordingly, this improper instruction and the rejection of Globus' compet-

ing instructions (A15196-197; A16663) warrant a new trial.

## III.  If the judgment below is reversed, or a new trial is granted, as to Globus' liability for infringement of any one of Synthes' three asserted patents, a new trial on damages is necessary.

Finally, if the Court reverses the judgment or orders a new trial as to Globus'

infringement of *any* Synthes' patent, a new trial on damages is necessary.

The jury found that Globus infringed all three asserted patents (A16880-96),

awarding Synthes a 15% royalty (A16897) based on the opinion of Synthes' dam-

ages expert, Dr. Richard Gering.  A17549 (1175:8-17).  But as he acknowledged,

the appropriate royalty could decrease to 10% "if one of the patents falls away and

there are only two."  A17556 (1200:13-16).  In that scenario, the parties would be

"negotiating for less," warranting a lower royalty.  A17549 (1175:2-7).

It follows that, if this Court reverses or orders a new trial as to infringement

of one or more asserted patents, the jury's 15% royalty must likewise be revisit-

ed.[13]  In that situation, it would be speculative to guess what royalty the jury would

---

[13] The district court's award of an 18% enhanced royalty for post-judgment sales likewise could not stand in this situation, as it was predicated on the jury's 15%

have awarded. The jury might have credited Globus' damages expert, who suggested a royalty between 3%-5%. A17700 (1766:16-22). Even if the jury would again rely on Dr. Gering, one cannot know whether it would award 10%, 15%, or something in between. And awards "based only on speculation and guesswork" cannot stand. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1376 (Fed. Cir. 2001).

Indeed, this Court's decision may affect both the royalty *rate* and *base*. The parties agree that, if the '207 patent is not infringed, the base decreases by $33 million—to $73 million. A17549 (1174:1-16). Thus, if this Court reverses as to the '207 patent, that will require a new trial on the royalty rate *and* base.

## CONCLUSION

The judgment below should be reversed as to Globus' liability for infringement. Alternatively, a new trial should be awarded. And if Globus' liability is reversed or a new trial is awarded as to one or two of the three asserted patents, Globus is entitled to a new trial on damages.

---

award. A19723-724. And of course, if this Court reverses as to all three patents, Synthes is not entitled to any damages.

DECEMBER 17, 2014                    Respectfully submitted,

                                    */s/ Steffen N. Johnson*

LUKE A. CULPEPPER                   STEFFEN N. JOHNSON
*Winston & Strawn LLP*              VIVIAN S. KUO
*1111 Louisiana St., 25th Floor*    ANDREW R. SOMMER
*Houston, TX 77002*                 *Winston & Strawn LLP*
*(713) 651-2600*                    *1700 K Street N.W.*
*lculpepper@winston.com*            *Washington, DC 20006*
                                    *(202) 282-5000*
                                    *sjohnson@winston.com*
                                    *vkuo@winston.com*
                                    *asommer@winston.com*

                                    *Counsel for Defendant-Appellant*

# ADDENDUM

April 9, 2014 Final Judgment…………………………………………………….A1

March 25, 2014 Order re Memorandum Opinion...……………………….....A4

March 25, 2014 SEALED Memorandum Opinion…………………………….A5

May 7, 2013 Order re Memorandum Opinion re Claim Construction..………A21

May 7, 2013 Memorandum Opinion re Claim Construction…………………..A28

U.S. Patent No. 7,846,207…………………………………………………….A61

U.S. Patent No. 7,862,616…………………………………………………….A75

U.S. Patent No. 7,875,076…………………………………………………….A88

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DEPUY SYNTHES PRODUCTS, LLC,    )
                                )
    Plaintiff,              )
                                )
    v.                      )    C.A. No. 11-652-LPS
                                )
GLOBUS MEDICAL, INC.,           )
                                )
    Defendant.              )
                                )

## [PROPOSED] FINAL JUDGMENT

This matter was tried before a jury, commencing on June 3, 2013, with the Honorable

Leonard P. Stark presiding. On June 14, 2013, the jury returned its verdict (D.I. 321, 322).

Plaintiff DePuy Synthes Products, LLC ("Synthes") filed a Motion for Attorneys' Fees Under 35

U.S.C. § 285 (D.I. 340); a Motion for a Permanent Injunction and Destruction of Infringing

Products (D.I. 356); a Motion for an Accounting and Determination of an Ongoing Royalty Rate

(D.I. 357); and a Motion for Prejudgment and Postjudgment Interest (D.I. 358) (collectively,

"Synthes' Post Trial Motions"). Defendant Globus Medical, Inc. ("Globus") filed a Renewed

Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial (D.I. 371); and a

Motion for Attorneys' Fees (D.I. 370) (collectively, and together with Synthes' Post Trial

Motions, the "Post Trial Motions"). On March 25, 2014, the Court issued its Memorandum

Opinions and Orders on the Post Trial Motions (D.I. 410, 411, 412, 413).

In accordance with the jury's verdict and the Court's pre and post trial orders, it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.    Judgment be and is hereby entered on the June 14, 2013 verdict in favor of
Synthes and against Globus on the claims of infringement, validity and damages set out in the
verdict form (D.I. 321, 322).

2.    Subject to the Court's resolution of any motion to stay enforcement of this Final
Judgment, Globus shall pay Synthes damages caused by Globus' infringement of Synthes'
asserted patents in the amounts of:

> a.  $16,286,645.25 (reflecting compensatory damages through June 30, 2013),
>
> b.  pre-judgment interest in the amount of $881,723,
>
> c.  post-judgment interest under 28 U.S.C. § 1961(a) from June 25, 2013 through
> April 2, 2014 in the amount of $17,243,
>
> d.  post-judgment interest under 28 U.S.C. § 1961(a) from April 3, 2014 through
> the date upon which Globus satisfies this Final Judgment, and
>
> e.  18% of the revenue from the sales of any accused Independence®, Coalition®
> or InterContinental® products sold beginning on July 1, 2013 through the
> expiration dates of U.S. Patent Nos. 7,875,076; 7,862,616; and 7,846,207.

3.    Globus shall provide Synthes business records sufficient to identify infringing
sales made under paragraph 2(e) (including without limitation the date of sale, units sold for each
of the accused Independence®, Coalition® and InterContinental® products, price per unit, and
total revenues) within 15 days after the close of the calendar quarter in which such sales are
made; however, for any such sales made through December 31, 2013, Globus shall provide the
required business records by April 9, 2014. Damages for any infringing sales made under
paragraph 2(e) shall accrue and shall be paid by Globus to Synthes when and if the balance of
this Final Judgment becomes due. In the event that this Final Judgment has otherwise been paid

2

**A 2**

in full, any additional amounts owed by Globus under paragraph 2(e) of this Final Judgment shall be due and payable within 30 days after the close of the calendar quarter in which such sales are made.

4.      Judgment be and is hereby entered in favor of Synthes and against Globus on Globus' counterclaims of noninfringement and invalidity.

5.      Judgment be and is hereby entered in favor of Synthes and against Globus on Globus' claim for a declaration that this case is exceptional under 35 U.S.C. § 285.

6.      Judgment be and is hereby entered in favor of Globus and against Synthes on Synthes' claims for an injunction under 35 U.S.C. § 283, for willful infringement and treble damages under 35 U.S.C. § 284, and for a declaration that this case is exceptional under 35 U.S.C. § 285.

This Final Judgment is intended to be a final judgment under Fed. R. Civ. P. 58 upon the date entered by the Court

The Court maintains jurisdiction as necessary to enforce the terms of and ensure compliance with this Final Judgment.

IT IS SO ORDERED AND ADJUDGED.

April ___9___, 2014

_____
UNITED STATES DISTRICT JUDGE

3

**A 3**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEPUY SYNTHES PRODUCTS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-652-LPS |
| | : | |
| GLOBUS MEDICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER

At Wilmington, this 25th day of March, 2014, for the reasons set forth in the

Memorandum Opinion issued this date, **IT IS HEREBY ORDERED** that:

(1)   Globus' Renewed Motion for Judgment as a Matter of Law, or in the Alternative,

for a New Trial (D.I. 371) is **DENIED**.

(2)   Synthes' Rule 50(a) motions made during trial are **DENIED**.

(3)   Because the Memorandum Opinion has been filed under seal, the parties are to

submit, no later than **March 27, 2014**, a jointly-proposed redacted version.

(4)   The parties shall meet and confer to determine the appropriate amount of interest

and shall submit, no later than **April 2, 2014**, any proposed order they believe is

necessary, consistent with the Orders entered this same date.

_Leund P. Ar_____

UNITED STATES DISTRICT JUDGE

**A 4**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEPUY SYNTHES PRODUCTS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-652-LPS |
| | : | ██████████████ |
| GLOBUS MEDICAL, INC., | : | |
| | : | |
| Defendant. | : | |

Karen E. Keller and John W. Shaw, SHAW KELLER LLP, Wilmington, Delaware.

Matthew J. Becker, Jeremy C. Lowe, Edward M. Mathias, and Tara R. Rahemba, AXINN, VELTROP & HARKRIDER LLP, Hartford, CT.

Diane C. Ragosa, AXINN, VELTROP & HARKRIDER LLP, New York, NY.

    Counsel for Plaintiff.

Richard L. Horwitz and David E. Moore, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Vivian S. Kuo and Robert F. Ruyak, WINSTON & STRAWN LLP, Washington, D.C.

Shane A. Nelson and Luke A. Culpepper, WINSTON & STRAWN LLP, Houston, TX.

    Counsel for Defendant.

## **MEMORANDUM OPINION**

March 25, 2014
Wilmington, Delaware.

**A 5**

*Leand P. Ass*

**STARK, U.S. District Judge:**

The Court held a ten-day jury trial in this patent infringement action in June 2013. At the

conclusion of the trial, the jury returned a verdict for Plaintiff DePuy Synthes Products, LLC

("Synthes"), finding U.S. Patent Nos. 7,875,076 ("the '076 patent"), 7,862,616 ("the '616

patent"), and 7,846,207 ("the '207 patent") valid and infringed by Defendant Globus Medical,

Inc.'s ("Globus") three accused products. (D.I. 322) Now pending before the Court is Globus's

Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial. (D.I.

371) For the reasons set forth below, the Court will deny this Motion.

## I.   BACKGROUND

Synthes filed this patent infringement action against Globus on July 22, 2011.[1] (D.I. 1)

The patents-in-suit relate to medical devices called "inter-vertebral implants" and methods of

implanting such devices between adjacent vertebrae in spinal fusion procedures. (*See id.* at 2-4)

The Court held a jury trial beginning on June 3, 2013.[2] The jury returned a verdict for

Synthes, finding the patents-in-suit valid and infringed by Globus's three accused products. (D.I.

322) Upon receiving the jury's verdict in favor of Synthes on all claims of infringement,

validity, and damages, the Court entered judgment on June 24, 2013. (D.I. 329) Thereafter, on

August 1, 2013, Globus filed a Renewed Motion for Judgment as a Matter of Law, or in the

Alternative, for a New Trial (the "Motion"). (D.I. 371) Briefing on the Motion was completed

---

[1]The action was actually filed by Synthes USA, LLC; Synthes USA Products, LLC; and
Synthes USA Sales, LLC. (*See* D.I. 1) However, on February 8, 2013, the parties executed a
joint stipulation, later entered as an order, by which Synthes USA, LLC agreed to dismiss with
prejudice all claims and defenses asserted by Synthes USA Products, LLC and Synthes USA
Sales, LLC. (D.I. 130) Thereafter, on February 15, 2013, DePuy Synthes Products, LLC was
substituted as plaintiff for the lone remaining plaintiff in the case, Synthes USA, LLC. (D.I. 157)

[2]Additional background can be found in the Court's Memorandum Opinion addressing
the parties' other post-trial motions, issued this same date.

**A 6**

on August 29, 2013. (D.I. 395)

## II.    LEGAL STANDARDS

### A.    Motions for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a sparingly invoked remedy," one "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal quotation marks omitted).

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotation marks omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344,

2

**A 7**

1348 (3d Cir. 1991); *Perkin-Elmer Corp.*, 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893. Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B Wright & Miller, *Federal Practice & Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

## B.    Motions for a New Trial

Federal Rule of Civil Procedure 59(a) provides, in pertinent part, that "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584-85 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading,*

3

**A 8**

*Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or

denial of new trial motion under deferential "abuse of discretion" standard). However, where the

ground for a new trial is that the jury's verdict was against the great weight of the evidence, the

court should proceed cautiously, because such a ruling would necessarily substitute the court's

judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).

Although the standard for grant of a new trial is less rigorous than the standard for grant of

judgment as a matter of law – in that the court need not view the evidence in the light most

favorable to the verdict winner – a new trial should only be granted where "a miscarriage of

justice would result if the verdict were to stand," the verdict "cries out to be overturned," or

where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-53.

## III.   DISCUSSION

### A.   Globus's Motion is Timely

Synthes first argues that the Court should deny the Motion in its entirety as untimely.

(D.I. 389 at 5-6)  Citing Federal Rules of Civil Procedure 50(b) and 59(b), Synthes contends that

Globus had only 28 days after the Court entered the "Judgment Following Jury Verdict" (the

"Judgment") on June 24, 2013 (D.I. 329) to file a renewed motion for judgment as a matter of

law or a motion for a new trial (D.I. 389 at 5). Globus did not file the Motion until August 1,

2013, thirty-seven days after the Judgment.  (D.I. 371)  Globus responds that at that point the

Court had not yet entered *final* judgment – and, in fact, has still not done so. Thus, in Globus'

view, the Motion is not untimely.  (D.I. 395 at 2-4)

The Judgment uses language jointly proposed by the parties (D.I. 328, ex. 1), providing,

in relevant part: "This Judgment is subject to modification following the Court's consideration of

4

**A 9**

the parties' post-trial motions." (D.I. 329) At the time the Court signed the jointly proposed

Judgment, numerous issues remained unresolved, including Synthes' Motion for Temporary

Restraining Order and Preliminary Injunction. (D.I. 333) As Globus notes, when a request for

injunctive relief remains undecided, an appeal would be premature. (*See* D.I. 395 at 2 (citing 28

U.S.C. § 1292(c)(2) and *Cordance Corp. v. Amazon.com, Inc.*, 696 F. Supp. 2d 445, 447 (D. Del.

2010)); *see also* D.I. 1 at 5-6 (Synthes's Complaint seeking injunctive relief)) Because Rule

54(a) defines a "judgment" as "any order from which an appeal lies," and the Judgment here is

not such an order, the 28-day clock on the filing of motions under Rule 50(b) and 59(b) was not

started by entry of the Judgment.

The Court is similarly unpersuaded by Synthes' other arguments regarding timeliness.

(*See* D.I. 389 at 5-6) This is particularly true in light of communications among the parties'

counsel drafting the proposed judgment, during which Synthes agreed to delete language in the

proposed judgment indicating that its entry would "trigger the time for filing post-trial motions,"

and even asked to add language making the proposed judgment "subject to modification." (*See*

D.I. 395 at 3 & ex. 4-6) Moreover, when the parties submitted the proposed judgment, they also

submitted a briefing schedule for post-trial briefs (*see* D.I. 328 at 1-2), and it is undisputed that

Globus adhered to that schedule. Accordingly, Globus' motion is not untimely.

**B.     Globus' Motion Lacks Merit**

**1.     The "Non-Metallic Material" Limitation ('616 Patent)**

Globus contends that it is entitled to judgment as a matter of law that the accused

products do not infringe Claim 1 of the '616 patent, a claim that requires a "three dimensional

body . . . made from a biocompatible non-metallic material." (D.I. 372 at 3-7; D.I. 1, ex. B, '616

5

**A 10**

patent (Claim 1)) The Court disagrees.

The dispute here centers on the claim term "non-metallic material," a term that the Court construed to mean "material with no metallic components." (D.I. 253 at ¶ 23) At trial, Synthes presented evidence that █████████████████████████████████████████

█████████████████████████████(Transcript of Jury Trial 6/3/13-6/14/13 (D.I. 346-355) (hereinafter, collectively, "Trial Tr.") at 901-02, 1029) However, even Synthes acknowledged that █████████████████████████████████████████

(*Id.* at 1032) Globus points █████████████████████████████████████

████████████████, and from this concludes that there can be no literal infringement as a matter of law. (D.I. 372 at 3-4) While the parties dispute █████████████████████

███████████████████████████████████████████████████████

██████████████████████ (Trial Tr. at 685-86, 1032-36) Based on this and similar testimony, the Court agrees with Synthes that the jury "could reasonably have found as a matter of fact that █████████████████████████████████████████

████████████████████ (D.I. 389 at 9) Accordingly, substantial evidence supports the finding of infringement as to this disputed limitation of the '616 patent.[3]

Globus also asserts that a new trial is warranted because Synthes "ambushed Globus with new expert opinions" by disclosing opinions "for the first time" during the trial. (D.I. 372 at 6)

---

[3]The Court need not address Globus' arguments regarding infringement under the doctrine of equivalents (D.I. 372 at 4-6) because it finds that substantial evidence supports the jury's verdict of literal infringement and because, as Globus acknowledges, "the verdict form shows that the jury did not find infringement under the doctrine of equivalents." (*Id.* at 4 (citing D.I. 322 at 2-14)) In any event, the Court agrees with Synthes that a reasonable jury could find infringement under the doctrine of equivalents, as ████████████████ would not be substantially different from the claimed device. (D.I. 389 at 11)

6

In support of this argument, Globus first points to language in the expert report of Synthes'

expert on infringement, Dr. Hayes. (*Id.*) In his report, Dr. Hayes stated, ███████████████

████████████████████████████████████████████████████████████████."

(Trial Tr. at 1031) Globus argues that this language "essentially agreed" with Globus' theory of

non-infringement, but then at trial Dr. Hayes offered testimony that did not support Globus. (D.I.

372 at 6-7) For reasons already explained, the Court does not agree that even the passage in Dr.

Hayes' report "essentially agreed" with Globus' theory of non-infringement. Also, Globus was

permitted to emphasize the purported inconsistency between Dr. Hayes' report and trial

testimony during cross-examination of Dr. Hayes, further reducing any justification for a new

trial. (*See, e.g.*, Trial Tr. at 1029-37)

Globus further complains about the portion of Dr. Hayes' testimony in which he gave an

"example" of a material that would not fit within the Court's construction of "non-metallic

material," arguing that this example was improper because it was not disclosed in his expert

report. (D.I. 372 at 6-7 (citing Trial Tr. at 902-03)) The Court disagrees. Dr. Hayes' example is

a permissible "elaboration of the opinions contained in the expert's report." *Power Integrations,*

*Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008).

Accordingly, the Court concludes that the testimony of Dr. Hayes on this point does not warrant

a new trial.

## 2.    The "Anchoring" of Bone Screws ('076 Patent)

Globus next argues that the Court committed legal error by construing the '076 patent as

not requiring that the "bone screws be . . . rigidly connected to the front plate" of the implant.

(D.I. 372 at 7-8) The Court adheres to its view of the claims and believes it correctly construed

7

**A 12**

the pertinent claim terms and appropriately resolved the related issues at trial.

On June 12, 2013, the day before closing arguments, Synthes submitted proposed jury

instructions that, for the first time, contained the following paragraph:

> "sized and configured to extend through the
> first/second borehole and into the upper/lower
> endplate," as it appears in claim 1 of the '076 patent,
> is given its plain and ordinary meaning, and should
> not be read to require that the bone screws be
> locked, threaded, or otherwise "rigidly connected"
> to the front plate.

(D.I. 309 at ¶ 32) Synthes requested this instruction because Globus had "improperly attempt[ed]

to limit the meaning of the phrase" during trial. (*See* D.I. 311 at 1; D.I. 389 at 15) Also on June

12, Globus responded to the new proposal with a letter to the Court, arguing that Synthes'

proposed construction was incorrect, and providing a detailed explanation as to why its own

proposed claim construction was more appropriate. (*See* D.I. 314) The Court considered

Globus' arguments but ultimately sided with Synthes, "adopt[ing] language very similar to what

the plaintiff proposed" for the jury instructions. (Trial Tr. at 1923-24)

In the Motion, Globus reiterates some of the same claim construction arguments it

presented during trial when the Court was deciding how to construe the claim term. (*Compare*

D.I. 314 *with* D.I. 372 at 10) As before, the Court is not persuaded by Globus.

Globus now adds that by construing this claim term on the day of closing arguments, the

Court denied Globus an opportunity to present different noninfringement and invalidity defenses,

thereby violating Globus' right to "due process." (D.I. 372 at 13-14) Again, the Court disagrees.

Globus had notice and an opportunity to be heard on all claim construction disputes, including

the one resolved by the Court at the end of trial, and it is settled that the Court may continue to

8

**A 13**

construe claim terms as necessary to ensure that the jury is properly instructed on the scope of the claims.[4] In reviewing Globus' Motion, the Court has once again considered Globus' arguments, including its contention that the Court should not rely on its construction of a "somewhat similar phrase in the '207 patent" to arrive at its construction of the '076 patent's claim terms, because the two patents have "materially different specification[s]." (D.I. 372 at 8) Globus could have asked the Court to construe the relevant language of the '076 patent in the nearly two years prior to trial. Globus failed to do so. (*Id.*) In short, neither the new nor the renewed arguments by Globus are persuasive.

### 3.    Height Limitations ('076 and '616 Patents)

Globus argues that Synthes failed to prove that the height of the bodies of the accused products are "substantially" and "generally equal" to the height of the plates, as required by claim 1 of both the '076 and '616 patents. (D.I. 372 at 14-23) Globus' primary argument is that Dr. Hayes answered questions regarding relative size from a "common sense" or layperson perspective, rather than from the perspective of a person of ordinary skill in the art. (*Id.* at 15-19)

---

[4]*See generally Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315 (Fed. Cir. 2010) ("While recognizing the potential for surprise and prejudice in a late adjustment to the meaning of claim terms, this court also acknowledges that the trial court is in the best position to prevent gamesmanship and unfair advantage during trial. Moreover, this court understands that a trial judge may learn more about the technology during the trial that necessitates some clarification of claim terms before the jury deliberates."); *id.* at 1322 ("Claim construction is a matter of law, and it is essential that the jury be correctly instructed on the law, lest the entire trial be tainted.") (Newman, J., concurring in part and dissenting in part); *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005) ("[D]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.") (internal quotation marks omitted); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial.").

9

**A 14**

While Dr. Hayes, at times, appeared to be answering questions on this topic from the perspective

of a layperson (Trial Tr. at 889, 895), he later clarified that his responses were from the

perspective of his understanding of a person of ordinary skill in the art (*id*. at 1069).[5] Sufficient

evidence was presented from which a reasonable jury could find the height limitations to be

satisfied. (*See* D.I. 389 at 17-21) (summarizing evidence) Nor did Dr. Hayes provide improper

new opinions impermissibly beyond the scope of what he had disclosed prior to trial. *See Power*

*Integrations*, 585 F. Supp.2d at 581.

### 4.    The "Securing Plate" Limitation of the '207 Patent

Globus next argues that judgment as a matter of law, or at least a new trial, is warranted

as to the '207 patent. (D.I. 372 at 23-27) Its argument here relates essentially to two issues:

(1) whether the head of a screw could be a "securing plate" as required by the claims; and

(2) whether the jury instructions improperly invited the jury to find literal infringement, even if

just a "component or feature" of a structure, rather than the whole structure, reads on the claim.

(*Id*.)

As to the first issue, Globus contends that "no reasonable jury could have concluded that

---

[5]Globus faults other aspects of Dr. Hayes' testimony for failing to be from the perspective of a "person of ordinary skill in the art." First, Globus argues that "overwhelming evidence revealed that, in the context of the invention, 'constrained' meant that when the bone screws were in the boreholes, they were prevented from backing out." (D.I. 372 at 28) Globus acknowledges that Dr. Hayes testified to the contrary, and the Court disagrees with Globus' contention that "the jury could not reasonably have credited Dr. Hayes' testimony" because it did not come "from the perspective of a person of ordinary skill in the art." (*Id*. at 28-29) Second, Globus argues that it is entitled to judgment as a matter of law under the doctrine of equivalents solely because Dr. Hayes purportedly "admi[tted] that he did not know the relevant definition of one of ordinary skill in the art." (*Id*. at 29-30) Again, the Court disagrees. It is also worth noting that Dr. Hayes' expert report and deposition testimony had similar references to the effect that his opinions take into account the perspective of a person of ordinary skill in the art. (*See* D.I. 389 at 19 (citing D.I. 390 at B0114-132))

10

**A 15**

the head of a screw – without regard to the screw's shank or threads – performs the 'securing' function required by all claims." (D.I. 372 at 23) Synthes, however, presented substantial evidence, primarily through Dr. Hayes, that the head of the blocking set screws performs the "securing" function. (*See, e.g.*, Trial Tr. at 936-37 ("Q: And do the heads of the blocking set screws in the Globus products block the fixation elements or secure the fixation elements? A: They do block or secure the fixation elements . . .")[6] While some of the language used at trial was not entirely precise – in that Dr. Hayes occasionally referred to the screw rather than simply the head of the screw (*see* D.I. 372 at 24-25) – the testimony, as a whole, was clear and consistent with Synthes' position that the head of the blocking set screws performs the "securing" function.

The second issue, relating to a disputed jury instruction, centers on whether it was proper for the Court to instruct the jury to disregard "extra structure" in making its decision regarding infringement. Globus objects to one of the jury instructions[7] as allowing for a finding of literal

---

[6]*See also* Trial Tr. at 942-43 (Q: And what is the function of the securing plate in claim 1 of the '207 patent? A: The function of the securing plate is to inhibit the falling out of the screws. Q: Do the heads of the blocking set screws in . . . Globus' products perform that function? A: They do. Q: In what way does the securing plate perform its function in the patent? A: It does so by covering, by blocking . . . the screw heads and the screw holes. . . . Q: Do the heads of the blocking set screws in . . . Globus' products perform the claimed function in the same way that it is performed in the patent? A: Yes."))

[7]The disputed jury instruction reads as follows:

> [A] component or feature of the Accused Products can be part of a larger integral structure (a single structure that has two or more connected parts) and still satisfy a claim requirement. In such a case, the remainder of the integral structure is considered extra structure and is irrelevant to whether the claim requirement is satisfied by the Accused Products. However, if Globus' Accused Product omits a single requirement recited in one of the Asserted Claims, then that Globus product does not literally infringe that claim.

11

**A 16**

infringement based on "[a] component or feature of the Accused Products," i.e., the head of the blocking set screw, rather than instructing the jury to consider what Globus considers the "unitary unit," i.e., the screw as a whole. (D.I. 372 at 26-27) As Globus notes, Synthes cited to *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed. Cir. 1990), in support of the disputed jury instruction. (D.I. 372 at 26) In *Becton*, the Federal Circuit stated that "where the claim language reads directly on the accused device, additional structure present in such device may, in appropriate circumstances, be disregarded in an infringement analysis," but not where doing so would disregard "*specific limitations . . . in the claim*." 922 F.2d at 797 (emphasis in original). The Court's construction of the claim term "plate" and Synthes' evidence support a finding that the head of the blocking set screws may meet the "securing plate" limitation. The jury was free to agree with Synthes and Dr. Hayes and find the screw's shaft irrelevant, as doing so does not disregard any specific limitations in the claim.[8] Accordingly, the Court is not persuaded that the disputed jury instruction is based on a misreading of the law, and denies Globus' request for a new trial on this basis.[9]

_____

(D.I. 372 at 26 (citing D.I. 315 at 29))

[8]Relatedly, Globus also argues that the wording of the claim, in conjunction with the Court's construction of "plate," precludes an analysis in which the head of the screw is considered separately from the screw as a whole. (D.I. 372 at 26-27; *see also* Trial Tr. at 1355) In its claim construction Order, the Court construed "plate" to mean "a *structure* with a planar dimension greater than its thickness." (D.I. 253 at ¶ 2 (emphasis added)) Nothing in the Court's construction required such a "structure" to be a "freestanding structure." (D.I. 389 at 23)

[9]The Court concludes that Globus is not entitled to relief with respect to its Large Coalition product, an issue to which the parties' devote very little attention. (*See* D.I. 372 at 25-26; D.I. 389 at 23-24; D.I. 395 at 17) Globus did not raise this issue in its Rule 50(a) motion. Neither side, in any filing, has met its burden to provide the Court with a sufficient basis to award any relief with respect to the Large Coalition product.

12

**A 17**

## 5.    Globus' Obviousness Defenses

In the Motion, Globus argues that judgment as a matter of law, or at least a new trial, is

warranted on the legal question of obviousness of the asserted claims. (D.I. 372 at 30-38) As an

initial matter, it appears that Globus may have waived these arguments by failing to assert them

during trial as part of its original Rule 50(a) motions. Typically, when a party fails to move on

specific grounds in its Rule 50(a) motion, no relief may be afforded to that party on those

grounds through a Rule 50(b) motion. *See Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098,

1107-08 (Fed. Cir. 2003); *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir.

1989).[10] Assuming, without deciding, that Globus has not waived its right to press this portion of

---

[10]Globus responds to the waiver argument by asserting that "Synthes agreed to allow
Globus to defer argument on further [R]ule 50(a) motions until after trial" (D.I. 395 at 20), citing
to a portion of the Trial Transcript in which, immediately after Synthes made its Rule 50(a) oral
motion – and the Court stated it intended to reserve judgment but offered Globus the opportunity
to argue – Globus' counsel responded that he would "prefer to do what [Synthes] did, just give
you something in writing in the next few days, *respond* in the next few days in writing." (Trial
Tr. at 1961) (emphasis added) Following trial, Globus did file an Opposition to Synthes' Motion
for Judgment as a Matter of Law (D.I. 331), but that filing's discussion of obviousness was,
necessarily, solely in the context of seeking to avoid entry of final judgment of non-obviousness,
it was a *response*, not a request for the affirmative relief of entry of final judgment of
obviousness, an issue on which Globus bore the burden of proof. *See generally TruePosition v.
Andrew Corp.*, 568 F. Supp. 2d 500, 512-13 (D. Del. 2008) ("Rule 50 plainly requires a party to
specify the 'judgment sought' regardless of which party ultimately bore the burden of proof on
the issue.").

Relatedly, it is not entirely clear whether Synthes intended, post-trial, to renew its Rule
50(a) motions. The Court reserved judgment on Synthes' motions prior to return of the jury
verdict and entry of the Judgment. Subsequent to entry of the Judgment, the Court has not
received briefing in support of any of Synthes' Rule 50(a) motions. Nonetheless, the Court has
evaluated these motions (*see* Trial Tr. at 1956-62; D.I. 331 (Globus' opposition)) and finds no
basis to award Synthes judgment as a matter of law. *See generally Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating Rule 50(a) motion must be denied if
there is a "legally sufficient evidentiary basis for a reasonable jury to find for [the nonmovant] on
that issue"). Accordingly, to the extent they are still viewed as pending, Synthes' Rule 50(a)
motions made during trial will be denied.

13

**A 18**

its Motion, the Court concludes that the jury could reasonably find that Globus failed to prove by clear and convincing evidence that the asserted claims were invalid due to obviousness. Both parties presented evidence, including expert testimony, on the prior art and how it would have been viewed by one of ordinary skill in the art at the time of the inventions, and the jury was free to credit Synthes' evidence on these issues. (*See* D.I. 389 at 28-36) The jury's findings with respect to validity were not against the clear weight of the evidence,[11] so neither judgment as a matter of law nor a new trial are warranted.

### 6.    Jury Instructions

Finally, Globus seeks a new trial based on what it contends were the Court's flawed jury instructions. (D.I. 372 at 38-40) "In reviewing jury instructions, the full trial record and the jury instructions in their entirety must be examined because instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1331 (Fed. Cir. 2010) () (internal quotation marks omitted); *see also Limbach Co. v. Sheet Metal Workers Int'l Ass'n, AFL-CIO*, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991). The jury instructions as a whole must fairly and adequately apprise the jury of the issues and the applicable law. *See Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1123 (3d Cir. 1992). An otherwise proper jury verdict should not

---

[11]Globus also argues that a new trial is warranted because the verdict form did not explicitly state that obviousness of the asserted claims of the '076 patent could be found in view of a single prior art reference, although Globus acknowledges that the verdict form did allow for a finding of obviousness based on that single prior art reference combined with other prior art references. (D.I. 372 at 33-34) In finding that the inventions were not obvious in view of multiple prior art references, it would seem to follow logically that the jury also found that the inventions were not obvious in view of any one of those prior art references standing alone. (*See* D.I. 389 at 31) In any event, the Court finds no manifest injustice in allowing the verdicts of non-obviousness to stand and no basis for requiring obviousness to be tried again.

14

be disturbed based on an erroneous jury instruction that was harmless, that is, when "it is highly probable that the error did not affect the outcome of the case." *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005) (internal quotation marks omitted).

Applying these standards, the Court finds no basis to provide Globus a new trial. The Court is not persuaded that any of its instructions were erroneous. Additionally, taking the instructions as a whole, which the Court is required to do, the Court is satisfied that its instructions adequately conveyed the law to the jury. Furthermore, as an exercise of its discretion, the Court would not grant Globus a new trial even were some of the instructions shown to be less than fully appropriate.

## IV.    CONCLUSION

For the reasons discussed, the Court will deny Globus' Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial. (D.I. 371) An appropriate Order will be entered.[12]

---

[12]The Court has carefully reviewed each aspect of Globus' Motion, the extensive briefing the parties provided, and the other submissions relating to the Motion. To the extent there are arguments and issues raised in the Motion that are not expressly addressed in this Memorandum Opinion, the Court deemed them not worthy of further discussion.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEPUY SYNTHES PRODUCTS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-652-LPS |
| | : | |
| GLOBUS MEDICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER

At Wilmington, this 7th day of May, 2013:

For the reasons set forth in the Memorandum Opinion issued this same date,

IT IS HEREBY ORDERED that the claim language of U.S. Patent Nos. 7,846,207 (the

"'207 patent"), 7,862,616 (the "'616 patent"), and 7,875,076 (the "'076 patent"), is construed as

follows:

1.      **"teeth,"** as it appears in claims 1, 38, 42 of the '207 patent, and claim 2 of the

'076 patent, is construed to mean "protrusions provided on the top or bottom

surfaces of the body," as agreed upon by the parties.

2.      **"[front] plate/plate,"** as it appears in claims 1, 4, 6, 8-10, 12-13 of the '616

patent, and claims 1, 3-6, 8-11, 14-16 of the '076 patent, is construed to mean "a

structure with a planar dimension greater than its thickness."

3.      **"front plate,"** as it appears in claims 1, 2, 4, 10-12, 16, 21, 37-43 of the '207

patent, does not require construction.

4.      **"securing plate,"** as it appears in claims 1-3, 23, 38, 40, 42 of the '207 patent,

1

**A 21**

and claim 9 of the '616 patent, does not require construction.

5.  "**upper surface [of the plate]**," as it appears in claim 1 of the '616 patent, is construed to mean "top surface of the front plate."

6.  "**lower surface [of the plate]**," as it appears in claim 1 of the '616 patent, is construed to mean "bottom surface of the front plate."

7.  "**upper plane [of the body]**," as it appears in claims 1, 38, 42 of the '207 patent, and claim 1 of the '076 patent, is construed to mean "a plane defined from the front edge to the back edge of the top surface of the body."

8.  "**underside plane [of the body]**," as it appears in claims 1, 38, 42 of the '207 patent, and "**lower plane [of the body]**," as it appears in claim 1 of the '076 patent, are construed to mean "a plane defined from the front edge to the back edge of the bottom surface of the body."

9.  "**plate top surface located generally on the upper plane / plate top surface**," as it appears in claim 1 of the '076 patent, does not require construction.

10. "**plate lower surface located generally on the lower plane / plate lower surface**," as it appears in claim 1 of the '076 patent, does not require construction.

11. "**borehole**," as it appears in claims 1, 16, 38, 42 of the '207 patent, claims 1, 9, 13 of the '616 patent, and claim 1 of the '076 patent, is given its plain and ordinary meaning.

2

12. **"being anchorable within the first and second boreholes and the first and second partial boreholes,"** as it appears in claims 1, 42 of the '207 patent, is construed to mean "capable of being constrained by the boreholes and partial boreholes."

13. **"first and second boreholes of the front plate diverge when viewed from the front surface / diverge,"** as it appears in claim 16 of the '207 patent, is construed to mean "first and second boreholes of the front plate depart from a horizontal or vertical plane when viewed from the front surface of the front plate."

14. **"captured between the front plate and the securing plate,"** as it appears in claim 38 of the '207 patent, is construed to mean "captured partly or entirely within a space separating the front plate and the securing plate."

15. **"located between the plate and the securing plate,"** as it appears in claim 9 of the '616 patent, is construed to mean "located partly or entirely within a space separating the front plate and the securing plate."

16. **"contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies,"** as it appears in claim 1 of the '616 patent, is construed to mean "contained partly or entirely within a space separating the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

17. **"positioned between the upper and lower planes,"** as it appears in claim 1 of the '076 patent, is construed to mean "positioned partly or entirely within a space separating the upper and lower planes."

3

**A 23**

18.    **"the first and second boreholes of the front plate and the first and second**

**heads are covered at least partly by the securing plate / covered at least**

**partly by the securing plate,"** as it appears in claims 1, 42 of the '207 patent, is

construed to mean "the securing plate partly or entirely covers the first and second

boreholes of the front plate and the first and second heads of the fixation

elements."

19.    **"the securing plate at least partially covering each of the plurality of**

**boreholes / the securing plate at least partially covering,"** as it appears in claim

9 of the '616 patent, is construed to mean "the securing plate partly or entirely

covers each of the plurality of boreholes of the front plate."

20.    **"the securing mechanism at least partially covering each of the plurality of**

**boreholes / the securing mechanism at least partially covering,"** as it appears

in claim 13 of the '616 patent, is construed to mean "the securing mechanism

partly or entirely covers each of the plurality of boreholes of the front plate."

21.    **"attaching a securing plate with a fastening agent over the first and second**

**head portions of the first and second fixation elements,"** as it appears in claim

38 of the '207 patent, is construed to mean "attaching a securing plate with a

fastening agent entirely on top of the first and second head portions of the first and

second fixation elements."

4

**A 24**

22.    "**partial borehole in communication with the front surface and the upper side/underside of the body**," as it appears in claim 1 of the '616 patent, is construed to mean "a partial borehole contacts the front surface of the body and the upper/lower surface of the body."

23.    "**non-metallic material**," as it appears in claim 1 of the '616 patent, is construed to mean "material with no metallic components."

24.    "**the first height being substantially equal to the second height so that the three dimensional body and the plate are contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies / the first height being substantially equal to the second height**," as it appears in claim 1 of the '616 patent, is construed to mean "the first and second heights are substantially equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

25.    "**the second height being generally equal to the first height**," as it appears in claim 1 of the '076 patent, is construed to mean "the first and second heights are generally equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

5

**A 25**

26. **"the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes / positioned substantially between the upper and underside planes,"** as it appears in claims 1, 38, 42 of the '207 patent, is construed to mean "the first and second heads and the first and second boreholes and partial boreholes are positioned substantially between the upper and underside planes to allow the body and the front plate to fit between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

27. **"securing mechanism,"** as it appears in claim 13 of the '616 patent, is given its plain and ordinary meaning.

28. **"fastening agent,"** as it appears in claim 38 of the '207 patent, is given its plain and ordinary meaning.

29. **"upper surface,"** as it appears in claim 1 of the '076 patent, is construed to mean "top surface."

30. **"lower surface,"** as it appears in claim 1 of the '076 patent, is construed to mean "bottom surface."

31. **"upper side,"** as it appears in claims 1, 38, 42 of the '207 patent, and claim 1 of the '616 patent, is construed to mean "top surface."

32. **"underside,"** as it appears in claims 1, 38, 42 of the '207 patent, and claim 1 of the '616 patent, is construed to mean "bottom surface."

33. **"upper vertebra,"** as it appears in claim 1 of the '076 patent, is construed to mean "vertebra above and most proximate to the implant."

6

**A 26**

34.    "**lower vertebra**," as it appears in claim 1 of the '076 patent, is construed to mean

"vertebra below and most proximate to the implant."

35.    "**upper endplate**," as it appears in claim 1 of the '076 patent, is construed to

mean "endplate on the bottom side of the vertebra above the implant."

36.    "**lower endplate**," as it appears in claim 1 of the '076 patent, is construed to mean

"endplate on the top side of the vertebra below the implant."

UNITED STATES DISTRICT JUDGE

7

**A 27**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEPUY SYNTHES PRODUCTS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-652-LPS |
| | : | |
| GLOBUS MEDICAL, INC., | : | |
| | : | |
| Defendant. | : | |

Karen E. Keller and John W. Shaw, SHAW KELLER LLP, Wilmington, Delaware.

Matthew J. Becker, Jeremy C. Lowe, Edward M. Mathias, and Tara R. Rahemba, AXINN, VELTROP & HARKRIDER LLP, Hartford, CT.

Diane C. Ragosa, AXINN, VELTROP & HARKRIDER LLP, New York, NY.

   Counsel for Plaintiff.


Richard L. Horwitz and David E. Moore, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Vivian S. Kuo and Robert F. Ruyak, WINSTON & STRAWN LLP, Washington, D.C.

Shane A. Nelson and Luke A. Culpepper, WINSTON & STRAWN LLP, Houston, TX.

   Counsel for Defendant.


## <u>MEMORANDUM OPINION</u>


May 7, 2013
Wilmington, Delaware.

**STARK, U.S. District Judge:**

Presently before the Court is the issue of claim construction of various disputed terms

found in U.S. Patent Nos. 7,846,207 (the "'207 patent"), 7,862,616 (the "'616 patent"), and

7,875,076 (the "'076 patent") (collectively, the "patents-in-suit").[1]

## I.    INTRODUCTION

Synthes USA, LLC, Synthes USA Products, LLC, and Synthes USA Sales, LLC

(collectively, "Synthes" or "Plaintiffs") filed this patent infringement action against Globus

Medical, Inc. ("Globus" or "Defendant") on July 22, 2011.[2]  (D.I. 1)  The patents-in-suit relate to

medical devices called "intervertebral implants" and methods of implanting such devices

between adjacent vertebrae in spinal fusion procedures.  (*See* D.I. 1 at 2-4)

The parties completed claim construction briefing on June 8, 2012.  (D.I. 39; D.I. 52; D.I.

53; D.I. 54; D.I. 55)  The Court conducted a *Markman* hearing on July 9, 2012.  (*See* D.I. 70

(hereinafter "Tr."))

## II.    LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (internal quotation marks omitted).  Construing the claims of a patent presents a

question of law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir.

1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  "[T]here is no magic formula or catechism for

---

[1] The patents-in-suit are found at D.I. 55 Exs. A-C.

[2] DePuy Synthes Products, LLC was substituted as plaintiff for Synthes USA, LLC on
February 15, 2013.  (D.I. 157)

1

**A 29**

conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach

the appropriate weight to appropriate sources "in light of the statutes and policies that inform

patent law." *Id.*

   "[T]he words of a claim are generally given their ordinary and customary meaning . . .

[which is] the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321

(internal quotation marks omitted). The patent specification "is always highly relevant to the

claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of

a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

   While "the claims themselves provide substantial guidance as to the meaning of particular

claim terms," the context of the surrounding words of the claim also must be considered.

*Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted

and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are

normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

   "Differences among claims can also be a useful guide. . . . For example, the presence of a

dependent claim that adds a particular limitation gives rise to a presumption that the limitation in

question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This

"presumption is especially strong when the limitation in dispute is the only meaningful difference

between an independent and dependent claim, and one party is urging that the limitation in the

dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v.*

2

**A 30**

*SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim

term by the patentee that differs from the meaning it would otherwise possess. In such cases, the

inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

when the specification describes only a single embodiment, the claims of the patent will not be

read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481

F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution

history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is

"intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent

and Trademark Office] and includes the prior art cited during the examination of the patent."

*Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim

language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it would

otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to

the patent and prosecution history, including expert and inventor testimony, dictionaries, and

learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the

court in determining the meaning of a term to those of skill in the relevant art because such

dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science

3

**A 31**

and technology." *Phillips*, 415 F.3d at 1318.  Overall, while extrinsic evidence "may be useful"

to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result

in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic

evidence." *Id.* at 1318-19.

In addition to these fundamental claim construction principles, a court should also

interpret the language in a claim by applying the ordinary and accustomed meaning of the words

in the claim. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984).  If the

patent inventor clearly supplies a different meaning, however, then the claim should be

interpreted according to the meaning supplied by the inventor. *Markman*, 52 F.3d at 980 (noting

that patentee is free to be his own lexicographer, but emphasizing that any special definitions

given to words must be clearly set forth in patent).  If possible, claims should be construed to

uphold validity. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns

with the patent's description of the invention will be, in the end, the correct construction."

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  It follows

that "a claim interpretation that would exclude the inventor's device is rarely the correct

interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

4

**A 32**

## III.  CONSTRUCTION OF DISPUTED TERMS[3]

### A.  "[front] plate / plate"[4]

1. Synthes' Proposed Construction: "a structure with a planar dimension greater than its thickness that is in contact with the body and houses a plurality of boreholes."[5]

2. Globus' Proposed Construction: "flat and thin structure."

3. Court's Construction: "a structure with a planar dimension greater than its thickness."

The Court's construction is supported by the intrinsic and extrinsic evidence. The figures of the patents-in-suit depict plates that are not flat, but rather "relatively flat." (See, e.g., '616 patent figs. 1, 6, 7) To the extent Globus' position is that the term should be considered relatively flat and thin, the Court agrees with Synthes that the dispute between the parties is one of degree. (D.I. 52 at 13) The Court perceives no material distinction between comparing a plate's dimensions in the manner proposed by Plaintiffs and the manner proposed by Defendant. Both sides agree the plate is not perfectly flat. (D.I. 52 at 15; Tr. at 9)

The parties alternately accuse one another of improperly broadening and narrowing the scope of the term to include things such as a passenger bus or a sheet of paper. (D.I. 52 at 10, 14)

---

[3]The Court will adopt the parties' agreed upon construction of "teeth" as it appears in claims 1, 38, 42 of the '207 patent, and claim 2 of the '076 patent, as "protrusions provided on the top or bottom surfaces of the body." (D.I. 52 at 6)

[4]Claims 1, 4, 6, 8-10, 12-13 of the '616 patent; claims 1, 3-6, 8-11, 14-16 of the '076 patent.

[5]Although Synthes proposes that "plate" and "front plate" do not require separate constructions, in its reply brief it contends that "front plate" and "securing plate" accord the same meaning to "plate," which is "a structure with its planar dimension greater than its thickness." (D.I. 52 at 13) This is the construction the Court has adopted.

5

The Court finds neither argument persuasive. *See Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (declining to "interpret claim terms in a vacuum, devoid of the context of the claim as a whole").

The Court's construction is essentially the plain and ordinary meaning of the term in this field of art. *See, e.g.*, Biology Online Dictionary, http://www.biology-online.org/dictionary/Plate (Apr. 20, 2012) (defining "plate" as "[a] flat, or nearly flat, piece of metal, the thickness of which is small in comparison with the other dimensions").

**B.     "front plate"[6]**

1.     <u>Synthes' Proposed Construction</u>: "a structure with a planar dimension greater than its thickness that is in contact with the body and houses a plurality of boreholes."

2.     <u>Globus' Proposed Construction</u>: No separate construction needed once "plate" is construed.

Alternatively, "flat and thin structure with a rear surface resting against the front surface of the body."

3.     <u>Court's Construction</u>: No construction is necessary given that "plate" has been construed.

As the Court has construed "plate," the only remaining dispute related to this term is whether the Court should include Synthes' proposed limitations that the front plate be in contact with the body and have boreholes. The claim language does not support importing Synthes' proposed limitations.

Claim 1 of the '207 patent claims "a front plate mounted to the front surface . . . including a first borehole and a second borehole." ('207 patent col. 6 ll. 39-42) As the surrounding claim

---

[6]Claims 1, 2, 4, 10-12, 16, 21, 37-43 of the '207 patent.

6

**A 34**

language makes clear that the front plate is mounted, and thus necessarily makes contact with the body, and contains a plurality of boreholes, the Court sees no reason to import these same proposed limitations into the term "front plate" as Synthes proposes. *See Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). (*See also* '076 patent col. 4 ll. 64-col. 5 ll. 7 (claiming "a plate operatively coupled to the body . . . first and second boreholes passing through the plate"); '616 patent col. 6 ll. 42-44 (claiming "plate contacting the front surface . . . the plate including a plurality of boreholes")) Moreover, as Synthes acknowledged during the *Markman* hearing, "front is a term the jury would clearly understand." (Tr. at 25)

C.     **"securing plate"**[7]

1.     Synthes' Proposed Construction: "a structure with a planar dimension greater than its thickness that inhibits the fixation elements from falling out."

2.     Globus' Proposed Construction: No separate construction needed once "plate" is construed.

Alternatively: "flat and thin structure with a rear surface resting against the front surface of the front plate that prevents the fixation elements from backing out of the boreholes."

3.     Court's Construction: No construction is necessary given that "plate" has been construed.

The Court agrees with the parties that once the term "plate" is construed, there is no need to construe "securing plate." (Tr. at 16, 81) (Synthes agreeing with this point)

---

[7]Claims 1-3, 23, 38, 40, 42 of the '207 patent; claim 9 of the '616 patent.

**D.     "upper surface [of the plate]"[8]**

1.     <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "top surface of the front plate."

2.     <u>Globus' Proposed Construction</u>: "uppermost boundary of the plate, including any tabs and extensions."

3.     <u>Court's Construction</u>: "top surface of the front plate."

The primary dispute between the parties is whether the top and bottom surfaces of the plate include tabs and extensions that extend from the plate in addition to the perimeter of the boreholes.

Globus relies on the prosecution history, specifically the applicants' treatment of U.S. Patent No. 6,432,106 (the "Fraser patent") (D.I. 53 Ex. P), to argue that Synthes disclaimed any claim scope of "top/bottom surfaces" of the plate that do not include extensions, tabs, or protrusions.  (D.I. 52 at 23)  The Court does not find a clear and unambiguous disclaimer in the prosecution history.  During prosecution, the applicant explained that the tabs disclosed in the prior art were part of the height of the front plate because the front plate itself housed the boreholes.  (*See* D.I. 53 Ex. K at 17)  In contrast, tabs or extensions that do not house boreholes do not define the upper/lower surfaces of the plate.  Rather, they are merely appendages and not part of the plate.  As there was no clear and unambiguous disavowal, there is no basis to adopt Globus' proposed construction.

---

[8]Claim 1 of the '616 patent.

**E.**    **"lower surface [of the plate]"[9]**

    1.    Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "bottom surface of the front plate."

    2.    Globus' Proposed Construction: "bottommost boundary of the plate, including any tabs and extensions."

    3.    Court's Construction: "bottom surface of the front plate."

Consistent with the related discussed in Section D, the Court will adopt Synthes' alternate construction here as well.

**F.**    **"upper plane [of the body]"[10]**

    1.    Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "a plane defined from the front edge to the back edge of the top surface of the body."

    2.    Globus' Proposed Construction: "a flat plane defined by the frontmost edge and backmost edge of the top surface where the top surface abuts the upper vertebral body once inserted."

    3.    Court's Construction: "a plane defined from the front edge to the back edge of the top surface of the body."

The Court's construction is supported by the prosecution history. During prosecution, the patentee graphically depicted the upper and underside planes of a prior art reference. (*See* D.I. 53 Ex. G at 17-8; *id.* Ex. H at 10-11) Synthes' construction is consistent with this depiction, as the upper and underside planes begin at the front edge of the body, and end at the back edge of the

---

[9]Claim 1 of the '616 patent.

[10]Claims 1, 38, 42 of the '207 patent; claim 1 of the '076 patent.

9

body.

Globus fails to persuade the Court that its additional limitation, "where the top surface abuts the upper vertebral body once inserted," is appropriate. Thus, the Court will decline to adopt Globus' construction.

G.     **"underside plane [of the body]"**[11] and **"lower plane [of the body]"**[12]

1.     Synthes' Proposed Construction: These terms can be understood in the context of these patents by their ordinary meaning, and do not require further construction. If the Court construes these terms, they should be construed as: "a plane defined from the front edge to the back edge of the bottom surface of the body."

2.     Globus' Proposed Construction: "a flat plane defined by the frontmost edge and backmost edge of the bottom surface where the bottom surface abuts the lower vertebral body once inserted."

3.     Court's Construction: "a plane defined from the front edge to the back edge of the bottom surface of the body."

The parties' dispute over this term is substantively identical to their dispute over the claim term addressed above at Section F. The Court's resolution is the same as well.

H.     **"plate top surface located generally on the upper plane / plate top surface"**[13]

1.     Synthes' Proposed Construction: "most or all of the front plate top surface is located approximately on the upper plane."

2.     Globus' Proposed Construction: "uppermost boundary of the plate, including any tabs and extensions."

3.     Court's Construction: No construction is necessary.

---

[11]Claims 1, 38, 42 of the '207 patent.

[12]Claim 1 of the '076 patent.

[13]Claim 1 of the '076 patent.

10

**A 38**

The primary dispute between the parties is whether this term includes tabs and extensions extending from the plate in addition to the perimeter of the boreholes. (D.I. 52 at 19) As discussed above, the Court is not persuaded that the inclusion of tabs and extensions is appropriate.

Synthes' construction simply rephrases the plain language of the claim. (D.I. 52 at 18 (citing *Anchord Wall Sys. v. Rockwood Retaining Walls Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) (noting that "generally" is "commonly used in patent claims to avoid a strict numerical boundary to the specified parameter"))) The Court concludes that replacing "generally" with "most or all" or "approximately" is neither helpful nor necessary, and therefore declines to adopt Synthes' proposed construction. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).

I. **"plate lower surface located generally on the lower plane / plate lower surface"**[14]

    1.    <u>Synthes' Proposed Construction</u>: "most or all of the front plate bottom surface is located approximately on the lower plane."

    2.    <u>Globus' Proposed Construction</u>: "bottommost boundary of the plate, including any tabs and extensions."

    3.    <u>Court's Construction</u>: No construction is necessary.

This term presents the identical issues as the term immediately preceding it at Section H. For the same reasons, the Court has determined that no construction is necessary.

---

[14]Claim 1 of the '076 patent.

11

**A 39**

J.    **"borehole"**[15]

1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "fixation element receiving hole."

2.    <u>Globus' Proposed Construction</u>: "drilled passageway for receiving a fixation element."

3.    <u>Court's Construction</u>: Plain and ordinary meaning.

The parties agree that the hole receives a fixation element.  Further, the parties appear to agree that "borehole" should be given its plain and ordinary meaning.  (D.I. 52 at 43; Tr. at 100) The dispute between the parties is whether the borehole must be created by "drilling."

"Courts must generally take care to avoid reading process limitations into an apparatus claim because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) (internal citation omitted).  Here, the intrinsic evidence does not require the Court to construe "borehole" to include the process limitation of "drilling."  Notably, neither the specification nor prosecution history mentions the process of creating a "borehole;" it follows, then, that there is no mention of creating a borehole by drilling.  (D.I. 52 at 46)  Thus, the Court will not read Globus' process limitation into the claim.

---

[15]Claims 1, 16, 38, 42 of the '207 patent; claims 1, 9, 13 of the '616 patent; claim 1 of the '076 patent.

**K.      "being anchorable within the first and second boreholes and the first and second partial boreholes"[16]**

1.    Synthes' Proposed Construction: "capable of being constrained by the boreholes and partial boreholes."

2.    Globus' Proposed Construction: "being rigidly connected to the internal walls of the first and second boreholes and first and second partial boreholes."

3.    Court's Construction: "capable of being constrained by the boreholes and partial boreholes."

The dispute between the parties is whether "anchorable within" includes non rigid and rigid connections or whether, instead, it is limited to a rigid connection. The specification makes clear that a "threaded, conical or expendable end" forms "rigid connection[s]" and a "smooth head" forms a non rigid connection. (*Id.* at col. 5 ll. 1-4) Thus, while a spiral or vaned blade is considered rigid, the expressly disclosed threadless or smooth fixation element would not be considered rigid.

The specification also discloses a preferred embodiment in which fixation elements are "preferably constructed as bone screws." (*See id.* at col. 5 ll. 8-9) This preferred embodiment is "anchored in the boreholes in a rigid manner." (*See id.* at ll. 14-15) The disputed term, however, is not limited to this preferred embodiment; nor is there a clear disclaimer of non rigid connections. *See, e.g., Medegen MMS, Inc. v. ICU Med., Inc.*, 317 F. App'x 982, 986 (Fed. Cir. Nov. 20, 2008) (holding that "plug" is not limited to "elastomeric" because there was no limiting claim language or disclaimer in specification, rather "elastomeric" appeared in preferred embodiment).

---

[16]Claims 1, 42 of the '207 patent.

**L.**    **"first and second boreholes of the front plate diverge when viewed from the front surface / diverge"[17]**

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "first and second boreholes of the front plate depart from a horizontal or vertical plane when viewed from the front surface of the front plate."

    2.    <u>Globus' Proposed Construction</u>: "depart from the vertical middle plane."

    3.    <u>Court's Construction</u>: "first and second boreholes of the front plate depart from a horizontal or vertical plane when viewed from the front surface of the front plate."

The parties agree the term "diverge" means "depart from." (Tr. at 103) Their dispute is whether the term is limited to departure only from the vertical middle plane or applies to departure from both the horizontal and vertical middle planes. The Court agrees with Synthes that the latter construction is correct.

Defendant's contention that its construction is necessary to differentiate claims 1 and 16 is not persuasive. The doctrine of claim differentiation "is not a hard and fast rule of construction." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (internal quotation marks omitted). Even if the Court were to apply the doctrine of claim differentiation, claims 1 and 16 are distinguishable without Globus' additional limitation because claim 1 refers to the positioning of the ***shafts***, whereas claim 16 refers to ***boreholes***. (*See* '207 patent col. 6 ll. 51-53 ("the first and second ***shafts*** being positioned substantially on an opposite side of the . . . planes") (emphasis added); *id.* at col. 7 ll. 36-37 ("the first and second ***boreholes*** of the front plate diverge when viewed from the front surface") (emphasis added))

---

[17]Claim 16 of the '207 patent.

Defendant points to no other support for its narrowed construction. The Court's

construction properly includes both horizontal and vertical departure, as depicted in the

specification. (*See* '207 patent figs. 3, 4)

**M.**   **"captured between the front plate and the securing plate"**[18]

1.  Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "captured partly or entirely within a space separating the front plate and the securing plate."

2.  Globus' Proposed Construction: "captured entirely within a space separating the front plate and the securing plate."

3.  Court's Construction: "captured partly or entirely within a space separating the front plate and the securing plate."

While the parties agree that "between" means "within a space" or at least "a space

separating two things," they dispute how much within the space this term covers. Globus would

limit the term to "entirely within a space" while Synthes would allow the term to encompass

"partly or entirely within a space." (D.I. 52 at 57-65)

Globus' construction would read out the embodiment depicted in Figure 7 of the '207

patent. Figure 7 shows fixation element heads "between" the front plate and securing plate. The

fixation element heads are not depicted as ***entirely*** between the two plates, rather only partly

between the plates.

The Court is also not persuaded that there was, in the prosecution of the '207 patent, a

clear and unambiguous disclaimer of implants with fixation heads only partly within the planes

of the body. At a minimum, there is some ambiguity in the figures of the Fraser patent, making it

---

[18]Claim 38 of the '207 patent.

unclear whether the fixation element heads are between the plates at all. (*Compare* Fraser patent

fig. 3 *with* '207 patent fig. 8; *see also* Tr. at 80 (noting that if Fraser patent discloses flexible

tabs, there is ambiguity over whether fixation elements are partly between planes))

N.    **"located between the plate and the securing plate"**[19]

1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "located partly or entirely within a space separating the front plate and the securing plate."

2.    <u>Globus' Proposed Construction</u>: "located entirely within a space separating the plate and the securing plate."

3.    <u>Court's Construction</u>: "located partly or entirely within a space separating the front plate and the securing plate."

The parties' dispute over this claim term is substantively identical to their dispute over

the claim term addressed above at Section M.  The Court's resolution is the same as well.

---

[19]Claim 9 of the '616 patent.

16

**A 44**

**O.**     **"contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies"[20]**

       1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "contained partly or entirely within a space separating the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

       2.    <u>Globus' Proposed Construction</u>: "contained entirely within a space separating the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

       3.    <u>Court's Construction</u>: "contained partly or entirely within a space separating the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section M. The Court's resolution is the same as well.

**P.**     **"positioned between the upper and lower planes"[21]**

       1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "positioned partly or entirely within a space separating the upper and lower planes."

       2.    <u>Globus' Proposed Construction</u>: "positioned entirely within a space separating the upper and lower planes."

       3.    <u>Court's Construction</u>: "positioned partly or entirely within a space separating the upper and lower planes."

The claim language supports Synthes' construction. Claim 5 of the '076 patent demonstrates that when this patentee intended for an element to be contained entirely between

---

[20]Claim 1 of the '616 patent.

[21]Claim 1 of the '076 patent.

17

**A 45**

two other structures, the patentee expressly stated so.   (*See* '076 patent col. 5 ll. 23-24 ("the plate

is *entirely* contained between the endplates . . . .") (emphasis added))  The Court agrees with

Synthes that by refraining from using "entirely" as a qualifier in the disputed term, the language

claims something broader than "entirely between."  (D.I. 52 at 59)

> **Q.** **"the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate / covered at least partly by the securing plate"[22]**
>
>> 1.  <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "the securing plate partly or entirely covers the first and second boreholes of the front plate and the first and second heads of the fixation elements."
>>
>> 2.  <u>Globus' Proposed Construction</u>: "at least partly underneath and concealed by the rear surface of the securing plate."
>>
>> 3.  <u>Court's Construction</u>: "the securing plate partly or entirely covers the first and second boreholes of the front plate and the first and second heads of the fixation elements."

The parties agree that this term requires partial to total coverage by the securing plate.

(*See* D.I. 52 at 69)  The only dispute is whether the Court should construe "cover" to mean

"underneath and concealed," as Globus proposes and Synthes opposes.

The Court is not persuaded by Globus.  Globus relies primarily on Webster's dictionary

for its proposed construction of the "ordinary meaning" of "cover."  (D.I. 52 at 68)  Even in this

extrinsic evidence, however, Globus fails to identify support for including "underneath" in its

construction.  Moreover, as a general matter, extrinsic evidence is often unhelpful in interpreting

claim language, particularly when divorced from the context of the intrinsic evidence.  *See*

---

[22]Claim 1, 42 of the '207 patent.

18

*Phillips*, 415 F.3d at 1318-19. Thus, the Court will decline to adopt Globus' construction.

**R.**   **"the securing plate at least partially covering each of the plurality of boreholes / the securing plate at least partially covering"[23]**

1. Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "the securing plate partly or entirely covers each of the plurality of boreholes of the front plate."

2. Globus' Proposed Construction: "the rear surface of the securing plate at least partly on top of and concealing."

3. Court's Construction: "the securing plate partly or entirely covers each of the plurality of boreholes of the front plate."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section Q. The Court's resolution is the same as well.

**S.**   **"the securing mechanism at least partially covering each of the plurality of boreholes / the securing mechanism at least partially covering"[24]**

1. Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "the securing mechanism partly or entirely covers each of the plurality of boreholes of the front plate."

2. Globus' Proposed Construction: "the rear surface of the securing mechanism at least partly on top of and concealing."

3. Court's Construction: "the securing mechanism partly or entirely covers each of the plurality of boreholes of the front plate."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section Q. The Court's resolution is the same as well.

---

[23]Claim 9 of the '616 patent.

[24]Claim 13 of the '616 patent.

19

**A 47**

T.    **"attaching a securing plate with a fastening agent over the first and second head portions of the first and second fixation elements"[25]**

1.    Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "a securing plate is attached to the front plate with a fastening agent so as to partly or entirely cover the first and second heads of the fixation elements."

2.    Globus' Proposed Construction: "attaching a securing plate with a fastening agent entirely on top of the first and second head portions of the first and second fixation elements."

3.    Court's Construction: "attaching a securing plate with a fastening agent entirely on top of the first and second head portions of the first and second fixation elements."

Unlike the related claim terms in dispute discussed above (*see* Sections Q, R, S), which involve "cover" and "covering" and contain the modifier "at least partly/partially," this claim term does not contain similar modifiers.  A comparison of the '207 and '616 patents – which share the same inventors – makes clear the patentee understood how to distinguish between claiming partial coverage and total coverage.  (*Compare* '207 patent col. 9 ll. 6-8 ("attaching a securing plate with a fastening agent over the first and second head portions of the first and second fixation elements") *with id*. at col. 6 ll. 55-58 ("a securing plate fastened . . . in such a manner that . . . the first and second heads are covered at least partly by the securing plate")) Hence, the Court adopts Globus' proposed construction.

---

[25]Claim 38 of the '207 patent.

20

**A 48**

U.  **"partial borehole in communication with the front surface and the upper side/underside of the body"**[26]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "a partial borehole contacts the front surface of the body and the upper/lower surface of the body."

    2.    <u>Globus' Proposed Construction</u>: "a partial borehole extending through the front surface of the body and the upper/lower surface of the body."

    3.    <u>Court's Construction</u>: "a partial borehole contacts the front surface of the body and the upper/lower surface of the body."

Figure 5 of the '616 patent specification supports the Court's construction. Figure 5 depicts a partial borehole in contact with the front surface and upper/lower surface of the body. By contrast, Globus' construction suggests that the partial borehole must pass completely through the entire body of the implant. Such a construction is not supported by the patent.

V.  **"non-metallic material"**[27]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "material not having metallic qualities."

    2.    <u>Globus' Proposed Construction</u>: "material with no metallic components."

    3.    <u>Court's Construction</u>: "material with no metallic components."

The dispute between the parties is whether non-metallic material lacks metallic qualities or metallic components. Claim 1 of the '616 patent claims a plate "made from a . . . metallic material" and a "body [] made from a . . . non-metallic material." (*See* '616 patent col. 6 ll. 65-

---

[26]Claim 1 of the '616 patent.

[27]Claim 1 of the '616 patent.

21

**A 49**

67) The claim language does not reference the properties of the materials, rather it states that the material itself is either metallic or non-metallic. Similarly, the specification does not describe or suggest what "qualities" are possessed by metals and non-metals. Synthes provides a general example in its brief that lead paint is non-metallic because it "does not behave like a metal." (D.I. 52 at 73) But the specification does not describe how a metal behaves (for example, how it conducts heat, electricity, etc.). Synthes' construction is divorced from the meaning of the term as used in the intrinsic record, and the Court will decline to adopt it.

**W.** **"the first height being substantially equal to the second height so that the three dimensional body and the plate are contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies / the first height being substantially equal to the second height"**[28]

1. Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "the first and second heights are substantially equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

2. Globus' Proposed Construction: Indefinite.

3. Court's Construction: "the first and second heights are substantially equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

Globus argues that this term is indefinite under 35 U.S.C. § 112 and, therefore, incapable of being construed. Globus falls short of demonstrating by clear and convincing evidence that the claim term is insolubly ambiguous and incapable of construction. *See generally Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (describing indefiniteness as

---

[28]Claim 1 of the '616 patent.

22

**A 50**

"exacting standard," which is satisfied when claim term is "completely dependent on a person's subjective opinion"). To prove a claim to be indefinite, a party must show by clear and convincing evidence that a person of ordinary skill in the art, after reading the claims, specification, and prosecution history, would not be able to understand the bounds of the claim; the claim must be "insolubly ambiguous" after all reasonable attempts at construction. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). A claim is not indefinite if it is amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree." *Id.* "The standard of indefiniteness is somewhat high; a claim is not indefinite merely because its scope is not ascertainable from the face of the claims." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003).

While "[i]ndefiniteness is a matter of claim construction," *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), and presents a question of law, *see ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012), the Court declines to make a final determination as to indefiniteness in the context of this claim construction dispute. Here, as is typical for this stage of the proceedings, the standard of clear and convincing evidence of invalidity is not satisfied. *See, e.g., Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011).

The Court finds that it is able to construe the disputed term. Figure 4 of the '616 patent depicts the fixation elements slightly above and below the upper and underside planes. Figure 4 is consistent with patentee's Appeal Brief filed in the Board of Patent Appeals on April 15, 2010. (*See* D.I. 53 Ex. H at 12-15) In its Appeal Brief, the patentee distinguishes the present invention

23

**A 51**

from the Fraser patent based on the Fraser patent's depiction of fixation elements that are not positioned between the upper and underside planes of the body. (*Id.* at 12)  Patentee argued, consistently with the patent figures and Synthes' construction, that the Fraser patent is distinguishable because the fixation elements in the asserted patents are positioned substantially between the upper and underside planes of the body. (*Id.* at 14-15)

The specification's description that the body of the implant is "preferably [] convex in shape" further supports the Court's construction. (*See* '616 patent col. 3 l. 26)  The specification explains that the convex shape "allows for an improved fit with the . . . vertebral bodies." (*Id.* at ll. 28-29)  This preferred embodiment involves first and second heights that are not equal but, instead, substantially equal to allow for the implant to fit between the vertebral bodies.

Synthes' proposed construction is supported, and the claim term is not insolubly ambiguous and not proven indefinite. Thus, the Court will adopt Synthes' construction.

### X.    "the second height being generally equal to the first height"[29]

1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "the first and second heights are generally equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

2.    <u>Globus' Proposed Construction</u>: Indefinite.

3.    <u>Court's Construction</u>: "the first and second heights are generally equal to allow the body and the front plate to fit partly or entirely between adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies."

---

[29]Claim 1 of the '076 patent.

The parties' dispute over this claim term is substantively identical to their dispute over

the claim term addressed above at Section W. The Court's resolution is the same as well.

Y.   **"the first and second heads and the first and second boreholes and partial**
     **boreholes positioned substantially between the upper and underside planes /**
     **positioned substantially between the upper and underside planes"[30]**

    1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the
     context of these patents by its ordinary meaning, and does not require
     further construction. If the Court construes the term, it should be
     construed as: "the first and second heads and the first and second
     boreholes and partial boreholes are positioned substantially between the
     upper and underside planes to allow the body and the front plate to fit
     between adjacent vertebral bodies when the implant is inserted between
     the adjacent vertebral bodies."

    2.   <u>Globus' Proposed Construction</u>: Indefinite.

    3.   <u>Court's Construction</u>: "the first and second heads and the first and second
     boreholes and partial boreholes are positioned substantially between the
     upper and underside planes to allow the body and the front plate to fit
     between adjacent vertebral bodies when the implant is inserted between
     the adjacent vertebral bodies."

The parties' dispute over this claim term is substantively identical to their dispute over

the claim term addressed above at Section W. The Court's resolution is the same as well.

Z.   **"securing mechanism"[31]**

    1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the
     context of these patents by its ordinary meaning, and does not require
     further construction. If the Court construes the term, it should be
     construed as: "a mechanical device that at least partially covers each of the
     plurality of boreholes in the front plate to inhibit the fixation elements
     from falling out."

---

[30]Claims 1, 38, 42 of the '207 patent.

[31]Claim 13 of the '616 patent.

25

**A 53**

2.     Globus' Proposed Construction: Means-plus-function limitation; governed by 35 U.S.C. § 112, ¶ 6.
Function: to secure.
Structure: securing plate as disclosed in element 18 of Figures 1, 3, 6, 7 and at 4:4-18 and 6:13-23.

3.     Court's Construction: Plain and ordinary meaning.

"[A] claim term that does not use 'means' will trigger the rebuttable presumption that

§ 112 ¶ 6 does not apply." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354,

1358 (Fed. Cir. 2004). This is a strong presumption, not readily overcome. *See id.* Specifically,

the presumption is overcome "if it is demonstrated that the claim term fails to recite sufficiently

definite structure or else recites function without reciting sufficient structure for performing that

function." *Id.* (internal quotation marks omitted).

The strong presumption against this claim term being a means-plus-function term is not

overcome here. "Securing mechanism" is generally understood by persons of skill in the art and

is not used in "a purely functional manner designed to invoke section 112 ¶ 6, but as a

description of structure." *Id.* at 1361. (*See also* Tr. at 92) Moreover, the claim language

identifies a structure for this term. Claim 13 of the '616 patent claims a securing mechanism that

"operatively engage[s] the plate" and "partially cover[s] each of the plurality of boreholes formed

in the plate to inhibit the bone fixation elements from falling out." (*See* '616 patent col. 8 ll. 30-

33) The Court agrees with Synthes that in the context of this patent, "securing mechanism" has

its plain and ordinary meaning.

AA.    **"fastening agent"**[32]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "a mechanical device that attaches the securing plate to the front plate."

    2.    <u>Globus' Proposed Construction</u>: Means-plus-function limitation; governed by 35 U.S.C. § 112, ¶ 6.
Function: to fasten.
Structure: screw, bayonet catch, click catch.

    3.    <u>Court's Construction</u>: Plain and ordinary meaning.

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section Z.  The Court's resolution is the same as well.

BB.    **"upper surface"**[33]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "top surface."

    2.    <u>Globus' Proposed Construction</u>: "top surface."

    3.    <u>Court's Construction</u>: "top surface."

The Court adopts what the parties have essentially agreed is an appropriate construction of this claim term.

---

[32]Claim 38 of the '207 patent.

[33]Claim 1 of the '076 patent.

CC.   **"lower surface"**[34]

1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "bottom surface."

2.   <u>Globus' Proposed Construction</u>: "bottom surface."

3.   <u>Court's Construction</u>: "bottom surface."

The Court adopts what the parties have essentially agreed is an appropriate construction of this claim term.

DD.   **"upper side"**[35]

1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "top side."

2.   <u>Globus' Proposed Construction</u>: "top surface."

3.   <u>Court's Construction</u>: "top surface."

The parties are in agreement that the upper surface/upper side, lower surface/underside of the body should be construed such that all of the "upper" terms mean "top" and all of the "lower" terms mean "bottom."  (Tr. at 31 ("there is no dispute as to that"))  The dispute between the parties is whether "side" should be construed consistently with "surface."  The Court concludes that "side" and "surface" should be construed consistently.

By way of example, the '076 patent specification describes a six-sided implant, including "a convex top side and convex underside, the two sides each being designed to rest against the

---

[34]Claim 1 of the '076 patent.

[35]Claim 1, 38, 42 of the '207 patent; claim 1 of the '616 patent.

28

**A 56**

end plates of two adjacent vertebras." ('076 patent col. 4 ll. 11-13)  This description refers to

Figures 1 through 4, which depict the upper side/surface as the side/surface that is in contact with

each vertebral body.  The claim language describes the same side/surface as "an upper surface

and a lower surface, the upper and lower surfaces . . . to contact the upper and lower endplates

. . . of the upper and lower vertebrae." (*Id.* at col. 4 ll. 58-62)  Thus, within the '076 patent,

"side" and "surface" are used interchangeably.  Similarly, claim 1 of the '207 and '616 patents

claim a six-sided implant.  (*See* '207 patent col. 6 ll. 29-38; '616 patent col. 6 ll. 31-33)  The

Court finds that replacing "side" with "surface" does not alter the meaning of the claims and, for

the sake of consistency and simplifying issues for the jury, will construe "side" as "surface."

### EE.  "underside"[36]

1.  Synthes' Proposed Construction: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "bottom side."

2.  Globus' Proposed Construction: "bottom surface."

3.  Court's Construction: "bottom surface."

The parties' dispute over this claim term is substantively identical to their dispute over

the claim term addressed above at Section DD.  The Court's resolution is the same as well.

---

[36]Claims 1, 38, 42 of the '207 patent; claim 1 of the '616 patent.

FF.    **"upper vertebra"**[37]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "vertebra above and most proximate to the implant."

    2.    <u>Globus' Proposed Construction</u>: "vertebra on the top side of the implant."

    3.    <u>Court's Construction</u>: "vertebra above and most proximate to the implant."

Claim 1 of the '076 patent claims "[a]n intervertebral implant for insertion between an upper vertebra having an upper endplate and a lower vertebra having a lower endplate." (*See* '076 patent col. 4 ll. 54-56) Hence, the plain language of the claim describes an upper vertebra having an upper endplate and a lower vertebra having a lower endplate. The claim continues and states that "the upper and lower surfaces . . . contact the upper and lower endplates, respectively, of the upper and lower vertebrae." (*See id*. at ll. 59-62) Again, the plain language of the claim indicates that the upper vertebrae and upper endplate are in contact, and the lower vertebrae and lower endplate are in contact. The specification confirms that the "intervertebral implant" is meant to "rest against the end plates of two adjacent vertebras." (*See id*. at ll. 10-13) Hence, the claim language and the specification support Synthes' proposed construction, which properly construes "upper verterbra" as "vertebra above and most proximate to the implant."

Globus' proposed construction, by contrast, would not allow for the upper vertebra and implant to be in contact. This is not supported by the patent. Nor does the prosecution history on which Globus relies, which consists primarily of a statement by the Examiner in connection with the Fraser patent, to the effect that "endplates can be interpreted as a superior endplate of

---

[37]Claim 1 of the '076 patent.

vertebral body 52 and inferior endplate of vertebral body 54," (D.I. 39 Ex. H at 5), which does not constitute a clear and unambiguous disavowal of claim scope by the patentee.

GG.   **"lower vertebra"**[38]

1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "vertebra below and most proximate to the implant."

2.   <u>Globus' Proposed Construction</u>: "vertebra on the bottom side of the implant."

3.   <u>Court's Construction</u>: "vertebra below and most proximate to the implant."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section FF. The Court's resolution is the same as well.

HH.   **"upper endplate"**[39]

1.   <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction. If the Court construes the term, it should be construed as: "endplate on the bottom side of the vertebra above the implant."

2.   <u>Globus' Proposed Construction</u>: "endplate on the top side of the vertebra."

3.   <u>Court's Construction</u>: "endplate on the bottom side of the vertebra above the implant."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section FF. The Court's resolution is the same as well.

---

[38]Claim 1 of the '076 patent.

[39]Claim 1 of the '076 patent.

31

**A 59**

**II.**    **"lower endplate"**[40]

    1.    <u>Synthes' Proposed Construction</u>: This term can be understood in the context of these patents by its ordinary meaning, and does not require further construction.  If the Court construes the term, it should be construed as: "endplate on the top side of the vertebra below the implant."

    2.    <u>Globus' Proposed Construction</u>: "endplate on the bottom side of the vertebra."

    3.    <u>Court's Construction</u>: "endplate on the top side of the vertebra below the implant."

The parties' dispute over this claim term is substantively identical to their dispute over the claim term addressed above at Section FF.  The Court's resolution is the same as well.

**IV.    CONCLUSION**

For the reasons given above, the Court will construe the terms of the patents-in-suit consistent with this Memorandum Opinion.  An appropriate Order follows.

---

[40]Claim 1 of the '076 patent.

32

**A 60**



US007846207B2

(12) **United States Patent**　　(10) **Patent No.:**　　**US 7,846,207 B2**
Lechmann et al.　　　　　　　　(45) **Date of Patent:**　　　Dec. 7, 2010

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Beat Lechmann**, Bettlach (CH);
　　　　　　**Dominique Burkard**, Gretzenbach
　　　　　　(CH); **Chris M. J. Cain**, Norwood (AU);
　　　　　　**Claude Mathieu**, Zurich (CH)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
　　　　　　(US)

( * ) Notice:　Subject to any disclaimer, the term of this
　　　　　　patent is extended or adjusted under 35
　　　　　　U.S.C. 154(b) by 1412 days.

(21) Appl. No.: **11/199,599**

(22) Filed:　　**Aug. 8, 2005**

(65)　　　　**Prior Publication Data**

　　US 2006/0085071 A1　　Apr. 20, 2006

**Related U.S. Application Data**

(63) Continuation of application No. PCT/CH03/00089,
　　filed on Feb. 6, 2003.

(51) Int. Cl.
　　*A61F 2/44*　　　　(2006.01)
(52) **U.S. Cl.** ................................. **623/17.11**; 623/17.16
(58) **Field of Classification Search** ................. 606/63,
　　　　　606/291, 90, 293; 623/17.11, 17.15, 17.16
　　See application file for complete search history.

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

2,621,145 A　12/1952 Sano

(Continued)

FOREIGN PATENT DOCUMENTS

CA　　2317791 A1　8/1999

DE　30 42 003 A1　7/1982
DE　39 33 459 A1　4/1991

(Continued)

OTHER PUBLICATIONS

Office Notice of Reason of Rejection issued by the Japanese Patent
Office.

*Primary Examiner*—Todd E Manahan
*Assistant Examiner*—Lynnsy Schneider
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57)　　　　　**ABSTRACT**

An intervertebral implant having a three-dimensional body
(**10**) and a securing plate (**1**). The three-dimensional body
(**10**) includes an upper side (**1**) and an underside (**2**) which are
suitable for abutting the end plates of two adjacent vertebral
bodies, a left side surface (**3**) and a right side surface (**4**), a
front surface (**5**) and a rear surface (**6**), a horizontal middle
plane (**7**) between the upper side (**1**) and the underside (**2**), and
a vertical middle plane (**12**) extending from the front surface
(**5**) to the rear surface (**6**). The three-dimensional body further
includes a plurality of boreholes (**9***a*) passing through the
body (**10**), which are suitable for accommodating longitudi-
nal fixation elements (**20**). The intervertebral implant also
includes a front plate (**8**) displaceably disposed as an insert
with the front side (**5**) of the three-dimensional body, the front
plate (**8**) having a plurality of boreholes (**9**) in which the
longitudinal fixation elements (**20**) can be anchored, and
whose openings overlap with the openings of the boreholes of
the three-dimensional body (**10**). A securing plate can be
fastened essentially parallel to the front plate (**8**) at the three-
dimensional body (**10**) in such a manner that the boreholes of
the front plate (**9**) are covered at least partly by the securing
plate (**18**). By virtue of the configuration of the intervertebral
implant, a rigid, firm connection between the intervertebral
implant and the longitudinal fixation elements used to fasten
it, is possible.

**43 Claims, 6 Drawing Sheets**



GL_SYN0001001

DTX0001
(C.A.# 1:11cv652-LPS)

**US 7,846,207 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,506 A | 1/1979 | Ulrich | |
| 4,501,269 A | 2/1985 | Bagby | |
| 4,512,038 A | 4/1985 | Alexander et al. | |
| 4,627,853 A | 12/1986 | Campbell et al. | |
| 4,678,470 A | 7/1987 | Nashef et al. | |
| 4,717,115 A | 1/1988 | Schmitz | |
| 4,858,603 A | 8/1989 | Clemow et al. | |
| 4,904,261 A | 2/1990 | Dove et al. | |
| 4,936,851 A | 6/1990 | Fox et al. | |
| 4,950,296 A | 8/1990 | McIntyre | |
| 4,961,740 A | 10/1990 | Ray et al. | |
| 4,978,350 A * | 12/1990 | Wagenknecht | 606/312 |
| 4,994,084 A | 2/1991 | Brennan | |
| 5,026,373 A | 6/1991 | Ray et al. | |
| 5,053,049 A | 10/1991 | Campbell | |
| 5,062,850 A | 11/1991 | MacMillan et al. | |
| 5,084,051 A | 1/1992 | Törmälä et al. | |
| 5,112,354 A | 5/1992 | Sires | |
| 5,192,327 A | 3/1993 | Brantigan | |
| 5,211,664 A | 5/1993 | Tepic et al. | |
| 5,281,226 A | 1/1994 | Davydov et al. | |
| 5,284,655 A | 2/1994 | Bogdansky et al. | |
| 5,298,254 A | 3/1994 | Prewett et al. | |
| 5,314,476 A | 5/1994 | Prewett et al. | |
| 5,348,788 A | 9/1994 | White | |
| 5,405,391 A | 4/1995 | Hednerson et al. | |
| 5,423,817 A | 6/1995 | Lin | |
| 5,439,684 A | 8/1995 | Prewett et al. | |
| 5,458,638 A | 10/1995 | Kuslich et al. | |
| 5,489,308 A | 2/1996 | Kuslich et al. | |
| 5,507,818 A | 4/1996 | McLaughlin | |
| 5,514,180 A | 5/1996 | Heggeness et al. | |
| 5,522,899 A | 6/1996 | Michelson | |
| 5,534,030 A | 7/1996 | Navarro et al. | |
| 5,549,679 A | 8/1996 | Kuslich | |
| 5,554,191 A | 9/1996 | Lahille et al. | |
| 5,556,430 A | 9/1996 | Gendler | |
| 5,569,308 A | 10/1996 | Sottosanti | |
| 5,571,190 A | 11/1996 | Ulrich et al. | |
| 5,571,192 A | 11/1996 | Schönhöffer | |
| 5,607,474 A | 3/1997 | Athanasiou et al. | |
| 5,609,635 A | 3/1997 | Michelson | |
| 5,609,636 A | 3/1997 | Kohrs et al. | |
| 5,609,637 A | 3/1997 | Biedermann et al. | |
| 5,676,699 A | 10/1997 | Gogolewski et al. | |
| 5,683,394 A | 11/1997 | Rinner | |
| 5,683,463 A | 11/1997 | Godefroy et al. | |
| 5,702,449 A | 12/1997 | McKay | |
| 5,702,451 A | 12/1997 | Biedermann et al. | |
| 5,702,453 A | 12/1997 | Rabbe et al. | |
| 5,702,455 A | 12/1997 | Saggar | |
| 5,728,159 A | 3/1998 | Stroever et al. | |
| 5,735,905 A | 4/1998 | Parr | |
| 5,766,253 A | 6/1998 | Brosnahan, III | |
| 5,776,194 A | 7/1998 | Mikol et al. | |
| 5,776,197 A | 7/1998 | Rabbe et al. | |
| 5,776,198 A | 7/1998 | Rabbe et al. | |
| 5,776,199 A | 7/1998 | Michelson | |
| 5,782,915 A | 7/1998 | Stone | |
| 5,785,710 A | 7/1998 | Michelson | |
| 5,800,433 A | 9/1998 | Benzel et al. | 606/61 |
| 5,865,849 A | 2/1999 | Stone | |
| 5,876,452 A | 3/1999 | Athanasiou et al. | |
| 5,885,299 A | 3/1999 | Winslow et al. | |
| 5,888,222 A | 3/1999 | Coates et al. | |
| 5,888,223 A | 3/1999 | Bray, Jr. | 623/17 |
| 5,888,224 A | 3/1999 | Beckers et al. | |
| 5,888,227 A | 3/1999 | Cottle | |
| 5,895,426 A | 4/1999 | Scarborough et al. | |
| 5,899,939 A | 5/1999 | Boyce et al. | |
| 5,902,338 A | 5/1999 | Stone | |
| 5,904,719 A | 5/1999 | Errico et al. | |
| 5,910,315 A | 6/1999 | Stevenson et al. | |
| 5,922,027 A | 7/1999 | Stone | |
| 5,944,755 A | 8/1999 | Stone | |
| 5,968,098 A | 10/1999 | Winslow | |
| 5,972,368 A | 10/1999 | McKay | |
| 5,976,187 A | 11/1999 | Richelsoph | |
| 5,980,522 A | 11/1999 | Koros et al. | |
| 5,981,828 A | 11/1999 | Nelson et al. | |
| 5,984,967 A | 11/1999 | Zdeblick et al. | |
| 5,989,289 A | 11/1999 | Coates et al. | |
| 6,013,853 A | 1/2000 | Athanasiou et al. | |
| 6,025,538 A | 2/2000 | Yaccarino, III | |
| 6,033,405 A | 3/2000 | Winslow et al. | |
| 6,033,438 A | 3/2000 | Bianchi et al. | |
| 6,039,762 A | 3/2000 | McKay | |
| 6,045,579 A | 4/2000 | Hochshuler et al. | |
| 6,045,580 A | 4/2000 | Scarborough et al. | |
| 6,080,158 A | 6/2000 | Lin | |
| 6,080,193 A | 6/2000 | Hochshuler et al. | |
| 6,090,998 A | 7/2000 | Grooms et al. | |
| 6,096,081 A | 8/2000 | Grivas et al. | |
| 6,110,482 A | 8/2000 | Khouri et al. | |
| 6,123,731 A | 9/2000 | Boyce et al. | |
| 6,129,763 A | 10/2000 | Chauvin et al. | |
| 6,143,030 A | 11/2000 | Schroder | |
| 6,143,033 A | 11/2000 | Paul et al. | |
| 6,156,070 A | 12/2000 | Incavo et al. | |
| 6,193,756 B1 | 2/2001 | Studer et al. | |
| 6,200,347 B1 | 3/2001 | Anderson et al. | |
| 6,206,922 B1 | 3/2001 | Zdeblick et al. | |
| 6,231,610 B1 | 5/2001 | Geisler | |
| 6,235,059 B1 | 5/2001 | Benezech et al. | |
| 6,241,769 B1 | 6/2001 | Nicholson et al. | |
| 6,245,108 B1 | 6/2001 | Biscup | |
| 6,258,125 B1 | 7/2001 | Paul et al. | |
| 6,261,586 B1 | 7/2001 | McKay | |
| 6,264,695 B1 | 7/2001 | Stoy | |
| 6,270,528 B1 | 8/2001 | McKay | |
| 6,322,562 B1 * | 11/2001 | Wolter | 606/62 |
| 6,342,074 B1 | 1/2002 | Simpson | |
| 6,364,880 B1 | 4/2002 | Michelson | |
| 6,423,063 B1 | 7/2002 | Bonutti | |
| 6,432,106 B1 | 8/2002 | Fraser | |
| 6,458,158 B1 | 10/2002 | Anderson et al. | |
| 6,468,311 B2 | 10/2002 | Boyd et al. | |
| 6,569,201 B2 | 5/2003 | Moumene et al. | |
| 6,638,310 B2 | 10/2003 | Lin et al. | |
| 6,645,212 B2 * | 11/2003 | Goldhahn et al. | 606/291 |
| 6,761,739 B2 | 7/2004 | Shepard | |
| 6,884,242 B2 * | 4/2005 | LeHuec et al. | 606/86 B |
| 6,972,019 B2 * | 12/2005 | Michelson | 606/86 A |
| 6,984,234 B2 | 1/2006 | Bray | 606/69 |
| 7,112,222 B2 | 9/2006 | Fraser et al. | |
| 7,172,627 B2 * | 2/2007 | Fiere et al. | 623/17.11 |
| 7,232,464 B2 | 6/2007 | Mathieu et al. | 623/17.11 |
| 2001/0001129 A1 | 5/2001 | McKay et al. | |
| 2001/0005796 A1 | 6/2001 | Zdeblick et al. | |
| 2001/0010021 A1 | 7/2001 | Boyd et al. | |
| 2001/0016777 A1 | 8/2001 | Biscup | |
| 2001/0031254 A1 | 10/2001 | Bianchi et al. | |
| 2001/0039456 A1 | 11/2001 | Boyer, II et al. | |
| 2001/0041941 A1 | 11/2001 | Boyer, II et al. | |
| 2002/0010511 A1 | 1/2002 | Michelson | |
| 2002/0022843 A1 | 2/2002 | Michelson | 606/70 |
| 2002/0029084 A1 | 3/2002 | Paul et al. | |
| 2002/0082597 A1 | 6/2002 | Fraser | |
| 2002/0082603 A1 * | 6/2002 | Dixon et al. | 606/69 |
| 2002/0091447 A1 | 7/2002 | Shimp et al. | |
| 2002/0099376 A1 | 7/2002 | Michelson | 606/61 |
| 2002/0106393 A1 | 8/2002 | Bianchi et al. | |
| 2002/0111680 A1 | 8/2002 | Michelson | |
| 2002/0147450 A1 | 10/2002 | LeHuec et al. | 606/61 |

GL_SYN0001002

**A 62**

**US 7,846,207 B2**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 2002/0169508 A1 | 11/2002 | Songer et al. ............ 623/17.11 | WO | WO 96/39988 | 12/1996 | |
| 2002/0193880 A1* | 12/2002 | Fraser .................... 623/17.11 | WO | WO 97/20526 | 6/1997 | |
| 2003/0078668 A1* | 4/2003 | Michelson ............... 623/17.16 | WO | WO 97/25941 | 7/1997 | |
| 2003/0125739 A1 | 7/2003 | Bagga et al. | WO | WO 97/25945 | 7/1997 | |
| 2004/0210314 A1 | 10/2004 | Michelson | WO | WO 97/36693 | 10/1997 | |
| 2005/0033433 A1 | 2/2005 | Michelson | WO | WO 98/17209 | 4/1998 | |
| 2007/0219635 A1 | 9/2007 | Mathieu et al. .......... 623/17.16 | WO | WO 98/55052 | 12/1998 | |
| | | | WO | WO 98/56319 | 12/1998 | |
| | | | WO | WO 98/56433 | 12/1998 | |

FOREIGN PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | WO | WO 99/29271 | 6/1999 |
| DE | 42 42 889 | A1 | 6/1994 | WO | WO 99/32055 | 7/1999 |
| DE | 44 09 392 | A1 | 9/1995 | WO | WO 99/38461 | 8/1999 |
| DE | 195 04 867 | C1 | 2/1996 | WO | WO 99/38463 | 8/1999 |
| DE | 299 13 200 | U1 | 9/1999 | WO | WO 99/56675 | 11/1999 |
| EP | 0505634 | A1 | 9/1992 | WO | WO 99/63914 | 12/1999 |
| EP | 0517030 | A2 | 12/1992 | WO | WO 00/07527 | 2/2000 |
| EP | 0577178 | A1 | 1/1994 | WO | WO 00/07528 | 2/2000 |
| EP | 0639351 | A2 | 2/1995 | WO | WO 00/30568 | 6/2000 |
| EP | 0505634 | B1 | 8/1997 | WO | WO 00/40177 | 7/2000 |
| EP | 0966930 | | 12/1999 | WO | WO 00/41654 | 7/2000 |
| EP | 0968692 | A1 | 1/2000 | WO | WO 00/59412 | 10/2000 |
| EP | 0906065 | B1 | 1/2004 | WO | WO 00/66044 A1 | 11/2000 |
| FR | 2 697 996 | | 5/1994 | WO | WO 00/66045 A1 | 11/2000 |
| FR | 2 700 947 | | 8/1994 | WO | WO 00/74607 A1 | 12/2000 |
| FR | 2 753 368 | | 3/1998 | WO | WO 01/08611 | 2/2001 |
| GB | 2 148 122 | A | 5/1985 | WO | WO 01/56497 A2 | 8/2001 |
| SU | 1465040 | A1 | 3/1989 | WO | WO 01/93742 A2 | 12/2001 |
| WO | WO 88/03417 | | 5/1988 | WO | WO 01/95837 A1 | 12/2001 |
| WO | WO 88/10100 | | 12/1988 | | | |
| WO | WO 92/01428 | | 2/1992 | * cited by examiner | | |
| WO | WO 95/21053 | | 8/1995 | | | |



**Fig. 1**

GL_SYN0001004

**A 64**



**Fig. 2**

GL_SYN0001005

**A 65**

Case: 14-1483    Document: 38    Page: 145    Filed: 12/17/2014



**Fig. 3**

GL_SYN0001006

**A 66**

Case: 14-1483    Document: 38    Page: 146    Filed: 12/17/2014



**Fig. 4**

GL_SYN0001007

**A 67**



Fig. 5

Fig. 6

GL_SYN0001008



**Fig. 7**

GL_SYN0001009

**A 69**

US 7,846,207 B2

1

# INTERVERTEBRAL IMPLANT

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of International Patent Application No. PCT/CH2003/000089, filed Feb. 6, 2003, the entire contents of which is expressly incorporated herein by reference.

## TECHNICAL FIELD

The present invention relates generally to intervertebral implants.

## BACKGROUND OF THE INVENTION

GB-A-2 207 607 discloses an intervertebral implant, which has a horseshoe-shaped configuration with a plurality of cylindrical holes. The holes are smooth on the inside and only have a stop for the heads of the bone screws, which are to be introduced therein. A disadvantage of this arrangement is that the fastening screws, introduced therein, can be anchored only with their shaft in the bone. This does not result in a rigid connection with the horseshoe-shaped intervertebral implant. When the anchoring of the screw shaft in the bone is weakened, the intervertebral implant becomes movable with respect to the screw and the bone screws tend to migrate, endangering the blood vessels. Moreover, the loosening of the intervertebral implant can lead to a pseudarthrosis.

U.S. Patent Publication US-A 2000/0010511 (Michelson) discloses an intervertebral implant, which, at its front surface, has two boreholes with an internal thread, into which bone screws with a threaded head can be introduced. A disadvantage of this implant is that the bone screws can become loose and are not secured against being screwed out or falling out. A further disadvantage is that the bone screws are fastened completely to the implant body itself and that therefore the latter experiences a relatively large stress.

Screws which emerge at the anterior or anterolateral edge of the vertebral body because of loosening run the risk of injuring main vessels such as the aorta and Vena cava, as well as supply vessels such as lumbar arteries and veins. Injury to these main vessels may result in internal bleeding possibly causing death within a very short time. Loosening of screws is more likely when they are not mounted angularly firmly.

## SUMMARY OF THE INVENTION

The present invention is to provide a remedy for the above-discussed disadvantages. The present invention is directed to an intervertebral implant which can enter into a permanent, rigid connection with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means. Moreover, over a separately constructed front plate, there is tension chording for the bone fixation elements, so that the implant body experiences less stress, that is, superimposed tensions. Moreover, a securing plate enables all bone fixation elements to be secured simultaneously.

The present invention accomplishes the objective set out above with an intervertebral implant, comprising a three-dimensional body having an upper side and an under side which are suitable for abutting the end plates of two adjacent vertebral bodies. The three-dimensional body further includes a left side surface and a right side surface, a front surface and a rear surface, a horizontal middle plane between

2

the upper side and the under side, and a vertical middle plane extending from the front surface to the rear surface. The three-dimensional body further comprising a plurality of boreholes, having openings at least at or near the front surface, passing there through and being suitable for accommodating longitudinal fixation elements. The intervertebral implant further including a front plate displaceably disposed as an insert with the front side of the three-dimensional body, where the front plate includes a plurality of boreholes having openings and in which the longitudinal fixation elements can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body. The intervertebral implant has a securing plate fastened substantially parallel to the front plate in such a manner that the boreholes of the front plate are covered at least partly by the securing plate. An advantage achieved by the present invention, arises essentially from the solid connection between the intervertebral implant and the longitudinal fixation elements, used to fasten it.

Compared to the two-part implants of the state of the art, for which a front plate is implanted in a separate step, the present invention has the advantage that the implantation of the intervertebral implant may be carried out in one step and, with that, can be carried out more easily and more quickly. A further advantage is that the intervertebral implant is fixed as frontally as possible at the body of the vertebra. That is, at a place where good bone material usually is present. The result is an anterior movement limitation without a greater risk to the surrounding structures. The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements).

A method for implanting an intervertebral implant of the present invention between two adjacent vertebral bodies includes introducing the intervertebral implant, having a three-dimensional body, a front plate, and one or more boreholes, between two adjacent vertebral bodies, attaching longitudinal fixation elements with heads through the boreholes into the vertebral bodies, and attaching a securing plate by means of a fastening agent over the heads of the longitudinal fixation elements to the front plate, wherein the heads of the longitudinal fixation elements are captured between the front plate and the securing plate wherein the longitudinal fixation elements are secured against being shifted relative to the intervertebral implant.

Other objectives and advantages in addition to those discussed above will become apparent to those skilled in the art during the course of the description of a preferred embodiment of the invention which follows. In the description, reference is made to accompanying drawings, which form a part thereof, and which illustrate an example of the invention. Such example, however, is not exhaustive of the various embodiments of the invention, and therefore, reference is made to the claims that follow the description for determining the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an exploded drawing of the intervertebral implant,

FIG. 2 shows a longitudinal fixation element in the form of a screw,

FIG. 3 shows an elevation of the intervertebral implant of FIG. 1,

FIG. 4 shows a side view of the intervertebral implant of FIG. 1,

GL_SYN0001010

A 70

US 7,846,207 B2

3
4

FIG. **5** shows a three-dimensional detailed representation of the body of the intervertebral implant, which shows the connecting elements to the front plate of FIG. **6**,

FIG. **6** shows a three-dimensional detailed representation of the front plate of the intervertebral implant and the connecting elements to the body of FIG. **5** and

FIG. **7** shows a completely installed intervertebral implant with front plate and securing plate.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

The intervertebral implant, shown in FIG. **1-7**, includes a three-dimensional body **10** in the form of a cage with an upper side **1** and an underside **2**, which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface **3** and a right side surface **4**, a front surface **5** and a back surface **6**, a horizontal middle plane **7** located between the upper side **1** and the underside **2**, a vertical middle plane **12** extending from the front surface **5** to the rear surface **6** and four boreholes **9**a, which pass through the body **10** and are suitable for accommodating longitudinal fixation elements **20**. The body **10** may be constructed as a hollow body, the mantle surfaces of which are provided with perforations **19**. The upper side **1** and/or under side **2** of the intervertebral implant may preferably be convex in shape, not planar. A convex shape to the upper side **1** and the underside **2** allows for an improved fit with the end plates of the adjacent vertebral bodies by the intervertebral implant. Further, the side surfaces **1-6** of the intervertebral implant may be essentially convex, as well.

As shown in FIG. **7**, the upper side **1** and the underside **2** of the three-dimensional body **10** are provided with structuring in the form of teeth **30**.

At the front surface of the three-dimensional body **10**, a front plate **8** may be mounted, which is disposed perpendicular to the horizontal central plane of the intervertebral implant and through which four boreholes **9** pass and in which the longitudinal fixation elements **20** can be anchored. The front plate **8**, as shown in FIGS. **5** and **6**, is constructed as an insert for the three-dimensional body **10**. The three-dimensional body **10** has a semicircular groove **27** extending parallel to the vertical middle plane **12** at the transitions of the left side surface **3** and the right side surface **4** (FIG. **5**) to the front surface **5**. Correspondingly, the front plate **8** has right and left (FIG. **6**) similarly extending and similarly dimensioned, semicircular rail **28**. As a result, the front plate can be pushed and positioned easily with its two lateral rails **28** into the corresponding grooves **27** of the body **10** during the production of the intervertebral implant.

In one embodiment, at least one of the boreholes **9** in the front plate is constructed so that a longitudinal fixation element **20**, accommodated therein, can be connected rigidly with the front plate. A rigid connection may be accomplished, for example, owing to the fact that at least one of the boreholes **9** of the front plate **8** has an internal thread. A corresponding longitudinal fixation element **20**, bone screw, with a threaded end can then be screwed together rigidly with the implant. In an alternative embodiment, the four boreholes **9** in the front plate may have an internal thread **11**, so that longitudinal fixation elements **20** can be connected rigidly with the front plate **8**.

As discussed, the front plate **8** may be displaced, preferably vertically to the horizontal central plane, so that it can be displaced vertically with respect to the three-dimensional body **10**. By these means, "stress shielding" (protection and neutralization of mechanical stresses) is attained, which permits the end plates to be adapted to the intervertebral implant during the healing process.

The intervertebral implant may have a securing plate **18**, which can be fastened by means of a screw connection parallel to the front plate **8** at the front plate **8** in such a manner that the boreholes **9** of the front plate **8** are partly covered by the securing plate **18**. The securing plate **18** may have a central borehole **17** provided, preferably, with an internal thread. Corresponding thereto, the front plate **8** has a central borehole **15** for accommodating fastening means **16**. Preferably, the central borehole **15** has an internal thread **14** for accommodating a fastening means **16** in the form of a screw. The securing plate **18** may also be fastened by a bayonet catch or a click catch. By fastening the securing plate **18** to the front plate **8**, the heads **21** of the longitudinal fixation elements **20** (discussed later) are contacted by the securing plate **18**, so that they are secured against being ejected or screwed out.

Preferably, the boreholes **9**a of the three-dimensional body **10** do not pass either through the left side surface **3** or the right side surface **4** or completely through the front surface **5**. The front surface **5**, preferably, is also not crossed by the boreholes **9**a. Further, the horizontal middle plane **7** is not pierced by the boreholes **9**a. Only the axes **24** of the longitudinal fixation elements **20**, introduced therein, intersect the horizontal middle plane **7** of the body **10**. As seen from the front surface **5**, the boreholes of the three-dimensional body **10** and the front plate **8** diverge. The axes **24** of the boreholes of the three-dimensional plate **10** and the front plate **8** enclose an angle β ranging from 20° to 60°, specifically from 36° to 48°, and more preferably an angle β of 42° with the horizontal middle plane **7** (FIG. **4**) and an angle α ranging from 10° to 45°, specifically from 27° to 33°, and more preferably an angle α of 30° with the vertical middle plane **12** (FIG. **3**). Thus, better access for introducing the screws is achieved.

In one embodiment, at least one of the boreholes **9** of the front plate **8** may taper conically towards the underside **2**, so that a bone screw, with a corresponding conical head, can be anchored rigidly therein. The conical borehole preferably has a conical angle, which is smaller than the resulting frictional angle. Advisably, the conicity of the conical borehole is 1:3.75 to 1:20.00 and preferably 1:5 to 1:15.

In another configuration, at least two of the boreholes **9** of the front plate **8** extend parallel to each other. This makes insertion of the intervertebral implant easier. In another embodiment, at least two of the boreholes **9** of the front plate **8** diverge when viewed from the front side. By these means, a region of the vertebral body, which has a better bone quality than does the center of the vertebral body, is reached with bone screws.

To improve the anchoring of the bone screw in a plastic body of the intervertebral implant (discussed later), a metal sleeve with an internal thread (not shown) may be inserted in the boreholes of the front plate and three-dimensional body. The intervertebral implant may also consist only partially of an x-ray transparent plastic and, in the region of the boreholes consist of a metal, such as titanium or a titanium alloy. Improved guidance and anchoring of the bone screws in the intervertebral implant may be achieved. Further, the boreholes **9** may have a smooth internal wall, into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.

Depending on circumstances, two, three, four or more longitudinal fixation elements may be connected rigidly with the intervertebral implant. Preferably, at least one fixation element should pierce the upper side and at least one fixation element the underside of the intervertebral implant. The lon-

GL_SYN0001011

A 71

US 7,846,207 B2

5

gitudinal fixation elements **20** may have either a smooth head, so that there will not be a rigid connection with the implant or a threaded, conical or expendable end, so that there will be a rigid connection with the implant. In both cases, however, the longitudinal fixation elements **20** are secured by the securing plate against rotating out, being ejected out or falling out at a later time.

The longitudinal fixation elements **20** are preferably constructed as bone screws. As shown in FIG. **2**, the longitudinal fixation elements **20**, introduced into the boreholes **9**, have a head **21**, a tip **22**, a shaft **23** and an axis **24**. The head **21** may preferably be provided with an external thread **25**, which corresponds to the internal thread **11** of the borehole **9**, so that the heads **21** can be anchored in the boreholes **9** in a rigid manner. The shaft **23** may be provided with a thread **26**, which is self-drilling and self-cutting. The load thread angle of the thread **26** has a range of between 11° to 14°, preferably between 12° and 13°, and more preferably a load thread angle of 12.5°. The pitch angle of the thread may have a range of between 6° and 10°, preferably between 7° and 9°, and more preferably have a pitch angle of 8°. The special pitch angle produces a self-retardation in the thread, thus ensuring that the bone screw will not automatically become loose.

In the case of a second, possibly rigid type of connection, a longitudinal fixation element **20**, bone screw, may preferably be used, the head of which tapers conically towards the shaft, the conicity of the head corresponding to the conicity of the borehole of the intervertebral implant. The longitudinal fixation elements may also be constructed as threadless cylindrical pins, which are provided with a drilling tip, preferably in the form of a trocar. A further variation consist therein that the longitudinal fixation elements are constructed as spiral springs. Finally, the longitudinal fixation elements may also be constructed as single-vaned or multi-vaned spiral blades.

As shown in FIG. **7**, two longitudinal fixation elements **20** pierce the upper side **1** and two longitudinal fixation elements **20** pierce the underside **2** of the body **10**, thereby anchoring the intervertebral implant to the adjacent vertebral bodies.

The intervertebral implant may be produced from any material which is compatible with the body. Preferably, the three-dimensional body **10** may consist of a body-compatible plastic which has not been reinforced and which may be transparent to x-rays. The advantage over fiber-reinforced plastics, which are already known in implant technology, is that no reinforcing fibers are exposed. Such exposure may be disadvantageous clinically. In such a three-dimensional body **10** constructed of a plastic that has not been reinforced, the use bone screws may be preferable. As discussed previously, the external thread of the bone screw(s) may have a load thread angle range of 11° to 14°, and preferably between 12° to 13°. A comparatively slight inclination of the load flank brings about a high clamping force. As a result, radial expansion and the danger of forming cracks in the plastic are reduced. Furthermore, the external thread of the bone screw(s) may preferably have a pitch angle between 6° and 10° and preferably between 7° and 9°.

The front plate **8** may be made from materials different than the three-dimensional body **10**. The front plate **8** is preferably made from a metallic material. Titanium or titanium alloys are particularly suitable as metallic materials. The complete tension chord arrangement (front plate and screws) may also be made from implant steel or highly alloyed metallic materials, such as CoCrMo or CoCrMoC. The advantage of titanium lies in that there is good tissue compatibility and the good ingrowing behavior of bones. The advantage of highly alloyed metallic materials lies in their high-strength values, which permit filigree constructions.

6

A brief description of a surgical procedure follows in order to explain the invention further.

The intervertebral implant, in the form of a three-dimensional body **10**, is introduced between two adjacent vertebral bodies by means of a suitable instrument. Longitudinal fixation elements **20**, in the form of bone screws, securing the three-dimensional body **10** are screwed/inserted by means of a suitable aiming device through the boreholes **9** of the front plate **8** into the vertebral bodies. The front plate **8** may be displaced vertically with respect to the three-dimensional body **10**, such that the openings of the boreholes **9a** of the three-dimensional plate **10** and the boreholes **9** of the front plate **8** overlap, to obtain stress shielding. The securing plate **18** is fastened by means of the fastening agent **16** in the form of a screw over the heads **21** of the longitudinal fixation elements **20** at the front plate **8**, so that the heads **21** of the longitudinal fixation elements **20** and, with that, the screws themselves, are captured between the front plate **8** and the securing plate **18** and secured against being shifted relative to the three-dimensional body **10** (for example, by falling out or by turning out). The fastening agent **16**, in the form of a screw, preferably is provided with a thread, which is distinguished by a large self-retardation.

The invention claimed is:

1. An intervertebral implant for insertion into an intervertebral disc space between endplates of adjacent vertebral bodies, the implant comprising:

a three-dimensional body having an upper side and an underside provided with teeth, the upper side and underside suitable for abutting the end plates of the adjacent vertebral bodies, the upper side defining an upper plane and the underside defining an underside plane, a left side surface and a right side surface, a front surface including first and second partial boreholes, a rear surface, a horizontal middle plane between the upper side and the underside, and a vertical middle plane extending from the front surface to the rear surface;

a front plate mounted to the front surface of the three-dimensional body, the front plate including a first borehole and a second borehole having openings, the first borehole and the second borehole each being aligned with a respective first and second partial borehole;

first and second fixation elements being anchorable within the first and second boreholes and the first and second partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; and

a securing plate fastened substantially parallel to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

2. The intervertebral implant according to claim **1**, wherein the securing plate is fastened parallel to the front plate, by at least one of a screw connection, a bayonet catch or a click catch.

3. The intervertebral implant according to claim **1**, wherein the securing plate has a central borehole.

4. The intervertebral implant according to claim **3**, wherein the front plate has a central borehole for accommodating a fastening agent.

GL_SYN0001012

A 72

US 7,846,207 B2

7

**5**. The intervertebral implant according to claim **1**, wherein at least one of the first and second boreholes includes internal threads.

**6**. The intervertebral implant according to claim **5**, wherein the first and second boreholes are tapered conically in the direction of the underside of the three-dimensional body.

**7**. The intervertebral implant according to claim **6**, wherein the first and second boreholes have a conical angle, which is smaller than a resulting angle of friction.

**8**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:3.75 to 1:20.00.

**9**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:5 to 1:15.

**10**. The intervertebral implant according to claim **1**, wherein the front plate is preferably disposed vertically relative to the horizontal middle plane.

**11**. The intervertebral implant according to claim **10**, wherein the front plate is disposed in the three-dimensional body, such that it can be shifted vertically relative to the middle plane.

**12**. The intervertebral implant according to claim **1**, wherein the front plate is constructed of a material, which is different from that of the three-dimensional body and is metallic.

**13**. The intervertebral implant according to claim **1**, wherein the side surfaces are constructed convexly.

**14**. The intervertebral implant according to claim **1**, wherein at least one of the upper side and underside are not planar and are constructed convexly.

**15**. The intervertebral implant according to claim **1**, wherein the partial boreholes of the three-dimensional body do not pass completely through the front surface.

**16**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate diverge when viewed from the front surface.

**17**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 20° to 60° with the horizontal middle plane.

**18**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 10° to 45° with the vertical middle plane.

**19**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists of a reinforced plastic.

**20**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists partly of a material which is transparent to x-rays.

**21**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate have a smooth inner wall, and the first and second heads of the first and second fixation elements include external threads for embedding in the smooth inner walls of the first and second boreholes.

**22**. The intervertebral implant according to claim **1**, wherein the three-dimensional body is constructed as a hollow body and includes casing surfaces which are provided with perforations.

**23**. The intervertebral implant according to claim **1**, wherein the first and second heads are in contact with the securing plate in the assembled configuration.

**24**. The intervertebral implant according to claim **23**, wherein each of the first and second fixation elements include an axis, the axes of the first and second fixation elements intersect the horizontal middle plane of the three-dimensional body.

8

**25**. The intervertebral implant according to claim **1**, wherein the first fixation element pierces the upper side and the second fixation element pierces the underside.

**26**. The intervertebral implant according to claim **1**, wherein the first and second boreholes include internal threads and the first and second heads of the first and second fixation elements are provided with an external thread, which is threadably matable with the internal threads of the first and second boreholes.

**27**. The intervertebral implant according to claim **1**, wherein the first and second heads taper conically toward the first and second shafts, respectively.

**28**. The intervertebral implant according to claim **1**, wherein the first fixation element passes through the upper side and the second fixation element passes through the underside.

**29**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as bone screws, the first and second shafts including a thread capable of self-drilling and self-cutting.

**30**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as a threadless cylindrical pins with a drill tip.

**31**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as spiral springs.

**32**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as single-vaned or multi-vaned spiral blades.

**33**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a load thread angle of 11° to 14°.

**34**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a pitch angle ranging from 6° to 10°.

**35**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 36° to 48, with the horizontal middle plane.

**36**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 27° to 33° with the vertical middle plane.

**37**. The intervertebral implant according to claim **1**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**38**. A method for implanting an intervertebral implant between first and second adjacent vertebral bodies, said method comprising the steps of:

(a) introducing the intervertebral implant between the first and second adjacent vertebral bodies, the implant comprising:

a three-dimensional body having first and second partial boreholes extending through a front surface, an upper side and an underside including teeth, the upper side defining an upper plane and the underside defining an underside plane, and

a front plate having first and second boreholes which are aligned with the first and second partial boreholes, respectively, the first and second boreholes and first and second partial boreholes being positioned substantially between the upper and underside planes;

(b) attaching a first fixation element having a first head portion and a first shaft portion through the first borehole of the front plate, through the first partial borehole of the three-dimensional body, and into the first vertebral body;

GL_SYN0001013

US 7,846,207 B2

9

(c) attaching a second fixation element having a second head portion and a second shaft portion through the second borehole of the front plate, through the second partial borehole of the three-dimensional body, and into the second vertebral body; and

(d) attaching a securing plate with a fastening agent over the first and second head portions of the first and second fixation elements to the front plate, such that the first and second head portions of the first and second fixation elements are captured between the front plate and the securing plate wherein the first and second fixation elements are secured against being shifted relative to the intervertebral implant.

**39**. The method according to claim **38**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**40**. An intervertebral implant for mounting between adjacent vertebral bodies including a first vertebral body and a second vertebral body, the intervertebral implant comprising:

a body defining a horizontal middle plane, the body having an upper side including teeth for abutting the first vertebral body and an underside having teeth for abutting the second vertebral body, the upper side defining an upper plane and the underside defining an underside plane, the body further including a front surface having first and second partial boreholes;

a front plate mounted to the front surface of the body, the front plate including a first borehole and a second borehole, the first and second boreholes aligning with the first and second partial boreholes, respectively, and extending through the front plate at an angle ranging from about twenty degrees (20°) to about sixty degrees (60°) relative to the horizontal middle plane;

a first fixation element having a first head portion and a first shaft portion, the first head portion positioned in the first borehole and the first partial borehole and positioned between the upper and underside planes in an assembled configuration, the first shaft portion sized and configured to engage the first vertebral body;

a second fixation element having a second head portion and a second shaft portion, the second head portion positioned in the second borehole and the second partial borehole and positioned between the upper and under-

10

side planes in the assembled configuration, the second shaft portion sized and configured to engage the second vertebral body; and

a securing plate fastened to the front plate to at least partly cover the first and second head portions and prevent the first and second fixation elements from moving out of the first and second boreholes, respectively.

**41**. The intervertebral implant according to claim **40**, wherein the front surface of the body includes a recess for receiving the front plate.

**42**. An intervertebral implant for insertion into an intervertebral disc space between endplates of first and second vertebral bodies, the implant comprising:

a body portion including a left side surface, a right side surface, a front surface having first and second partial boreholes, a rear surface, an upper side having teeth suitable for abutting the end plate of the first vertebral body, the upper side defining an upper plane, an underside having teeth suitable for abutting the end plate of the second adjacent vertebral body, the underside defining an underside plane;

a front plate operatively coupled to the front surface of the body, the front plate including a first borehole and a second borehole having respective openings, the first and second boreholes being aligned with the first and second partial boreholes, respectively;

first and second fixation elements being anchorable within the first and second boreholes and partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; the implant further comprising a securing plate operatively connectable to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

**43**. The intervertebral implant according to claim **42**, wherein the front plate is received within a recess formed in the body portion.

\* \* \* \* \*

GL_SYN0001014

**A 74**



US007862616B2

(12) **United States Patent**

Lechmann et al.

(10) **Patent No.:** US 7,862,616 B2
(45) **Date of Patent:** *Jan. 4, 2011

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Beat Lechmann**, Bettlach (CH);
**Dominique Burkard**, Gretzenbach
(CH); **Chris M. J. Cain**, Norwood (AU);
**Claude Mathieu**, Zurich (CH)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **12/432,088**

(22) Filed: **Apr. 29, 2009**

(65) **Prior Publication Data**

US 2009/0210064 A1 Aug. 20, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/199,599, filed on
Aug. 8, 2005, which is a continuation of application
No. PCT/CH03/00089, filed on Feb. 6, 2003.

(51) **Int. Cl.**
*A61F 2/44* (2006.01)

(52) **U.S. Cl.** .................................. **623/17.11**; 623/17.16

(58) **Field of Classification Search** ... 623/17.11–17.16;
606/90, 293

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,621,145 A 12/1952 Sano

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2317791 A1 8/1999

(Continued)

OTHER PUBLICATIONS

Office Notice of Reason of Rejection issued by the Japanese Patent
Office.

*Primary Examiner*—Todd E Manahan
*Assistant Examiner*—Lynnsy Schneider
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57) **ABSTRACT**

An intervertebral implant having a three-dimensional body
(10) and a securing plate (1). The three-dimensional body
(10) includes an upper side (1) and an underside (2) which are
suitable for abutting the end plates of two adjacent vertebral
bodies, a left side surface (3) and a right side surface (4), a
front surface (5) and a rear surface (6), a horizontal middle
plane (7) between the upper side (1) and the underside (2), and
a vertical middle plane (12) extending from the front surface
(5) to the rear surface (6). The three-dimensional body further
includes a plurality of boreholes (9a) passing through the
body (10), which are suitable for accommodating longitudi-
nal fixation elements (20). The intervertebral implant also
includes a front plate (8) displaceably disposed as an insert
with the front side (5) of the three-dimensional body, the front
plate (8) having a plurality of boreholes (9) in which the
longitudinal fixation elements (20) can be anchored, and
whose openings overlap with the openings of the boreholes of
the three-dimensional body (10). A securing plate can be
fastened essentially parallel to the front plate (8) at the three-
dimensional body (10) in such a manner that the boreholes of
the front plate (9) are covered at least partly by the securing
plate (18). By virtue of the configuration of the intervertebral
implant, a rigid, firm connection between the intervertebral
implant and the longitudinal fixation elements used to fasten
it, is possible.

**13 Claims, 6 Drawing Sheets**



GL_SYN0001015

**US 7,862,616 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,506 A | 1/1979 | Ulrich | |
| 4,501,269 A | 2/1985 | Bagby | |
| 4,512,038 A | 4/1985 | Alexander et al. | |
| 4,627,853 A | 12/1986 | Campbell et al. | |
| 4,678,470 A | 7/1987 | Nashef et al. | |
| 4,717,115 A | 1/1988 | Schmitz et al. | |
| 4,858,603 A | 8/1989 | Clemow et al. | |
| 4,904,261 A | 2/1990 | Dove et al. | |
| 4,936,851 A | 6/1990 | Fox et al. | |
| 4,950,296 A | 8/1990 | McIntyre | |
| 4,961,740 A | 10/1990 | Ray et al. | |
| 4,978,350 A | 12/1990 | Wagenknecht | 606/312 |
| 4,994,084 A | 2/1991 | Brennan | |
| 5,026,373 A | 6/1991 | Ray et al. | |
| 5,053,049 A | 10/1991 | Campbell | |
| 5,062,850 A | 11/1991 | MacMillan et al. | |
| 5,084,051 A | 1/1992 | Törmälä et al. | |
| 5,112,354 A | 5/1992 | Sires | |
| 5,192,327 A | 3/1993 | Brantigan | |
| 5,211,664 A | 5/1993 | Tepic et al. | |
| 5,281,226 A | 1/1994 | Davydov et al. | |
| 5,284,655 A | 2/1994 | Bogdansky et al. | |
| 5,290,312 A * | 3/1994 | Kojimoto et al. | 623/17.15 |
| 5,298,254 A | 3/1994 | Prewett et al. | |
| 5,314,476 A | 5/1994 | Prewett et al. | |
| 5,348,788 A | 9/1994 | White | |
| 5,397,364 A * | 3/1995 | Kozak et al. | 623/17.11 |
| 5,405,391 A * | 4/1995 | Hednerson et al. | 623/17.15 |
| 5,423,817 A | 6/1995 | Lin | |
| 5,439,684 A | 8/1995 | Prewett et al. | |
| 5,458,638 A | 10/1995 | Kuslich et al. | |
| 5,489,308 A | 2/1996 | Kuslich et al. | |
| 5,507,818 A | 4/1996 | McLaughlin | |
| 5,514,180 A | 5/1996 | Heggeness et al. | |
| 5,522,899 A | 6/1996 | Michelson | |
| 5,534,030 A | 7/1996 | Navarro et al. | |
| 5,549,679 A | 8/1996 | Kuslich | |
| 5,554,191 A | 9/1996 | Lahille et al. | |
| 5,556,430 A | 9/1996 | Gendler | |
| 5,569,308 A | 10/1996 | Sottosanti | |
| 5,571,190 A | 11/1996 | Ulrich et al. | |
| 5,571,192 A | 11/1996 | Schönhöffer | |
| 5,607,474 A | 3/1997 | Athanasiou et al. | |
| 5,609,635 A * | 3/1997 | Michelson | 623/17.16 |
| 5,609,636 A | 3/1997 | Kohrs et al. | |
| 5,609,637 A | 3/1997 | Biedermann et al. | |
| 5,676,699 A | 10/1997 | Gogolewski et al. | |
| 5,683,394 A | 11/1997 | Rinner | |
| 5,683,463 A | 11/1997 | Godefroy et al. | |
| 5,702,449 A | 12/1997 | McKay | |
| 5,702,451 A | 12/1997 | Biedermann et al. | |
| 5,702,453 A | 12/1997 | Rabbe et al. | |
| 5,702,455 A | 12/1997 | Saggar | |
| 5,728,159 A | 3/1998 | Stroever et al. | |
| 5,735,905 A | 4/1998 | Parr | |
| 5,766,253 A | 6/1998 | Brosnahan, III | |
| 5,776,194 A | 7/1998 | Mikol et al. | |
| 5,776,197 A | 7/1998 | Rabbe et al. | |
| 5,776,198 A | 7/1998 | Rabbe et al. | |
| 5,776,199 A | 7/1998 | Michelson | |
| 5,782,915 A | 7/1998 | Stone | |
| 5,785,710 A | 7/1998 | Michelson | |
| 5,800,433 A | 9/1998 | Benzel et al. | 606/61 |
| 5,861,041 A * | 1/1999 | Tienboon | 623/17.16 |
| 5,865,849 A | 2/1999 | Stone | |
| 5,876,452 A | 3/1999 | Athanasiou et al. | |
| 5,885,299 A | 3/1999 | Winslow et al. | |
| 5,888,222 A | 3/1999 | Coates et al. | |
| 5,888,223 A * | 3/1999 | Bray, Jr. | 623/17.16 |
| 5,888,224 A | 3/1999 | Beckers et al. | |
| 5,888,227 A | 3/1999 | Cottle | |
| 5,895,426 A | 4/1999 | Scarborough et al. | |
| 5,899,939 A | 5/1999 | Boyce et al. | |
| 5,902,338 A | 5/1999 | Stone | |
| 5,904,719 A | 5/1999 | Errico et al. | |
| 5,910,315 A | 6/1999 | Stevenson et al. | |
| 5,922,027 A | 7/1999 | Stone | |
| 5,944,755 A | 8/1999 | Stone | |
| 5,968,098 A | 10/1999 | Winslow | |
| 5,972,368 A | 10/1999 | McKay | |
| 5,976,187 A | 11/1999 | Richelsoph | |
| 5,980,522 A | 11/1999 | Koros et al. | |
| 5,981,828 A | 11/1999 | Nelson et al. | |
| 5,984,967 A | 11/1999 | Zdeblick et al. | |
| 5,989,289 A | 11/1999 | Coates et al. | |
| 6,013,853 A | 1/2000 | Athanasiou et al. | |
| 6,025,538 A | 2/2000 | Yaccarino, III | |
| 6,033,405 A | 3/2000 | Winslow et al. | |
| 6,033,438 A | 3/2000 | Bianchi et al. | |
| 6,039,762 A | 3/2000 | McKay | |
| 6,045,579 A | 4/2000 | Hochshuler et al. | |
| 6,045,580 A | 4/2000 | Scarborough et al. | |
| 6,066,175 A * | 5/2000 | Henderson et al. | 623/17.11 |
| 6,080,158 A | 6/2000 | Lin | |
| 6,080,193 A | 6/2000 | Hochshuler et al. | |
| 6,090,998 A | 7/2000 | Grooms et al. | |
| 6,096,080 A * | 8/2000 | Nicholson et al. | 623/17.16 |
| 6,096,081 A | 8/2000 | Grivas et al. | |
| 6,110,482 A | 8/2000 | Khouri et al. | |
| 6,123,731 A | 9/2000 | Boyce et al. | |
| 6,129,763 A | 10/2000 | Chauvin et al. | |
| 6,143,030 A | 11/2000 | Schroder | |
| 6,143,033 A | 11/2000 | Paul et al. | |
| 6,156,070 A | 12/2000 | Incavo et al. | |
| 6,193,756 B1 | 2/2001 | Studer et al. | |
| 6,200,347 B1 | 3/2001 | Anderson et al. | |
| 6,206,922 B1 * | 3/2001 | Zdeblick et al. | 623/17.11 |
| 6,231,610 B1 | 5/2001 | Geisler | |
| 6,235,059 B1 | 5/2001 | Benezech et al. | |
| 6,241,769 B1 | 6/2001 | Nicholson et al. | |
| 6,245,108 B1 | 6/2001 | Biscup | |
| 6,258,125 B1 | 7/2001 | Paul et al. | |
| 6,261,586 B1 | 7/2001 | McKay | |
| 6,264,695 B1 | 7/2001 | Stoy | |
| 6,270,528 B1 | 8/2001 | McKay | |
| 6,306,139 B1 * | 10/2001 | Fuentes | 606/70 |
| 6,342,074 B1 | 1/2002 | Simpson | |
| 6,364,880 B1 | 4/2002 | Michelson | |
| 6,423,063 B1 | 7/2002 | Bonutti | |
| 6,432,106 B1 * | 8/2002 | Fraser | 623/17.11 |
| 6,458,158 B1 | 10/2002 | Anderson et al. | |
| 6,468,311 B2 | 10/2002 | Boyd et al. | |
| 6,558,423 B1 * | 5/2003 | Michelson | 623/17.11 |
| 6,569,201 B2 | 5/2003 | Moumene et al. | |
| 6,576,017 B2 * | 6/2003 | Foley et al. | 623/17.16 |
| 6,629,998 B1 * | 10/2003 | Lin | 623/17.11 |
| 6,638,310 B2 | 10/2003 | Lin et al. | |
| 6,645,212 B2 | 11/2003 | Goldhahn et al. | 606/291 |
| 6,761,739 B2 | 7/2004 | Shepard | |
| 6,972,019 B2 | 12/2005 | Michelson | 623/86 A |
| 6,984,234 B2 | 1/2006 | Bray | 606/69 |
| 7,044,968 B1 * | 5/2006 | Yaccarino et al. | 623/16.11 |
| 7,172,627 B2 | 2/2007 | Fiere et al. | 623/17.11 |
| 7,232,463 B2 * | 6/2007 | Falahee | 623/17.11 |
| 7,232,464 B2 | 6/2007 | Mathieu et al. | 623/17.11 |
| 7,323,011 B2 * | 1/2008 | Shepard et al. | 623/17.11 |
| 7,608,107 B2 * | 10/2009 | Michelson | 623/17.15 |
| 2001/0001129 A1 | 5/2001 | McKay et al. | |
| 2001/0005796 A1 | 6/2001 | Zdeblick et al. | |
| 2001/0010021 A1 | 7/2001 | Boyd et al. | |
| 2001/0016077 A1 | 8/2001 | Biscup | |
| 2001/0031254 A1 | 10/2001 | Bianchi et al. | |
| 2001/0039456 A1 | 11/2001 | Boyer, II et al. | |
| 2001/0041941 A1 | 11/2001 | Boyer, II et al. | |

GL_SYN0001016

A 76

**US 7,862,616 B2**

Page 3

| | | | |
|---|---|---|---|
| 2002/0010511 A1* | 1/2002 | Michelson | 623/17.15 |
| 2002/0022843 A1* | 2/2002 | Michelson | 606/70 |
| 2002/0029084 A1 | 3/2002 | Paul et al. | |
| 2002/0082597 A1* | 6/2002 | Fraser | 606/61 |
| 2002/0082603 A1 | 6/2002 | Dixon et al. | 607/69 |
| 2002/0091447 A1 | 7/2002 | Shimp et al. | |
| 2002/0099376 A1* | 7/2002 | Michelson | 606/61 |
| 2002/0106393 A1 | 8/2002 | Bianchi et al. | |
| 2002/0111680 A1 | 8/2002 | Michelson | |
| 2002/0128712 A1* | 9/2002 | Michelson | 623/17.11 |
| 2002/0147450 A1* | 10/2002 | LeHuec et al. | 606/61 |
| 2002/0169508 A1* | 11/2002 | Songer et al. | 623/17.11 |
| 2002/0193880 A1* | 12/2002 | Fraser | 623/17.11 |
| 2003/0078668 A1 | 4/2003 | Michelson | 623/17.16 |
| 2003/0125739 A1* | 7/2003 | Bagga et al. | 606/61 |
| 2003/0153975 A1* | 8/2003 | Byrd et al. | 623/17.11 |
| 2004/0078078 A1* | 4/2004 | Shepard | 623/17.11 |
| 2004/0210314 A1 | 10/2004 | Michelson | |
| 2004/0254644 A1* | 12/2004 | Taylor | 623/17.13 |
| 2005/0033433 A1 | 2/2005 | Michelson | |
| 2005/0101960 A1* | 5/2005 | Fiere et al. | 606/72 |
| 2005/0159813 A1* | 7/2005 | Molz | 623/17.11 |
| 2007/0219635 A1* | 9/2007 | Mathieu et al. | 623/17.16 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 42 42 889 A1 | 6/1944 |
| DE | 30 42 003 A1 | 7/1982 |
| DE | 39 33 459 A1 | 4/1991 |
| DE | 44 09 392 A1 | 9/1995 |
| DE | 195 04 867 C1 | 2/1996 |
| DE | 299 13 200 U1 | 9/1999 |
| EP | 0505634 A1 | 9/1992 |
| EP | 0517030 A2 | 12/1992 |
| EP | 0577178 A1 | 1/1994 |
| EP | 0639351 A2 | 2/1995 |
| EP | 05056341 B1 | 8/1997 |
| EP | 0966930 | 12/1999 |
| EP | 0968692 A1 | 1/2000 |
| EP | 0906065 B1 | 1/2004 |

| | | |
|---|---|---|
| FR | 2 697 996 | 5/1994 |
| FR | 2 700 947 | 8/1994 |
| FR | 2 753 368 | 3/1998 |
| GB | 2 148 122 A | 5/1985 |
| SU | 1465040 A1 | 3/1989 |
| WO | WO 88/03417 | 5/1988 |
| WO | WO 88/10100 | 12/1988 |
| WO | WO 92/01428 | 2/1992 |
| WO | WO 95/21053 | 8/1995 |
| WO | WO 96/39988 | 12/1996 |
| WO | WO 97/20526 | 6/1997 |
| WO | WO 97/25941 | 7/1997 |
| WO | WO 97/25945 | 7/1997 |
| WO | WO 97/39693 | 10/1997 |
| WO | WO 98/17209 | 4/1998 |
| WO | WO 98/55052 | 12/1998 |
| WO | WO 98/56319 | 12/1998 |
| WO | WO 98/56433 | 12/1998 |
| WO | WO 99/29271 | 6/1999 |
| WO | WO 99/32055 | 7/1999 |
| WO | WO 99/38461 | 8/1999 |
| WO | WO 99/38963 | 8/1999 |
| WO | WO 99/56675 | 11/1999 |
| WO | WO 99/63914 | 12/1999 |
| WO | WO 00/07527 | 2/2000 |
| WO | WO 00/07528 | 2/2000 |
| WO | WO 00/30568 | 6/2000 |
| WO | WO 00/40177 | 7/2000 |
| WO | WO 00/41654 | 7/2000 |
| WO | WO 00/59412 | 10/2000 |
| WO | WO 00/66044 A1 | 11/2000 |
| WO | WO 00/66045 A1 | 11/2000 |
| WO | WO 00/74607 A1 | 12/2000 |
| WO | WO 01/08611 | 2/2001 |
| WO | WO 01/56497 A2 | 8/2001 |
| WO | WO 01/93742 A2 | 12/2001 |
| WO | WO 01/95837 A1 | 12/2001 |

* cited by examiner

GL_SYN0001017

**A 77**



Fig. 1

GL_SYN0001018

**A 78**



Fig. 2

GL_SYN0001019

**A 79**



**Fig. 3**

GL_SYN0001020

**A 80**



Fig. 4

GL_SYN0001021



Fig. 5          Fig. 6

GL_SYN0001022

**A 82**

Case: 14-1483    Document: 38    Page: 162    Filed: 12/17/2014



**Fig. 7**

GL_SYN0001023

**A 83**

US 7,862,616 B2

1

# INTERVERTEBRAL IMPLANT

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 11/199,599, filed Aug. 8, 2005, which is a continuation of International Patent Application No. PCT/CH2003/000089, filed Feb. 6, 2003, the entire contents of which are expressly incorporated herein by reference thereto.

## TECHNICAL FIELD

The present invention relates generally to intervertebral implants.

## BACKGROUND OF THE INVENTION

GB-A-2 207 607 discloses an intervertebral implant, which has a horseshoe-shaped configuration with a plurality of cylindrical holes. The holes are smooth on the inside and only have a stop for the heads of the bone screws, which are to be introduced therein. A disadvantage of this arrangement is that the fastening screws, introduced therein, can be anchored only with their shaft in the bone. This does not result in a rigid connection with the horseshoe-shaped intervertebral implant. When the anchoring of the screw shaft in the bone is weakened, the intervertebral implant becomes movable with respect to the screw and the bone screws tend to migrate, endangering the blood vessels. Moreover, the loosening of the intervertebral implant can lead to a pseudoarthrosis.

U.S. Patent Publication US-A 2000/0010511 (Michelson) discloses an intervertebral implant, which, at its front surface, has two boreholes with an internal thread, into which bone screws with a threaded head can be introduced. A disadvantage of this implant is that the bone screws can become loose and are not secured against being screwed out or falling out. A further disadvantage is that the bone screws are fastened completely to the implant body itself and that therefore the latter experiences a relatively large stress.

Screws which emerge at the anterior or anterolateral edge of the vertebral body because of loosening run the risk of injuring main vessels such as the aorta and Vena calva, as well as supply vessels such as lumbar arteries and veins. Injury to these main vessels may result in internal bleeding possibly causing death within a very short time. Loosening of screws is more likely when they are not mounted angularly firmly.

## SUMMARY OF THE INVENTION

The present invention is to provide a remedy for the above-discussed disadvantages. The present invention is directed to an intervertebral implant which can enter into a permanent, rigid connection with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means. Moreover, over a separately constructed front plate, there is tension chording for the bone fixation elements, so that the implant body experiences less stress, that is, superimposed tensions. Moreover, a securing plate enables all bone fixation elements to be secured simultaneously.

The present invention accomplishes the objective set out above with an intervertebral implant, comprising a three-dimensional body having an upper side and an under side which are suitable for abutting the end plates of two adjacent vertebral bodies. The three-dimensional body further includes a left side surface and a right side surface, a front

2

surface and a rear surface, a horizontal middle plane between the upper side and the under side, and a vertical middle plane extending from the front surface to the rear surface. The three-dimensional body further comprising a plurality of boreholes, having openings at least at or near the front surface, passing there through and being suitable for accommodating longitudinal fixation elements. The intervertebral implant further including a front plate displaceably disposed as an insert with the front side of the three-dimensional body, where the front plate includes a plurality of boreholes having openings and in which the longitudinal fixation elements can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body. The intervertebral implant has a securing plate fastened substantially parallel to the front plate in such a manner that the boreholes of the front plate are covered at least partly by the securing plate. An advantage achieved by the present invention, arises essentially from the solid connection between the intervertebral implant and the longitudinal fixation elements, used to fasten it.

Compared to the two-part implants of the state of the art, for which a front plate is implanted in a separate step, the present invention has the advantage that the implantation of the intervertebral implant may be carried out in one step and, with that, can be carried out more easily and more quickly. A further advantage is that the intervertebral implant is fixed as frontally as possible at the body of the vertebra. That is, at a place where good bone material usually is present. The result is an anterior movement limitation without a greater risk to the surrounding structures. The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements).

A method for implanting an intervertebral implant of the present invention between two adjacent vertebral bodies includes introducing the intervertebral implant, having a three-dimensional body, a front plate, and one or more boreholes, between two adjacent vertebral bodies, attaching longitudinal fixation elements with heads through the boreholes into the vertebral bodies, and attaching a securing plate by means of a fastening agent over the heads of the longitudinal fixation elements to the front plate, such that the heads of the longitudinal fixation elements are captured between the front plate and the securing plate wherein the longitudinal fixation elements are secured against being shifted relative to the intervertebral implant.

Other objectives and advantages in addition to those discussed above will become apparent to those skilled in the art during the course of the description of a preferred embodiment of the invention which follows. In the description, reference is made to accompanying drawings, which form a part thereof, and which illustrate an example of the invention. Such example, however, is not exhaustive of the various embodiments of the invention, and therefore, reference is made to the claims that follow the description for determining the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an exploded drawing of the intervertebral implant,

FIG. 2 shows a longitudinal fixation element in the form of a screw,

FIG. 3 shows an elevation of the intervertebral implant of FIG. 1,

FIG. 4 shows a side view of the intervertebral implant of FIG. 1,

GL_SYN0001024

US 7,862,616 B2

3

FIG. **5** shows a three-dimensional detailed representation of the body of the intervertebral implant, which shows the connecting elements to the front plate of FIG. **6**,

FIG. **6** shows a three-dimensional detailed representation of the front plate of the intervertebral implant and the connecting elements to the body of FIG. **5** and

FIG. **7** shows a completely installed intervertebral implant with front plate and securing plate.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The intervertebral implant, shown in FIG. **1-7**, includes a three-dimensional body **10** in the form of a cage with an upper side **1** and an underside **2**, which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface **3** and a right side surface **4**, a front surface **5** and a back surface **6**, a horizontal middle plane **7** located between the upper side **1** and the underside **2**, a vertical middle plane **12** extending from the front surface **5** to the rear surface **6** and four boreholes **9**$a$, which pass through the body **10** and are suitable for accommodating longitudinal fixation elements **20**. The body **10** may be constructed as a hollow body, the mantle surfaces of which are provided with perforations **19**. The upper side **1** and/or under side **2** of the intervertebral implant may preferably be convex in shape, not planar. A convex shape to the upper side **1** and the underside **2** allows for an improved fit with the end plates of the adjacent vertebral bodies by the intervertebral implant. Further, the side surfaces **1-6** of the intervertebral implant may be essentially convex, as well.

As shown in FIG. **7**, the upper side **1** and the underside **2** of the three-dimensional body **10** are provided with structuring in the form of teeth **30**.

At the front surface of the three-dimensional body **10**, a front plate **8** may be mounted, which is disposed perpendicular to the horizontal central plane of the intervertebral implant and through which four boreholes **9** pass and in which the longitudinal fixation elements **20** can be anchored. The front plate **8**, as shown in FIGS. **5** and **6**, is constructed as an insert for the three-dimensional body **10**. The three-dimensional body **10** has a semicircular groove **27** extending parallel to the vertical middle plane **12** at the transitions of the left side surface **3** and the right side surface **4** (FIG. **5**) to the front surface **5**. Correspondingly, the front plate **3** has right and left (FIG. **6**) similarly extending and similarly dimensioned, semicircular rail **28**. As a result, the front plate can be pushed and positioned easily with its two lateral rails **28** into the corresponding grooves **27** of the body **10** during the production of the intervertebral implant.

In one embodiment at least one of the boreholes **9** in the front plate is constructed so that a longitudinal fixation element **20**, accommodated therein, can be connected rigidly with the front plate. A rigid connection may be accomplished, for example, owing to the fact that at least one of the boreholes **9** of the front plate **8** has an internal thread. A corresponding longitudinal fixation element **20**, bone screw, with a threaded end can then be screwed together rigidly with the implant. In an alternative embodiment, the four boreholes **9** in the front plate may have an internal thread **11**, so that longitudinal fixation elements **20** can be connected rigidly with the front plate **8**.

As discussed, the front plate **8** may be disposed, preferably vertically to the horizontal central plane, so that it can be displaced vertically with respect to the three-dimensional body **10**. By these means, "stress shielding" (protection and

4

neutralization of mechanical stresses) is attained, which permits the end plates to be adapted to the intervertebral implant during the healing process.

The intervertebral implant may have a securing plate **18**, which can be fastened by means of a screw connection parallel to the front plate **8** at the front plate **8** in such a manner that the boreholes **9** of the front plate **3** are partly covered by the securing plate **18**. The securing plate **18** may have a central borehole **17** provided, preferably, with an internal thread. Corresponding thereto, the front plate **8** has a central borehole **15** for accommodating fastening means **16**. Preferably, the central borehole **15** has an internal thread **14** for accommodating a fastening means **16** in the form of a screw. The securing plate **18** may also be fastened by a bayonet catch or a click catch. By fastening the securing plate **18** to the front plate **8**, the heads **21** of the longitudinal fixation elements **20** (discussed later) are contacted by the securing plate **18**, so that they are secured against being ejected or screwed out.

Preferably, the boreholes **9**$a$ of the three-dimensional body **10** do not pass either through the left side surface **3** or the right side surface **4** or completely through the front surface **5**. The front surface **5**, preferably, is also not crossed by the boreholes **9**$a$. Further, the horizontal middle plane **7** is not pierced by the boreholes **9**$a$. Only the axes **24** of the longitudinal fixation elements **20**, introduced therein, intersect the horizontal middle plane **7** of the body **10**. As seen from the front surface **5**, the boreholes of the three-dimensional body **10** and the front plate **8** diverge. The axes **24** of the boreholes of the three-dimensional plate **10** and the front plate **8** enclose an angle β ranging from 20° to 60°, specifically from 36° to 48°, and more preferably an angle β of 42° with the horizontal middle plane **7** (FIG. **4**) and an angle α ranging from 10° to 45°, specifically from 27° to 33°, and more preferably an angle α of 30° with the vertical middle plane **12** (FIG. **3**). Thus, better access for introducing the screws is achieved.

In one embodiment, at least one of the boreholes **9** of the front plate **8** may taper conically towards the underside **2**, so that a bone screw, with a corresponding conical head, can be anchored rigidly therein. The conical borehole preferably has a conical angle, which is smaller than the resulting frictional angle. Advisably, the conicity of the conical borehole is 1:3.75 to 1:20.00 and preferably 1:5 to 1:15.

In another configuration, at least two of the boreholes **9** of the front plate **8** extend parallel to each other. This makes insertion of the intervertebral implant easier. In another embodiment, at least two of the boreholes **9** of the front plate **8** diverge when viewed from the front side. By these means, a region of the vertebral body, which has a better bone quality than does the center of the vertebral body, is reached by the bone screws.

To improve the anchoring of the bone screw in a plastic body of the intervertebral implant (discussed later), a metal sleeve with an internal thread (not shown) may be inserted in the boreholes of the front plate and three-dimensional body. The intervertebral implant may also consist only partially of an x-ray transparent plastic and, in the region of the boreholes consist of a metal, such as titanium or a titanium alloy. Improved guidance and anchoring of the bone screws in the intervertebral implant may be achieved. Further, the boreholes **9** may have a smooth internal wall, into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.

Depending on circumstances, two, three, four or more longitudinal fixation elements may be connected rigidly with the intervertebral implant. Preferably, at least one fixation element should pierce the upper side and at least one fixation element the underside of the intervertebral implant. The lon-

GL_SYN0001025

US 7,862,616 B2

5

gitudinal fixation elements 20 may have either a smooth head, so that there will not be a rigid connection with the implant or a threaded, conical or expendable end, so that there will be a rigid connection with the implant. In both cases, however, the longitudinal fixation elements 20 are secured by the securing plate against rotating out, being ejected out or falling out at a later time.

The longitudinal fixation elements 20 are preferably constructed as bone screws. As shown in FIG. 2, the longitudinal fixation elements 20, introduced into the boreholes 9, have a head 21, a tip 22, a shaft 23 and an axis 24. The head 21 may preferably be provided with an external thread 25, which corresponds to the internal thread 11 of the borehole 9, so that the heads 21 can be anchored in the boreholes 9 in a rigid manner. The shaft 23 may be provided with a thread 26, which is self-drilling and self-cutting. The load thread angle of the thread 26 has a range of between 11° to 14°, preferably between 12° and 13°, and more preferably a load thread angle of 12.5°. The pitch angle of the thread may have a range of between 6° and 10°, preferably between 7° and 9°, and more preferably have a pitch angle of 8°. The special pitch angle produces a self-retardation in the thread, thus ensuring that the bone screw will not automatically become loose.

In the case of a second, possibly rigid type of connection, a longitudinal fixation element 20, bone screw, may preferably be used, the head of which tapers conically towards the shaft, the conicity of the head corresponding to the conicity of the borehole of the intervertebral implant. The longitudinal fixation elements may also be constructed as threadless cylindrical pins, which are provided with a drilling tip, preferably in the form of a trocar. A further variation consist therein that the longitudinal fixation elements are constructed as spiral springs. Finally, the longitudinal fixation elements may also be constructed as single-vaned or multi-vaned spiral blades.

As shown in FIG. 7, two longitudinal fixation elements 20 pierce the upper side 1 and two longitudinal fixation elements 20 pierce the underside 2 of the body 10, thereby anchoring the intervertebral implant to the adjacent vertebral bodies.

The intervertebral implant may be produced from any material which is compatible with the body. Preferably, the three-dimensional body 10 may consist of a body-compatible plastic which has not been reinforced and which may be transparent to x-rays. The advantage over fiber-reinforced plastics, which are already known in implant technology, is that no reinforcing fibers are exposed. Such exposure may be disadvantageous clinically. In such a three-dimensional body 10 constructed of a plastic that has not been reinforced, the use bone screws may be preferable. As discussed previously, the external thread of the bone screw(s) may have a load thread angle range of 11° to 14°, and preferably between 12° to 13°. A comparatively slight inclination of the load flank brings about a high clamping force. As a result, radial expansion and the danger of forming cracks in the plastic are reduced. Furthermore, the external thread of the bone screw(s) may preferably have a pitch angle between 6° and 10° and preferably between 7° and 9°.

The front plate 8 may be made from materials different than the three-dimensional body 10. The front plate 8 is preferably made from a metallic material. Titanium or titanium alloys are particularly suitable as metallic materials. The complete tension chord arrangement (front plate and screws) may also be made from implant steel or highly alloyed metallic materials, such as CoCrMo or CoCrMoC. The advantage of titanium lies in that there is good tissue compatibility and the good ingrowing behavior of bones. The advantage of highly alloyed metallic materials lies in their high-strength values, which permit filigree constructions.

6

A brief description of a surgical procedure follows in order to explain the invention further.

The intervertebral implant, in the form of a three-dimensional body 10, is introduced between two adjacent vertebral bodies by means of a suitable instrument. Longitudinal fixation elements 20, in the form of bone screws, securing the three-dimensional body 10 are screwed/inserted by means of a suitable aiming device through the boreholes 9 of the front plate 8 into the vertebral bodies. The front plate 8 may be displaced vertically with respect to the three-dimensional body 10, such that the openings of the boreholes 9a of the three-dimensional plate 10 and the boreholes 9 of the front plate 8 overlap, to obtain stress shielding. The securing plate 18 is fastened by means of the fastening agent 16 in the form of a screw over the heads 21 of the longitudinal fixation elements 20 at the front plate 8, so that the heads 21 of the longitudinal fixation elements 20 and, with that, the screws themselves, are captured between the front plate 8 and the securing plate 18 and secured against being shifted relative to the three-dimensional body 10 (for example, by falling out or by turning out). The fastening agent 16, in the form of a screw, preferably is provided with a thread, which is distinguished by a large self-retardation.

The invention claimed is:

1. An intervertebral implant for implantation between two adjacent vertebral bodies, the implant comprising:

a plurality of bone fixation elements each including a head and a shaft, the shaft having a thread for engaging one of the adjacent vertebra;

a three dimensional body having a left side surface, a right side surface, a front surface, a back surface, an upper side and an underside, the upper side and the underside being sized and configured to contact the one of the two adjacent vertebral bodies, respectively, the three-dimensional body further including at least one partial borehole in communication with the front surface and the upper side of the body and at least one partial borehole in communication with the front surface and the underside of the body;

a plate having an upper surface and a lower surface, the plate contacting the front surface of the three dimensional body, the plate including a plurality of boreholes, at least one of the plurality of boreholes formed in the plate aligning with the at least one partial borehole in communication with the upper side of the body and at least one of the plurality of boreholes formed in the plate aligning with the at least one partial borehole in communication with the underside of the body when the three-dimensional body is coupled to the plate so that one of the plurality of bone fixation elements is insertable through one of the plurality of boreholes formed in the plate, through one of the plurality of partial borehole formed in the three dimensional body and into one of the adjacent vertebral bodies, respectively, wherein the three dimensional body further includes a first height as defined by the upper side and the underside and the plate includes a second height as defined by the upper and lower surfaces of the plate, the first height being substantially equal to the second height so that the three dimensional body and the plate are contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies;

wherein the plate is made from a biocompatible metallic material and the three dimensional body is made from a biocompatible non-metallic material.

GL_SYN0001026

A 86

US 7,862,616 B2

7

**2**. The intervertebral implant of claim **1**, further comprising:

    a semicircular groove extending parallel to a vertical middle plane at transitions of the left and right side surfaces to the front surface.

**3**. The intervertebral implant of claim **1**, wherein the three dimensional body is made from a biocompatible plastic.

**4**. The intervertebral implant of claim **1**, wherein the plurality of bone fixation elements are bone screws and the plurality of boreholes formed in the plate include internal threads, at least a portion of the heads of the bone screws being externally threaded for engaging the internal threads of the plurality of boreholes to anchor the plurality of bone screws to the plurality of boreholes in a rigid manner.

**5**. The intervertebral implant of claim **1**, wherein the three dimensional body includes at least one through hole extending from the upper side to the underside.

**6**. The intervertebral implant of claim **1**, wherein the body includes a horizontal middle plane and a vertical middle plane, the plurality of partial borehole formed in the body comprise four body partial borehole, the plurality of boreholes formed in the plate comprise four plate boreholes and the plurality of bone fixation elements comprise four bone fixation elements, two of the bone fixation elements passing through the upper side of the body and two of the bone fixation elements passing through the underside of the body, the four partial borehole formed in the body and the four boreholes formed in the plate being arranged such that the heads of the four bone fixation elements are located between the upper side and an underside in an assembled configuration.

**7**. The intervertebral implant of claim **6**, wherein the two of bone fixation elements passing through the upper side diverge

8

with respect to one another and the two bone fixation elements passing through the underside diverge with respect to one another.

**8**. The intervertebral implant of claim **1**, wherein the plate may be pushed and placed easily with respect to the front surface of the body.

**9**. The intervertebral implant of claim **1**, further comprising:

    a securing plate fastenable to the plate, the securing plate at least partially covering each of the plurality of boreholes formed in the plate so that, once implanted, the head of the bone fixation elements are located between the plate and the securing plate.

**10**. The intervertebral implant of claim **9**, wherein the plate includes an internally threaded central borehole for receiving a central screw for fastening the securing plate to the plate.

**11**. The intervertebral implant of claim **1**, wherein the body is convex in shape.

**12**. The intervertebral implant of claim **1**, wherein the body includes a horizontal middle plane and a vertical middle plane, the plurality of partial borehole formed in the body and the plurality of boreholes formed in the plate define borehole axes, the borehole axes defining a first angle $\beta$ relative to the horizontal middle plane and a second angle $\alpha$ relative to the vertical middle plane, the first angle ranging from twenty to sixty degrees (20-60°) and the second angle ranging from ten to forty-five degrees (10-45).

**13**. The intervertebral implant of claim **1**, further comprising:

    a securing mechanism operatively engaging the plate, the securing mechanism at least partially covering each of the plurality of boreholes formed in the plate to inhibit the bone fixation elements from falling out.

\* \* \* \* \*

GL_SYN0001027

US007875076B2

(12) **United States Patent**
    Mathieu et al.

(10) **Patent No.:** **US 7,875,076 B2**
(45) **Date of Patent:** *Jan. 25, 2011

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Claude Mathieu**, Zurich (CH);
    **Christopher Marden John Cain**,
    Eastwood (AU)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
    (US)

( * ) Notice: Subject to any disclaimer, the term of this
    patent is extended or adjusted under 35
    U.S.C. 154(b) by 0 days.

    This patent is subject to a terminal dis-
    claimer.

(21) Appl. No.: **12/574,222**

(22) Filed: **Oct. 6, 2009**

(65) **Prior Publication Data**

    US 2010/0094421 A1    Apr. 15, 2010

    **Related U.S. Application Data**

(63) Continuation of application No. 11/751,757, filed on
    May 22, 2007, now Pat. No. 7,618,456, which is a
    continuation of application No. 10/923,534, filed on
    Aug. 19, 2004, now Pat. No. 7,232,464, which is a
    continuation of application No. PCT/CH02/00099,
    filed on Feb. 19, 2002.

(51) **Int. Cl.**
    *A61F 2/44* (2006.01)

(52) **U.S. Cl.** ...................................... **623/17.11**

(58) **Field of Classification Search** .... 623/17.11–17.16
    See application file for complete search history.

(56) **References Cited**

    U.S. PATENT DOCUMENTS

    2002/0082597 A1* 6/2002 Fraser ........................ 606/61

    2005/0033433 A1* 2/2005 Michelson ............... 623/17.11

    OTHER PUBLICATIONS

Co-Pending U.S. Appl. No. 11/199,599—Preliminary Amendment
dated Jan. 9, 2008.
Co-Pending U.S. Appl. No. 11/199,599—Non-Final Office Action
dated Apr. 1, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Interview Summary
including Draft Claim Amendments dated Sep. 24, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Amendment dated Sep. 29,
2009.
Co-Pending U.S. Appl. No. 11/199,599—Final Office Action dated
Dec. 24, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Appeal Brief dated Apr.
15, 2010.

* cited by examiner

*Primary Examiner*—Bruce E Snow
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57) **ABSTRACT**

The intervertebral implant is in the form of a three-dimen-
sional structure (10) comprising (a) a top side (1) and an
underside (2) which are designed to rest against the end plates
of two adjacent vertebras, (b) a left side face (3) and a right
side face (4), (c) a front face (5) and a rear face (6), (d) a
horizontal center plane situated between the top side (1) and
the underside (2), (e) a vertical center plane (8) situated
between the left side face (3) and the right side face (8) and (f)
a plurality of boreholes (9) passing through the implant struc-
ture (10) that are designed to receive longitudinal affixation
elements (20), the axes (19) of said elements intersecting the
horizontal center plane (7). At least one of the boreholes (9) is
designed in a manner that the affixation element (10) received
in it can be rigidly connected to the intervertebral implant.
Said connection is implemented using a thread or by match-
ing conical surfaces.

**16 Claims, 3 Drawing Sheets**





GL_SYN0001028

DTX0003
(C.A.# 1:11cv652-LPS)

A 88



Fig. 1

Fig. 2

GL_SYN0001029

**A 89**



Fig. 3



Fig. 4

GL_SYN0001030

**A 90**



Fig. 5



Fig. 6



Fig. 7

GL_SYN0001031

**A 91**

US 7,875,076 B2

1

## INTERVERTEBRAL IMPLANT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/751,757, now U.S. Pat. No. 7,618,456, filed May 22, 2007, which is a continuation of U.S. patent application Ser. No. 10/923,534, now U.S. Pat. No. 7,232,464, filed Aug. 19, 2004, which is a continuation of International Application No. PCT/CH02/00099, filed Feb. 19, 2002. The entire contents of these applications are expressly incorporated herein by reference thereto.

### FIELD OF THE INVENTION

The present invention relates to an intervertebral implant.

### BACKGROUND OF THE INVENTION

Such an intervertebral implant is known from the British patent document 2,207,607 A which discloses a horseshoe implant structure having a plurality of cylindrical holes. These holes are fitted with inner, smooth surfaces and comprise only one stop for the heads of the bone screws to be inserted into them. This design incurs the drawback that the inserted affixation screws may be anchored into the bone only by their shanks, a rigid connection with the horseshoe shaped intervertebral implant being lacking. As soon as the anchoring of the bone screw in the bone is weakened, the intervertebral implant becomes displaceable relative to the screw and the bone screws may then migrate while endangering the blood vessels. Moreover the loosening of the intervertebral implant may entail pseudoarthrosis.

The above cited state of the art is intended merely to elucidate the background of the present invention but it does imply that the cited state of the art had actually been made public or was publicly known at the time of this application or at the time of its priority.

### BRIEF SUMMARY OF THE INVENTION

The objective of the present invention is palliation. This invention creates an intervertebral implant which is able to rigidly connect to bone affixation means in a manner that even in the event of bone structure weakening, loosening between the intervertebral implant and the bone affixation means shall be precluded.

The above problem is solved in the present invention by an intervertebral implant exhibiting the features of claim 1.

The advantages offered by the present invention substantially are attained by the rigid, that is by the firm connection between the intervertebral implant and the longitudinal affixing elements. Basically two different embodiment modes are available to attain said rigid connection.

In a first embodiment mode, at least one of the boreholes shall be internally threaded. In this case a matching bone screw fitted with a thread head may be rigidly screwed into the implant.

As regards a second embodiment mode, a front plate is mounted at the front surface of the three dimensional (3D) implant structure so as to be configured vertically to the horizontal center plane of the intervertebral implant, said boreholes passing through said front plate and receiving the anchored longitudinal affixation elements. Compared to the state of the art of a two-part implant, wherein a front plate is implanted in a separate operational step, the above design of

2

the present invention offers the advantage that the intervertebral implant shall be implanted in a single step and hence in a simple and quicker manner. The invention offers a further advantage in that the intervertebral implant shall be affixed as frontally to the vertebra as possible, namely at a place where good bone material may be expected to be. As a result anterior displacement is restricted without thereby incurring greater danger to the surrounding structures than when using a state of the art intervertebral implant. The load still is being borne by the compressed vertebral implant, not by the front plate or the affixation screws.

In yet another embodiment mode of the present invention, the front plate is displaceably configured in the 3D implant structure in order that it may move vertically relative to this 3D implant structure. "Stress shielding" is attained in this manner (namely protection from or neutralization of mechanical stresses), and as a result the end plates may gradually match the intervertebral implant during the healing process.

As regards a further embodiment, the front plate is made of a material different from that of the 3D implant structure.

As regards a further embodiment of the present invention, at least one borehole tapers conically towards its underside and as a result a bone screw fitted with a matching conical head may be rigidly anchored in said borehole. Preferably the conical borehole exhibits a cone angle smaller than the resultant angle of friction. Appropriately the borehole's conicity shall be 1:3.75 to 1:20, preferably 1:5 to 1:15.

As regards a further embodiment mode of the present invention, the intervertebral implant side faces shall all be substantially convex.

Appropriately the intervertebral implant's top and/or undersides are not planar but convex. In this manner better matching to the end plates of the adjacent vertebras may be attained.

The boreholes preferably shall not pass through the left and right intervertebral implant side faces. Preferably again no borehole shall run through the front surface.

As regards a further preferred embodiment mode of the present invention, at least two boreholes shall be mutually parallel. This features facilitates inserting the vertebral implant during implantation.

As regards another preferred embodiment mode of the present invention, at least two boreholes shall run in mutually divergent manner as seen from the front side. As a result the bone screws shall move into a vertebral region offering better bone quality than found at the vertebra's center. Appropriately the borehole axes subtend an angle of 25 degrees to 70 degrees, preferably 35 degrees to 55 degrees with the horizontal center plane. This feature offers improved access for screw insertion.

As regards a further embodiment mode of the present invention, the boreholes shall not cross the horizontal center plane.

Depending on circumstance, two, three, four or even more longitudinal affixation elements may rigidly connected to the intervertebral implant; appropriately at least one affixation element shall pass through the top side and at least one affixation element shall pass through the intervertebral implant side.

Preferably the longitudinal affixation elements shall be bone screws comprising a head and a shank, said head preferably being fitted with an external thread that matches the inner thread of the intervertebral implant's borehole. As regards a second appropriate connection, preferably a bone screw shall be used of which the head tapers conically in the

GL_SYN0001032

**A 92**

US 7,875,076 B2

3

direction of the shank, the head's conicity corresponding to that of the intervertebral implant's borehole.

Regarding a further embodiment mode, at least two longitudinal affixation elements pass through the top side and at least two longitudinal affixation elements pass through the underside. In this manner the intervertebral implant is optimally anchored into the adjacent vertebras.

Preferably the screw-shaped longitudinal affixation elements exhibit a self-boring and self-tapping external thread. The longitudinal affixation elements also may be designed as unthreaded cylindrical pins fitted with a boring tip, preferably in the form of a trocar.

In another embodiment variation, the longitudinal affixation elements are spiral springs; lastly said longitudinal affixation elements also may be designed as single or multiwing spiral blades.

In a further embodiment mode of the present invention, the longitudinal affixation element tip may be anchored in the structure of the intervertebral implant, as a result of which the head of the longitudinal affixation element may be anchored in the adjacent vertebra.

In a further embodiment mode of the present invention, the longitudinal affixation element head exhibits a widened diameter; also a support disk is provided for said head to rest against the vertebra.

The intervertebral implant may be made of any physiologically compatible material, though appropriately the implant structure shall consist of a physiologically compatible plastic, preferably an unreinforced plastic. The advantage offered by the invention over the already known, fiber-reinforced plastics used in implantology is that no reinforcing fibers will be bared—an eventuality that would be clinically disadvantageous. Appropriately bone screws consisting of non-reinforced plastic of which the external threads exhibit load bevels of 11 degrees to 14 degrees, preferably 12 degrees to 13 degrees, may be used in such an implant structure. The relatively small slope of the load bevel implements high clamping forces, as a result of which radial elongation and danger of cracking of the plastic are reduced. Appropriately the bone screws' external thread exhibits the bones at an angular pitch of 6 degrees to 10 degrees, preferably 7 degrees to 9 degrees. This particular angular pitch produces thread self-locking and prevents the bone screw from loosening on its own.

The borehole may be in the form of a metal bush fitted with an inner thread for the purpose of improving anchoring the bone screw in the plastic implant structure. The intervertebral implant also may consist partly of plastic and, in the borehole zones, of metal. This design offers improved guidance and anchoring of the bone screw in the intervertebral implant.

As regards a further preferred embodiment mode, the inside borehole walls are smooth, the thread head of a metallic, longitudinal affixation element cutting or tapping into said smooth wall.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The present invention and further embodiment modes of it are elucidated below in relation to the partly schematic representation of two illustrative embodiments.

FIG. 1 is a perspective view including a partial section of the intervertebral implant with inserted bone screws,

FIG. 2 is a front view of the intervertebral implant of FIG. 1,

FIG. 3 is a side view of the intervertebral implant of FIG. 1,

FIG. 4 is a top view of the intervertebral implant of FIG. 1,

4

FIG. 5 is a front view of the intervertebral implant with a front insert, in partial section,

FIG. 6 is a vertical, longitudinal section of the intervertebral implant of FIG. 5, and

FIG. 7 is a horizontal cross-section of the intervertebral implant of FIG. 5.

DETAILED DESCRIPTION OF THE INVENTION

The intervertebral implant of FIGS. 1 through 4 consists of a 3D structure 10 exhibiting both a convex top side 1 and a convex underside 2, the two sides each being designed to rest against the end plates of two adjacent vertebras. To attain improved anchoring, the top side 1 and the underside 2 may be topographically shaped and be fitted with grooves, ribs or teeth, or their surfaces may be merely roughened.

The 3D implant structure 10 moreover comprises a left side face 3 and a right side face 4, also a front face 5 and a rear face 6. The implant structure 10 also may be hollow and its outer surface may comprise perforations.

The implant structure 10 comprises a plurality of boreholes 9 passing through it and receiving longitudinal affixation elements 20. Preferably four such boreholes 9 shall be provided.

At least one of the boreholes 9 is designed in a way that the longitudinal affixation element 20 received therein may be rigidly connected to the intervertebral implant. The boreholes 9 are conical for that purpose.

Preferably the affixation elements 20 are bone screws having a head 21 and a tip 22. The head 21 conically tapers toward the shank 23, the shank 23's conicity corresponding to the conicity of the borehole 9. Moreover the four boreholes 9 may be fitted with inner threads 11.

As regards the embodiment variation shown in FIGS. 5 through 7, the 3D structure 10 is fitted at its front face 5 with a preferably metallic insert 8 into which the affixation elements 20 may be anchored. The insert 8 is mounted in vertically displaceable manner in the 3D structure 10.

While the invention has been shown and described herein with reference to particular embodiments, it is to be understood that the various additions, substitutions, or modifications of form, structure, arrangement, proportions, materials, and components and otherwise, used in the practice and which are particularly adapted to specific environments and operative requirements, may be made to the described embodiments without departing from the spirit and scope of the present invention. Accordingly, it should be understood that the embodiments disclosed herein are merely illustrative of the principles of the invention. Various other modifications may be made by those skilled in the art which will embody the principles of the invention and fall within the spirit and the scope thereof.

We claim:

1. An intervertebral implant for insertion between an upper vertebra having an upper endplate and a lower vertebra having a lower endplate, the implant comprising:

a body having a first lateral side surface, a second lateral side surface, a posterior face, an anterior face, an upper surface and a lower surface, the upper and lower surfaces being sized and configured to contact the upper and lower endplates, respectively, of the upper and lower vertebrae, the upper surface defining an upper plane and the lower surface defining a lower plane;

a plate operatively coupled to the body, the plate having a plate top surface located generally on the upper plane and a plate lower surface located generally on the lower plane when the plate is coupled to the body so that the

GL_SYN0001033

A 93

US 7,875,076 B2

5

body has a first height extending between the upper surface and the lower surface and the plate has a second height extending between the plate top surface and the plate lower surface, the second height being generally equal to the first height, first and second boreholes passing through the plate, the first and second boreholes positioned between the upper and lower planes; and

first and second bone screws each having a head and a shank, the first bone screw being sized and configured to extend through the first borehole and into the upper endplate, the second bone screw being sized and configured to extend through the second borehole and into the lower endplate to anchor the intervertebral implant to the upper and lower vertebrae and the heads of the first and second bone screws positioned between the upper and lower planes.

**2**. The implant of claim **1**, wherein the implant includes a plurality of teeth.

**3**. The implant of claim **1**, wherein the plate contacts the anterior face of the body.

**4**. The implant of claim **3**, wherein the anterior face of the body includes a recess for receiving the plate.

**5**. The implant of claim **1**, wherein the plate is entirely contained between the endplates of the upper and lower vertebrae when the implant is inserted between the upper and lower vertebrae.

**6**. The implant of claim **1**, wherein the body and the plate are pre-assembled so that the body and the plate are inserted between the upper and lower vertebrae as a single unit.

**7**. The implant of claim **1**, wherein the implant includes a vertical center plane, the first and second fasteners being laterally divergent from the vertical center plane.

**8**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the plate is disposed substantially perpendicular to the horizontal center plane.

6

**9**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the plate is displaceable in a direction substantially perpendicular to the horizontal center plane.

**10**. The implant of claim **1**, wherein the body is formed from a first biocompatible material and the plate is formed from a second biocompatible material, the second biocompatible material being different than the first biocompatible material.

**11**. The implant of claim **10**, wherein the plate is made from a biocompatible metal and the body is made from a biocompatible plastic.

**12**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the first and second fastener holes have an axis angled from about twenty-five degrees (25°) to about seventy degrees (70°) with respect to the horizontal center plane.

**13**. The implant of claim **12**, wherein the axis is angled from about thirty-five degrees (35°) to about fifty-five degrees (55°) with respect to the horizontal center plane.

**14**. The implant of claim **1**, wherein the plate is slidably displaceable with respect to the body.

**15**. The implant of claim **1**, wherein the first and second fasteners are bone screws and wherein the first and second fastener holes formed in the plate are internally threaded and the heads of the bone screws are externally threaded for engaging the internally threaded holes.

**16**. The implant of claim **1**, wherein the plate further comprises a horizontal center midplane, the head of the first fastener being located between the top surface of the plate and the horizontal center midplane and the head of the second fastener being located between the bottom surface of the plate and the horizontal center midplane.

\*    \*    \*    \*    \*

GL_SYN0001034

## CERTIFICATE OF SERVICE

I hereby certify pursuant to Fed. R. App. P. 25 (d)(1)(B), the foregoing *Non-Confidential Brief for Defendant-Appellant* was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on this 17th day of December, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system on the following:

MATTHEW J. BECKER
EDWARD M. MATHIAS
TARA RYAN RAHEMBA
*Axinn, Veltrop & Harkrider LLP*
*90 State House Square, 9th Floor*
*Hartford, CT 06103*
*(860) 275-8177*
*mbecker@axinn.com*
*etmathias@axinn.com*
*trahemba@axinn.com*

AARON JEFFREY FEIGENHBAUM
*Axinn, Veltrop & Harkrider LLP*
*114 West 47th Street, 24th Floor*
*New York, NY 10036*
*(212) 728-2224*
*afeigenbaum@axinn.com*

Dated:  DECEMBER 17, 2014

*/s/ Steffen N. Johnson*
STEFFEN N. JOHNSON
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*sjohnson@winston.com*

*Counsel for Defendant-Appellant*
*Globus Medical, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Steffen N. Johnson, counsel for Defendant-Appellant, certify pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b) that this brief contains 14,000 words, as counted by Microsoft Word 2010. The text of the brief and footnotes are in 14-point Times New Roman font.


Dated:  December 17, 2014            */s/ Steffen N. Johnson*
                                     STEFFEN N. JOHNSON
                                     *Winston & Strawn LLP*
                                     *1700 K Street, N.W.*
                                     *Washington, DC 20006*
                                     *(202) 282-5000*
                                     *sjohnson@winston.com*

                                     *Counsel for Defendant-Appellant*
                                     *Globus Medical, Inc.*